1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
2                       DEL RIO DIVISION

3

4

UNITED STATES OF AMERICA    )
5                         )
                         )    DR-10-CR-361(02) AM
6  VS.                   )
                         )    DEL RIO, TEXAS
7                         )    MARCH 15, 2011
  LUIS ROEL CASTANEDA       )
8

9

10

11

12  _____

13                 **TRIAL ON THE MERITS**

14         **BEFORE THE HONORABLE ALIA MOSES**
           **UNITED STATES DISTRICT JUDGE**

15                    **Volume 3**

16

17  _____

18

19

20

21

22

23

24  Proceedings reported by stenotype, transcript produced by

25  computer-aided transcription.

1              **A P P E A R A N C E S**

2   FOR THE UNITED STATES OF AMERICA:
            UNITED STATES ATTORNEY'S OFFICE
3           MARTON GYIRES
                -AND-
4           MICHAEL GALDO
            Assistant U.S. Attorney
5           Third Floor, U.S. Courthouse
            111 East Broadway
6           Suite 300
            Del Rio, Texas  78840

7

8

9   FOR THE DEFENDANT:
            RALPH R. MARTINEZ
            MARTINEZ & MARTINEZ
10          2900 Woodridge Drive
            Suite 306
11          Houston, Texas  77087

12

13

14  FEDERAL INTERPRETER:
            ENRIQUE NORIEGA
            United States District Court
15          Western District of Texas
            111 E. Broadway
16          Del Rio, Texas  78849

17

18  OFFICIAL COURT REPORTER:
            ANNA RENKEN LAFRENZ, CSR, RPR
19          United States District Court
            Western District of Texas
20          111 E. Broadway
            Suite 214
21          Del Rio, Texas  78840

22

23

24

25

**I N D E X**

|  | PAGE |
|---|---|
| JURY SWORN | 183 |
| PRELIMINARY JURY INSTRUCTIONS | 183 |
| OPENING STATEMENT BY MR. GALDO | 193 |
| OPENING STATEMENT BY MR. MARTINEZ | 198 |

GOVERNMENT WITNESSES
ESTEBAN LUNA
Direct Examination by Mr. Gyires                202
Cross Examination by Mr. Martinez               218

ROGER DIXON
Direct Examination by Mr. Galdo                 220
Cross Examination by Mr. Martinez               235

STIPULATON OF PARTIES READ INTO RECORD          238

AURELIO CORTINAS
Direct Examination by Mr. Gyires                240


**E X H I B I T S**

| GOVERNMENT EXHIBIT | IDENTIFIED | ADMITTED |
|---|---|---|
| 1 | 217, 238, 239 | preadmitted |
| 2 | 238, 239 | preadmitted |
| 5 | 221 | preadmitted |
| 6 | 242 | preadmitted |
| 8 | 213, 232 | preadmitted |
| 9 | 213 | preadmitted |

**E X H I B I T S**

| GOVERNMENT EXHIBIT | IDENTIFIED | ADMITTED |
|---|---|---|
| 11 | 203, 242 | preadmitted |
| 12 | 204, 208, 222 | preadmtited |
| 14 | 209 | preadmitted |
| 18 | 211 | preadmitted |
| 22 | 214 | preadmitted |
| 24 | 214 | preadmitted |
| 26 | 215 | preadmitted |
| 27 | 215 | preadmitted |
| 29 | 216 | preadmitted |
| 31 | 223, 244 | preadmitted |
| 32 | 244 | preadmitted |
| 35 | 244 | preadmitted |
| 36 | 243 | preadmitted |
| 37 | 230 | preadmitted |
| 39 | 230, 243 | preadmitted |
| 45 | 231 | preadmitted |
| 64 | 248 | preadmitted |
| 65 | 249 | preadmitted |
| 68 | 259 | preadmitted |
| 80 | 232 | 235 |
| 81 | 271 | 272 |

| | |
|---|---|
| 1 | **(MARCH 15, 2011, OPEN COURT.)** |
| 2 | THE COURT:  We are on the record in DR-10-CR-361; |
| 3 | United States of America vs. Defendant Number 2, Luis Roel |
| 4 | Castaneda.  Let me go ahead and have announcements again. |
| 03:43 5 | MR. GYIRES:  Marton Gyires and Michael Galdo for the |
| 6 | United States.  The government is ready. |
| 7 | MR. MARTINEZ:  Your Honor, Ralph Martinez for Mr. |
| 8 | Castaneda.  The defense is ready. |
| 9 | THE COURT:  Okay.  All right.  The jury is back; is |
| 03:43 10 | that correct? |
| 11 | COURT SECURITY OFFICER:  Yes. |
| 12 | THE COURT:  All right.  Let's bring them in. |
| 13 | (JURY IN.) |
| 14 | THE COURT:  Go ahead. |
| 03:44 15 | COURTROOM DEPUTY:  Please raise your right hand. |
| 16 | (OATH ADMINISTERED.) |
| 17 | THE COURT:  The first row? |
| 18 | JURY PANEL:  Yes.  Yes.  Yes.  Yes.  Yes.  Yes.  Yes. |
| 19 | THE COURT:  Okay.  The second row? |
| 03:44 20 | JURY PANEL:  Yes.  Yes.  Yes.  Yes.  Yes.  Yes. |
| 21 | THE COURT:  Okay.  Everybody has answered.  Okay. |
| 22 | Let me begin by -- you may be seated.  Let me begin by giving |
| 23 | you some preliminary instructions: |
| 24 | Members of the jury, you are now the jury in the case, and |
| 03:45 25 | I want to take a few minutes to tell you something about your |

1    duty as jurors and to give you some instructions.  At the end

2    of the trial I will give you more detailed instructions.  You

3    must follow all of my instructions in doing your job as jurors.

4         This criminal case has been brought by the United States

03:45  5    government.  I may sometimes refer to the government as the

6    prosecution.  The government is represented at this trial by

7    Assistant United States Attorneys Marton Gyires and Michael

8    Galdo.  The Defendant Luis Roel Castaneda is represented by his

9    attorney Rafael Martinez.

03:45  10   The defendant has been charged by the government with

11   criminal violations of federal law, that is, conspiracy to

12   import into the United States from Mexico five kilograms or

13   more of a mixture or substance containing a detectable amount

14   of cocaine and the conspiracy to possess with intent to

03:45  15   distribute five kilograms or more of a mixture or substance

16   containing a detectible amount of cocaine.

17        The charges against the defendant are contained in the

18   indictment.  The indictment is simply the description of the

19   charges made by the government against the defendant; but it is

03:46  20   not evidence that the defendant committed any crime.  The

21   defendant pleaded not guilty to the charges.  A defendant is

22   presumed innocent and may not be found guilty by you unless all

23   12 of you unanimously find that the government has proved the

24   defendant's guilt beyond a reasonable doubt.

03:46  25        The first step in the trial will be the opening

1    statements.  The government in its opening statement will tell

2    you about the evidence which it intends to put before you so

3    that you will have an idea of what the government's case is

4    going to be.

03:46  5        Just as the indictment is not evidence, neither is the

6    opening statement evidence.  Its purpose is only to help you

7    understand what the evidence will be and what the government

8    will try to prove.

9        After the government's opening statement the defendant's

03:46 10    attorney may make an opening statement.  At this point in the

11    trial no evidence has been offered by either side.  Next the

12    government will offer evidence that it claims will support the

13    charges against the defendant.  The government's evidence may

14    consist of the testimony of witnesses as well as documents and

03:46 15    exhibits.

16        Some of you have probably heard the term "circumstantial

17    evidence" and "direct evidence."  Do not be concerned with

18    these terms.  You are to consider all of the evidence given in

19    this trial.

03:47 20        After the government's evidence the defendant's attorney

21    may present evidence on the defendant's behalf; but he is not

22    required to do so.  I remind you that the defendant is presumed

23    innocent and that the government must prove the defendant's

24    guilt beyond a reasonable doubt.  The defendant does not have

03:47 25    to prove his sentence.  If the defendant decides to present

1    evidence however, the government may introduce rebuttal

2    evidence.

3        After you have heard all of the evidence on both sides the

4    government and the defense will each be given time for their

03:47  5    final arguments.  I just told you that the opening statements

6    by the lawyers are not evidence.  The same applies to closing

7    arguments.  They are not evidence either; but you should pay

8    close attention to them.

9        The final part of the trial occurs when I instruct you

03:47  10    about the rules of law which you are to use in reaching your

11    verdicts.  After hearing my instructions you will leave the

12    courtroom together to make your decisions.  Your deliberations

13    will be secret.  You will never have to explain your verdicts

14    to anyone.

03:48  15    Now that I have described the trial itself, let me explain

16    the jobs that you and I are to perform during the trial.  I

17    will decide which rules of law apply to this conveys in

18    response to questions or objections raised by the attorneys as

19    we go along and also in the final instructions given to you

03:48  20    after the evidence and arguments are completed.

21        You must follow the law as I explain it to you, whether

22    you agree with it or not.  You and you alone are the judges of

23    the facts; therefore, you should give careful attention to the

24    testimony and exhibits, because based upon this evidence you

03:48  25    will decide whether the government has proved beyond a

1    reasonable doubt that the defendant has committed the crimes

2    charged in the indictment.  You must base your decisions only

3    on the evidence in the case and my instructions about the law.

4    You will have the exhibits with you when you deliberate.

03:48   5    It will be up to you to decide which witnesses to believe,

6    which witnesses not to believe and how much of any witness's

7    testimony to accept or reject.  I will give you some guidelines

8    for determining the credibility of the witnesses at the end of

9    the case.

03:49  10    You may not take notes during the course of the trial.

11   There are several reasons for this.  It is difficult to take

12   notes and at the same time pay attention to what a witness is

13   saying.  Furthermore, in a group the size of yours certain

14   persons will take better notes than others, and there is the

03:49  15   risk that the jurors who take good notes will depend upon the

16   jurors -- excuse me -- the jurors who do not take good notes

17   will depend upon the jurors who do take good notes.  The jury

18   system depends upon all 12 jurors paying close attention and

19   arriving at a unanimous decision.  I believe that the jury

03:49  20   system works better when the jurors do not take notes.

21   You will note that we do have an official court reporter

22   making a record of the trial.  However, we will not have

23   typewritten transcripts of this record available for your use

24   in reaching your decisions in this case.

03:49  25   I'm having trouble speaking today.  Excuse me.

1          The defendant is charged with conspiracy to import into

2     the United States from Mexico five kilograms or more of a

3     mixture or substance containing a detectible amount of cocaine

4     in Count One.  In Count Two the defendant is charged with

03:50  5     conspiracy to possess with intent to distribute five kilograms

6     or more of a mixture or substance containing a detectible

7     amount of cocaine.

8          I will give you detailed instructions on the law at the

9     end of the case and those instructions will control your

03:50  10     deliberations and your decisions; but in order to help you

11     follow the evidence I will now give you a brief summary of the

12     elements of the offenses which the government must prove to

13     make its case.

14          A "conspiracy" is an agreement between two or more persons

03:50  15     joined together to accomplish some unlawful purpose.  It is a

16     kind of partnership in crime in which each member becomes the

17     agent of every other member.

18          To "possess with intent to distribute" simply means to

19     possess with the intent to deliver or transfer possession of a

03:50  20     controlled substance to another person with or without any

21     financial interest in the transaction.

22          "Importation" means to bring into the United States from a

23     place outside of the United States.

24          During the course of the trial do not talk with any of the

03:50  25     witnesses or with the defendant or with any of the attorneys in

1     the case.  Please do not talk with them about any subject at

2     all.  You may be unaware of the identity of everyone connected

3     with the case; therefore, in order to avoid even the appearance

4     of impropriety, do not engage in any conversation with anyone

03:51  5     in or about the courtroom or the courthouse.  It is best that

6     you remain in the jury room during breaks in the trial and not

7     linger in the halls.

8         I will instruct the attorneys to say nothing to you.  So

9     if you see them in the hallway and they appear to ignore you,

03:51 10     do not think that they are being rude.  They are just following

11     my instructions.

12         In addition, during the course of the trial do not talk

13     about the trial with anyone else, not your family, not your

14     friends, not the people with whom you work.  All you should say

03:51 15     is that you were selected to be on the jury panel.  Please do

16     not even give the names of the parties or the type of the case.

17     This is to avoid the situation that someone may give you

18     information or an opinion as to this case.

19         And I'm going to add a caveat:  Please do not look

03:51 20     anything up on the internet regarding the law or the facts of

21     this particular case either.

22         Also do not discuss this case among yourselves until I

23     have instructed you on the law and you have gone to the jury

24     room to make your decisions at the end of the trial.  Otherwise

03:52 25     without realizing it you may start forming opinions before the

trial is over.  It is important that you wait until all of the evidence is received and you have heard my instructions on the rules of law before you deliberate among yourselves.

Let me add that during the course of the trial you will receive all of the evidence you properly may consider to decide this case.  Because of this, do not attempt to gather any information on your own which you think might be helpful, do not engage in any outside reading on the case, do not attempt to visit any places mentioned in the case, and do not in any other way try to learn about the case outside of the courtroom.

Now that the trial haw begun, you must not read about it in the newspapers or watch or listen to television or radio reports of what is happening here.  The reason for these rules, as I am certain you will understand, is that your decisions in this case must be made solely on the evidence presented at the trial.

At times during the trial a lawyer may make an objection to a question asked by another lawyer or to an answer given by a witness.  This simply means that the lawyer is requesting that I make a decision on a particular rule of law.  Do not draw any conclusions from such objections or my rulings on those objections.  These relate only to the legal questions that I must determine and should not influence your thinking.

If I sustain an objection to a question, the witness may not answer it.  Do not attempt to guess what answer might have

1      been given had I allowed the question to be answered.

2      Similarly, if I tell you not to consider a particular

3      statement, you should put that statement out of your mind and

4      you may not refer to that statement in your later

03:53  5      deliberations.  If an objection is overruled, treat the answer

6      like any other.

7          During the course of the trial I may ask a question of a

8      witness.  If I do, this does not indicate that I have any

9      opinions about the facts of the case.  Nothing I say or do

03:53  10     should lead you to believe that I have any opinion about the

11     facts nor be taken as indicating what your verdicts should be.

12         During the trial I may have to interrupt the proceedings

13     to confer with the attorneys about the rules of law which

14     should apply here.  Sometimes we will talk here at the bench.

03:54  15     Some of these conferences may take time, so as a convenience to

16     you I will excuse you from the courtroom.  I will try to avoid

17     such interruptions us much as possible and will try to keep

18     them short; but please be patient even if the trial seems to be

19     moving slowly.  Conferences outside of your presence are

03:54  20     sometimes unavoidable.

21         Finally, there are three basic rules about a criminal case

22     which you should keep in mind.  First, the defendant is

23     presumed innocent until proven guilty.  The indictment against

24     the defendant brought by the government is only an accusation,

03:54  25     nothing more.  It is not proof of guilt or anything else.  The

1     defendant therefore starts out with a clean slate.

2         Second, the burden of proof is on the government until the

3     very end of the case.  The defendant has no burden to prove his

4     innocence or present any evidence or to testify.  Since the

03:54 5     defendant has a right to remain silent, the law prohibits you

6     in arriving at your verdicts from considering that the

7     defendant may not have testified.

8         Third, the government must prove the defendant's guilt

9     beyond a reasonable doubt.  I will give you further

03:55 10    instructions on this point later; but bear in mind that in this

11    respect a criminal case is different from a civil case.

12        Now some administrative matters:  The air conditioning in

13    the courtroom or the temperature is very difficult to control

14    for whatever reason here.  It is either going to be too hot or

03:55 15    it's going to be too cold.  So if you get uncomfortable, raise

16    your hand, and we will try to work with the temperature.  And

17    you have the horrible situation of you are sitting behind.  You

18    have got some vents pointing over your heads right now and you

19    have got the ones across the courtroom.  So if at any time you

03:55 20    are uncomfortable, just raise a hand, and we will work with the

21    thermostat and see if we can fix it.

22        Number two, if you need a break, we will try to take a

23    break as soon as possible depending on where we are with the

24    witness.  So be sure and let my know if you need a break.

03:55 25        And, three, I will be working here at the bench.  You may

1    not see me because I may be behind the screens here; but I will

2    be paying attention to everything that is happening in the

3    courtroom.

4        Mr. Gyires, are you starting off with the opening

03:56  5    statement?

6                MR. GYIRES:  Mr. Galdo is, Your Honor.

7                THE COURT:  Mr. Galdo, you may proceed.

8                MR. GALDO:  Thank you, Your Honor.  May it please the

9    Court.  Counsel, ladies and gentlemen, it is early 2008.  A

03:56 10    fishing boat takes off from Mexico and begins to make its way

11    across Lake Amistad.  From the outside it looks like any of the

12    hundreds of fishing boats you can find around Del Rio; but this

13    boat was different.

14        It's different because of the cargo it was carrying.

03:56 15    Inside a secret compartment within the body of that boat was

16    over 140 kilograms of cocaine.  That's over 300 pounds.  When

17    broken up into small doses and sold on the streets of a U.S.

18    city it could be worth over 14 million dollars.

19        Now that boat reaches a dock just outside of Del Rio near

03:56 20    Highway 90.  It was picked up and taken to a warehouse right

21    off Highway 90 just a little bit, about a mile down the road

22    from that dock, a warehouse that had blackened windows, a

23    warehouse that was filled with tools and supplies that could

24    transport that cocaine outside of that boat and ready it for

03:57 25    its next, the next leg of its journey.

1       My name is Michael Galdo and with me is Marton Gyires; and

2   as a the judge said, we're the prosecutors in this case.  We

3   are both Assistant United States Attorneys here in Del Rio; and

4   it is our job to present the evidence to you, evidence that

03:57  5   will prove beyond a reasonable doubt that that man, Luis

6   Castaneda, also known as "Pajaro" is guilty beyond a reasonable

7   doubt, guilty of conspiring or agreeing with other people to

8   import cocaine into the United States and guilty of possessing

9   cocaine, of conspiring to possess cocaine with the intent to

03:57 10   distribute it (indicating).

11       Now as I said, the conspiracy didn't import the cocaine

12   just to bring it to Del Rio.  DEA Agent William Meholif will

13   testify the cocaine value increases the further away from the

14   border it goes.

03:58 15       The next step for that cocaine was to go to Houston; but

16   the conspiracy couldn't get it there by boat, so they had to

17   transfer it.  And what they did is they transferred it to

18   flatbed trailers, 18-wheeler trucks.  And I'm not talking about

19   a big container you see going down the highway on the top of

03:58 20   the truck.

21       I'm talking about the flatbed trailer itself.  There is a

22   hollow area towards the front of those flatbed trailer where it

23   attaches to the trucks.  They would remove -- it is difficult

24   to get to; but you can remove portions of the bottom of the

03:58 25   flatbed trailer and in there there is a hollow area.  And they

1    would fill the cocaine in that area in little portable bundles

2    that were taped or taped closed and they would spray it with

3    dog repellant spray so that narcotics dogs couldn't detect it.

4    And then it would be sealed tight and pickup trucks -- and Mac

03:58  5    trucks rather would come and pick it up.

6        The conspiracy had recruited multiple truck drivers

7    including and Eduardo Barrientos and an Aurelio Cortinas.

8        A man by the name of Eladio Pena, also known as "Chaparro"

9    was in charge of not only putting the drugs inside the trailer,

03:59  10    but also monitoring their progress as they traveled from Del

11    Rio to Houston.

12        It was in Houston that "Pajaro," Mr. Castaneda's role

13    kicked in.  He established the safe area for the truck to

14    arrive and he along with Chaparro would unload the cocaine, and

03:59  15    then once that hollowed-out space was emptied they would fill

16    it with bundles of cash.

17        So you have cocaine coming into the United States and

18    money flowing out.  Those flatbed trailer trucks would then be

19    driven back to Del Rio and sometimes to Roma, Texas, which is

03:59  20    small border town in South Texas.

21        Importing cocaine and distributing it in the United States

22    is a business.  No one brings cocaine in and gives it away out

23    of the goodness of their heart.  They do it to make money, lots

24    of money.  And just like a business, there's different jobs

04:00  25    that need to be done.  Someone needed to hide the cocaine in

1    the boat.  Somebody needed to drive the boat over.  Somebody

2    needed to keep the warehouse running.  Someone needed to hide

3    the cocaine in the trailers and monitor it.

4         It was Pajaro, Mr. Castaneda's job to establish that safe

04:00  5    area in Houston and to load the trailers with cash.

6         This was a business and business was good; but all that

7    changed in February 2008.  See, law enforcement were watching

8    that warehouse.  They saw a trailer pull out attached to a

9    tractor/truck.  That truck was stopped.

04:00 10    You are going to hear from Trooper Luna who was there at

11    that stop.  He is going to tell you about the search of that

12    flatbed trailer, about the hundreds of pounds of cocaine that

13    were removed from that flatbed trailer.

14         You are also going to hear from Texas Ranger Roger Dixon.

04:01 15    After that flatbed trailer was searched law enforcement went

16    back to that warehouse and they searched the warehouse, and

17    they found a boat and inside that boat was a secret compartment

18    and inside that secret compartment was an additional, was

19    another large amount of cocaine, around 300 pounds.  He's going

04:01 20    to take the stand and tell you about that search.

21         Additionally, ladies and gentlemen, you're going to get a

22    behind-the-scenes view of this conspiracy, an inside look.  You

23    are going to hear from two of the truck drivers, Mr. Barrientos

24    and Mr. Cortinas.  They are going to take the stand.

04:01 25    Both men drove numerous truckloads of cocaine from Del Rio

1    to Houston between 2007 and 2008.  Both men are going to tell

2    you about Eladio Pena, Chaparro's role in Del Rio; and

3    importantly for this case both men are going to tell you that

4    Castaneda set up that safe area in Houston and that they saw

04:02  5    him there and that he unloaded, helped unload the cocaine and

6    helped load those trailers again with cash.

7         But the evidence that is going to be presented to you

8    means that you won't just have to take their word for it.

9    Mr. Cortinas was actually the man driving the tractor that was

04:02  10    stopped in February 2008.  He was obviously part of a cocaine

11    trafficking conspiracy.  When he was caught he had a cell phone

12    on him, and that cell phone has contacts including a Chaparro

13    and Pajaro.  Pajaro, Mr. Castaneda had called that phone

14    numerous times the day Mr. Cortinas was stopped.  You are going

04:02  15    to see those phone records and you're going to hear testimony

16    about that.

17         Additionally both Mr. Cortinas and Mr. Barrientos

18    identified the defendant in a photo lineup as the man named

19    Pajaro who they dealt with in Houston.

04:02  20         Finally, ladies and gentlemen, the defendant was

21    previously convicted in federal court of possessing narcotics

22    with intent to distribute them.  In 2003 in the Southern

23    District of Texas he was convicted for smuggling narcotics, and

24    you can infer from that conviction the defendant's intent and

04:03  25    knowledge in this case.

1    At the conclusion of this trial after you have heard all

2    of the evidence, after you have seen the photographs, after you

3    have seen the dozens of bundles of cocaine, after you have

4    heard from the two members of the conspiracy who are going to

04:03  5    take the stand and tell you that Mr. Castaneda was the man in

6    Houston, after you have heard about his prior conviction, after

7    all of that we are going to come back to this spot and we are

8    going to ask you to return the verdict that justice demands,

9    guilty on all counts.

04:03  10    THE COURT:  Mr. Martinez.

11    MR. MARTINEZ:  May it please the Honorable Court, the

12    members of the government, Mr. Castaneda.  The government is

13    going to ask you at the close of this case to remove the veil

14    that is the presumption of innocence, and they are going to

04:03  15    tell you that they have proved the case beyond a reasonable

16    doubt.  But ultimately every word or almost every word, every

17    dot, every period, every breath this gentleman just made

18    depends on the word of two witnesses, a guy named Barrientos

19    and a guy named Cortinas.  That's really all they have.

04:04  20    Now they are believed, that might be enough; but I'm going

21    to tell you that the evidence is going to show that they should

22    not be believed.  And if you agree with me, there is no way the

23    veil of presumption of innocence can be removed, and reasonable

24    doubt will be basically in neon lights in this courtroom.

04:04  25    Barrientos on May 12, 2009, was stopped at Eagle Pass.

1    His wife was the driver, Teresa Barrientos, and they had 12

2    kilos of coke in a hidden compartment.  When the wife whose

3    knowledge and participation was established starts getting heat

4    Mr. Barrientos decides to talk to the officers implicating

04:05  5    himself and his wife.

6          Cortinas was stopped in Brackettville in possession of

7    163, almost 164 kilos.  He starts to talk.  He's alone and he

8    says that he was involved and took many trips up and was

9    usually paid $2000 to $4,000 per trip.  So what you have here

04:05 10    is the word of two people that were caught red handed

11          There's no eye witness -- there is no need for eye witness

12    testimony, informant testimony, accomplice testimony, prints,

13    logs, cell phones, nothing.  The evidence is right there.

14          Basically the evidence is going to show their hands were

04:05 15    caught in the cookie jar.  At that point both men face 10 to

16    life.  Barrientos is going to be sentenced severely based on 12

17    kilos of coke and Cortinas even more severely based on 164

18    kilograms.

19          At that point the evidence is going to show that they

04:06 20    started talking even more and they took advantage of a system

21    the federal courts created that encourages cooperation by

22    people who are known criminals.  Many times it is a good system

23    and it helps law enforcement detect other criminals; but the

24    problem is that many times dealing with these people it is hard

04:06 25    to control.

            1              MR. GALDO:  Objection, Your Honor, argumentative.

            2              THE COURT:  Be careful, Mr. Martinez.

            3              MR. MARTINEZ:  The evidence is going to show that

            4      both men are facing 10 to life.

    04:07   5              THE COURT:  Be careful with the punishment range too,

            6      Mr. Martinez.  Go ahead.

            7              MR. MARTINEZ:  He decided in the case of Barrientos

            8      to take advantage of a reduction in sentence that comes with

            9      his cooperation.  And while he's testifying Barrientos expects

    04:07  10      even more of a reduction the evidence is going to show.

           11          Cortinas has not received a reduction, but expects a

           12      reduction.  And throughout this system not only is there an

           13      expectation for a reduction that motivates the testimony.  The

           14      evidence is going to show that the government makes the

    04:07  15      decision as to whether or not they get the reduction, and the

           16      government evaluates and the government controls whether or not

           17      they get the reduction.

           18              MR. GALDO:  Objection, Your Honor.  It is up to the

           19      Court to decide.

    04:08  20              THE COURT:  That will come out.  This is opening.  Go

           21      ahead, Mr. Martinez.

           22              MR. MARTINEZ:  If the government doesn't file the

           23      reductions, for all intents and purposes it is pretty hard to

           24      get it, the evidence is going to show.

    04:08  25          Now the issue is going to be whether or not after viewing

1    these people and determining from their demeanor whether their

2    testimony is consistent within themselves or with each other,

3    whether or not when they first talked did they say anything

4    about my client as opposed to now, whether or not they are

04:08   5    talking because they want their reduction, whether or not they

6    can even be trusted knowing that they were caught red handed,

7    is that going to be enough to establish that there is no longer

8    reasonable doubt to meet the government's burden of proof?  And

9    on both witnesses, with both witnesses that is really how the

04:09  10    government is going to prove my client's involvement.

11         There is going to be other evidence.  There is going to be

12    the phone record; but they are not going to have any evidence,

13    the evidence is not going to show any conversations that took

14    place, who even made the calls.  So you'll have calls made on

04:09  15    the day.  But they knew each other.  The evidence is going to

16    show these people making calls knew each other; but you are not

17    going to know what they said, when they said it or anything

18    else.  There are not going to be any witnesses other than those

19    witness, independent witnesses, no prints of my client, no

04:10  20    seizures where he was caught with drugs.

21         And in the end you are going to decide.  The evidence is

22    going to be such that it will be your decision to evaluate and

23    decide did the government meet its burden of proof by providing

24    basically these two witnesses and if they removed the

04:10  25    presumption of innocence based on their word?  Thank you.

1          THE COURT:  Okay.  Mr. Gyires and Mr. Galdo, call

2     your first witness.

3          MR. GYIRES:  The government calls Esteban Luna.

4          (OATH ADMINISTERED.)

04:11  5          THE WITNESS:  I do.

6          MR. GYIRES:  May I proceed, Your Honor?

7          THE COURT:  You may.

8                         DIRECT EXAMINATION

9     Q.   (BY MR. GYIRES)  Would you please introduce yourself to

04:11  10    the jury.

11    A.   My name is Esteban Luna.  I'm from Eagle Pass.  I'm a

12    trooper with DPS eight years.

13    Q.   How long have you been with DPS?

14    A.   Eight years.

04:11  15    Q.   In what capacity?

16    A.   I'm in the Commercial Vehicle Enforcement Section.  We

17    inspect 18-wheelers and commercial vehicles.

18    Q.   Have you been that for the full eight years?

19    A.   Since I graduated from the academy.

04:12  20    Q.   Can you briefly describe your day-to-day duties on that

21    job?

22    A.   Day-to-day we enforce state law and federal regulations,

23    which what we do is basically inspect commercial vehicles and

24    check for equipment violation, log book violation, driver

04:12  25    qualifications, make sure they keep the trucks in good

1    standing.

2    Q.    Were you working in that capacity on February 24th, 2008?

3    A.    Yes, sir.  We were working an operation.

4    Q.    Did you come into contact on that day with an individual

04:12 5    named Aurelio Cortinas?

6    A.    Yes, I did.

7    Q.    Can you please describe how that contact was initiated?

8    A.    We were working the operation in Kinney and Val Verde

9    County that day, and I was up -- I don't know the specific

04:12 10    time; but we were working between Kinney and Val Verde, and I

11    was stationery that day in my patrol unit, and then when we saw

12    the 18 -- when I saw the 18-wheeler pass by or come through we

13    conducted or I conducted a traffic stop.

14    Q.    Let me pause you for a second and show you a photograph

04:13 15    marked Government's Exhibit 11.

16                 THE COURT:  Let me make sure that -- okay.  Try that

17    now (indicating).

18                 MR. GYIRES:  Has it been published, Your Honor?

19                 THE COURT:  It should be.  The screens are not muted,

04:13 20    so it should be.  I know the witness can see it.

21                 THE WITNESS:  I can see it.

22                 THE COURT:  I think everybody else can too.

23                 MR. GYIRES:  Okay.

24    Q.    (BY MR. GYIRES)  Do you recognize this (indicating)?

04:13 25    A.    Yes, sir, I do.

1    Q.    Is that the tractor and trailer that you saw going by that

2    day?

3    A.    Yes, sir, it is.

4    Q.    Let me show you another photograph.  This one is marked

04:13 5    Government's Exhibit 12.  It is just another photograph of that

6    tractor.  Do you recognize that (indicating)?

7    A.    Yes, sir, I do recognize it.

8    Q.    Is that the same tractor?

9    A.    That's the same tractor.

04:13 10    Q.    What does it say there on the side of it?

11    A.    Cortinas Trucking.

12    Q.    Okay.  What happened after you saw it pass you?

13    A.    As I saw it pass me we -- or "we."  I conducted a traffic

14    stop on that truck, and I approached the driver and advised him

04:14 15    that I was going to conduct a safety inspection on that truck

16    and that semi-trailer.

17    Q.    And again, the driver was named Aurelio Cortinas?

18    A.    Yes, sir.

19    Q.    What happened after you told him that?

04:14 20    A.    He complied, as they normally do.  Normally all truck

21    drivers do comply once you advise them that you are going to do

22    a level -- in this case it was a Level 2 inspection, safety

23    inspection.

24    Q.    What does that mean?

04:14 25    A.    That means we are going to do a walk-around to the

1    trailer, the truck/tractor and semi-trailer and look for, you

2    know, maybe a flat tire, anything having to do with safety

3    equipment.

4    Q.    What did you notice, if anything?

04:14  5    A.    On this truck as I was doing my inspection and I was

6    walking around it I mean I couldn't find anything on this

7    truck.  The only thing that I did see on this truck while I was

8    inspecting it was the DOT number on the side where it says

9    Cortinas Trucking normally you would have a TXDOT.  You know,

04:15 10    in front of DOT it would have a TX or a USDOT.  In this case it

11    didn't have either/or.

12    Q.    So what did you do next?

13    A.    So as I walked around and made a complete safety

14    inspection I advised the driver that I was going to do an

04:15 15    inspection inside the cab area in the sleeper berth inside the

16    cab.  And what we do there is we look for alcohol, radar

17    detectors; and that is part of the regulations, safety

18    regulations, federal safety regulations.  And I did.  He

19    agreed, and I just put him to the side of the road on the other

04:15 20    side of the vehicle; and I conducted my inspection of the

21    interior of the truck and it was definitely clean.  I mean I

22    couldn't find any defects or anything, any contraband as far as

23    illegal equipment.

24    Q.    What happened next?

04:15 25    A.    As I conducted that I approached and interviewed the

1    driver, Mr. Cortinas and asked him where he was going, what was

2    he picking up?

3    Q.   What did he say?

4    A.   He advised that he was headed to San Antonio to pick up a

04:16  5    load of clothing.  And I asked who his contact or who, where he

6    was picking up.  He had no clue.

7    Q.   What else did he say?

8    A.   So he said that he was supposed to pick up clothing that

9    day in San Antonio.  And, you know, I had never seen anybody

04:16  10    pick up clothing in a flatbed trailer in the years that I have

11    done this.  It doesn't happen.

12    Q.   What did you do next?

13    A.   I asked him who his contact was.  He had mentioned a name.

14    I don't recall the name that he was supposed to contact.  He

04:16  15    brought out a name.  I think it was a Mr. Gonzalez that was his

16    contact person once he arrived at San Antonio.

17        But so I continued my interview with him, and I asked for

18    his log book, and I noticed in his log book that I mean the guy

19    hadn't worked in the past two days.  And if you have a truck

04:17  20    like this he did, this was his truck according to what he told

21    me, you have got to put that truck on the road to make money.

22    If you don't have it on the road, you are losing money really.

23    Q.   So what did you do next?

24    A.   I looked at the log book and started questioning him on

04:17  25    that and asked him what he had done the prior two days, and he

1    said that he hadn't had any work.  And I said "Where was the

2    truck last night?"  He advised that the truck was left here in

3    Eagle Pass and he spent the night -- the truck was parked here

4    in Del Rio and he spent the night in Eagle Pass.  And I asked

04:17  5    "How did you get to Eagle Pass?"  He said some friend picked

6    him up in Del Rio and took him back to Eagle Pass.  It didn't

7    make sense to me.  I asked him why and he said that it was too

8    much, it was a hassle to do that in your log book.  And it is

9    not really a hassle.

04:17 10    Q.    Let me back up a little bit.  You said you walked --

11    before you searched the inside of the tractor you also walked

12    around the whole trailer?

13    A.    Correct.

14    Q.    Did you also look underneath the trailer?

04:17 15    A.    Correct.

16    Q.    What did you see?

17    A.    I forgot about that.  Yes, as I walked at the left side of

18    the truck or the trailer, the semi-trailer I don't know if I

19    can explain it.  Can I explain the kingpin and the fifth wheel?

04:18 20    Q.    Yes.  I can show you some photographs.  But go ahead and

21    explain what that is.  What is a fifth wheel?

22    A.    A fifth wheel is where you have your truck/tractor which

23    the rear part, and it connects to the trailer and it has a

24    kingpin on it.  It is a bolt that connects into this and locks

04:18 25    into place.

1   So when I was looking and doing my inspection on the fifth

2 wheel there was a bunch of new bolts, or at least I saw two new

3 bolts on the left side of the fifth wheel.

4 Q. Let me stop you for one second.  On this photo marked

04:18 5 Government's Exhibit 12 in what are is the fifth wheel and the

6 kingpin?

7 A. The fifth wheel would be on the left side, on the left

8 side; but you can't see.  I mean you will see.  I can't see the

9 fifth wheel from here; but it is right where the trailer

04:18 10 attaches to the truck/tractor.

11 Q. So towards the front of the trailer?

12 A. Right, the very front of the truck.

13 Q. Okay.  So let me show you a picture of Government's 19.

14 And tell me what this is.  It is a close-up, so you can't tell

04:19 15 where it is on the trailer.  But what is that (indicating)?

16 A. That would be your kingpin.  That's what locks into the

17 fifth wheel and it will stay locked unless you disengage it.

18 Q. Is that attached to the trailer or the tractor?

19 A. That is attached to the truck/tractor.

04:19 20 Q. Okay.  And what did you notice on there?

21 A. I didn't notice anything on this; but if you notice on

22 there's a picture here on the fifth wheel, you will notice

23 there are new bolts that are in place or installed in this

24 fifth wheel and the truck (indicating).  I mean I asked him

04:19 25 about that, and he when I asked him about the new bolts on the

1    fifth wheel he advised that he had done some work on it a

2    couple of months ago in Eagle Pass.  And I did ask him where he

3    did it and he mentioned somewhere, Bravo Automotive or

4    something like that.

04:19 5    Q.    I'm showing you Government's Exhibit 14.  Do you recognize

6    that at all (indicating)?

7    A.    That would be your fifth wheel.

8    Q.    Okay.  So what did you do next after you asked him about

9    that?

04:20 10    A.    As I started, I mean, I don't know if the jury can see it;

11    but, you know, there are some new bolts.  Everything is black;

12    but if you look on the bottom, there are some silver bolts that

13    are brand new that were still painted with blue.

14    Q.    You can actually if you touch the screen, it should do

04:20 15    sort of a "John Madden" thing.

16    A.    No.

17    Q.    It is not working?

18         THE COURT:  You have to push hard.  You have got to

19    push hard.

04:20 20         THE WITNESS:  Hard?

21         THE COURT:  Yes.

22         THE WITNESS:  Right there, there it is.  Did you-all

23    see it right there (indicating)?

24         JURY PANEL:  (Nods affirmatively.)

04:20 25         THE WITNESS:  That bolt right there on top was a

1    brand-new bolt, and there was another one on the other side

2    that you can't.  I mean, if you are there, you can see it

3    painted freshly blue.

4              THE COURT:  What you are seeing up there is what you

04:20  5    have in front of you.

6              THE WITNESS:  Okay.

7              THE COURT:  Try that again.  I think I just tried to

8    change the color --

9              THE WITNESS:  Okay.

04:20 10             THE COURT:  -- so you can see it better.

11             THE WITNESS:  Right up here (indicating).

12             THE COURT:  Yes.  Yes.  There you go.  See, it

13   changed the color.

14             THE WITNESS:  Right there, that bolt (indicating).

04:20 15   Normally on all just about the majority of your fifth wheels

16   and kingpin you should have grease, oil, gunk where you can't

17   even see that because you need for it to slide on top of that.

18   It has got to be greased and oiled so it will slide smoothly.

19   If you don't have it like that, it will cause damage.

04:21 20        And everything there was new, so it was kind of odd being

21   that the truck was not a new truck.  And when I questioned him

22   about that he said that it was done in Eagle Pass.  And so I

23   continued to ask him questions about that, and it just didn't

24   make sense to me.

04:21 25   Q.   (BY MR. GYIRES)  Okay.  Let me --

1    A.    If you look --

2    Q.    Go ahead.

3    A.    -- on the top right -- I can't really see on this.  But

4    right here, somewhere here you'll see finger marks, fingerprint

04:21  5    marks (indicating).  Somebody had been under there, and I don't

6    know what they were doing down there.  So we started -- I

7    started asking him questions about that, and he said that it

8    was a mechanic; but I don't see how a mechanic is going to put

9    his fingerprints on the trailer if that is not what was worked

04:22  10    on.  What was worked on was the truck/tractor.

11    Q.    Let's me ask you something.  Is normally is the

12    kingpin -- well, let me show you a photograph marked

13    Government's Exhibit 18.  Make sure --

14          THE COURT:  Let me clear the annotations, Mr. Gyires.

04:22  15    There we go (indicating).

16          MR. GYIRES:  Thank you, Your Honor.

17    Q.    (BY MR. GYIRES) This is Government's Exhibit 18.  What is

18    that again (indicating)?

19    A.    This is the kingpin.

04:22  20    Q.    Is that normally ever removed once it is installed in the

21    trailer?

22    A.    You know, you can't remove.  Once that connects to the

23    fifth wheel you can't remove it.  The only way you can remove

24    that is if you detach the truck/tractor and semi-trailer, then

04:22  25    you can remove that; but you need a special tool to remove that

```
 1    kingpin right there.
 2    Q.   Is it normally -- explain why is it that normally it is
 3    all greased up?
 4    A.   That will make it slide and lock into place easier, that
 5    you know, being it is like rubbing metal against metal, so you
 6    need some grease to, you know, smooth it up.  So it has to have
 7    it.  If not, you are going to cause damage to all that fifth
 8    wheel.
 9    Q.   Is there normally a reason to remove that?
10    A.   No.
11    Q.   Okay.  What happened next?
12    A.   After I spoke with the gentleman, you know, there were
13    several inconsistencies with, you know, as far as where he was
14    going and the trip that he made to Eagle Pass and leaving his
15    truck here.  You know, it just it didn't make sense, you know.
16    I couldn't, you know, and him being -- I had asked him several
17    times to remove his hands from his pockets.  He kept putting
18    his hands in his pockets and he couldn't stop them moving, and
19    those were the inconsistencies that I saw and that's when I
20    contacted the other superiors.
21    Q.   You did what?  I'm sorry?
22    A.   I contacted one of my superiors and advised him what I
23    had.
24    Q.   And what happened next?
25    A.   So after that I made contact with my Communications and
```

1    advised them to send me a canine; and the canine, Border Patrol

2    canine arrived about 15 or 20 minutes after I requested it.

3    Q.    What happened then?

4    A.    The dog did a walk-around.  The agent walked around with

04:24 5    the dog.  The dog did not alert.

6    Q.    What happened then?

7    A.    After that we contacted Sergent Roger Dixon, which is our

8    narcotics supervisor.

9    Q.    What did he do?

04:24 10   A.    He showed up at my scene, and then after that he made

11   contact with the driver and started talking to the driver.  I

12   really don't know what they spoke about; but after Roger came

13   back to me he said that Sergeant Dixon gave -- that the driver

14   gave consent to go search, do an X-ray on the truck/tractor

04:24 15   semi-trailer at the port of entry here in Del Rio.

16   Q.    So what happened next?

17   A.    We, Roger rode with the driver to the POE.  I followed the

18   driver; and as we are arrived to the POE we had U.S. Customs

19   agents do the X-ray on the truck/tractor semi-trailer.

04:25 20   Q.    Did you personally see that X-ray?

21   A.    Yes, sir, I did.

22   Q.    I'm showing you a photograph marked Government's Exhibit

23   8.  Do you recognize that (indicating)?

24   A.    That is a picture of the X-ray.

04:25 25   Q.    Okay.  I'm showing you now Government's Exhibit 9.  What

1    is that?

2    A.    That is a picture of the truck/tractor semi-trailer.  And

3    when I was there and we were there and they showed us this

4    picture they were telling us that there was something not right

04:25  5    where this arrow is at right here where the arrow is

6    indicating.  There was something not right, that there was a

7    bulk, something bulky in that area (indicating).

8    Q.    Okay.  What happened next?

9    A.    After that so we had several agents on top of that area;

04:25 10    and what they did is they were trying to cut, because it is

11    plywood.  And normally on your flatbed trailers you have

12    plywood on top of that; but this one was different.  It had

13    plywood on the top; but underneath that plywood was metal.

14    Q.    Let me stop you for a second.

04:26 15    A.    Okay.

16    Q.    I show you a photograph marked Government's Exhibit 22.

17    What is that (indicating)?

18    A.    There you go.  You have the plywood which is normal on all

19    your flatbeds; but if you once you tear those plywood apart you

04:26 20    will just see there is metal there, and I have never seen a

21    metal container like that (indicating).

22    Q.    Okay.  Let me show you Government's Exhibit 24.  Describe

23    that (indicating).

24    A.    That's that metal plate, which was I would say maybe being

04:26 25    conservative maybe a quarter of inch thick, a metal plate.

Q.    Okay.  Let me also show you Government's Exhibit 26.  What is that (indicating)?

A.    That was once the agents, you know, were able to pry that wood or the plywood they used some sort of saw and they cut through that steel metal plate.

Q.    Okay.  I think this is a little bit backwards in time. But Government's Exhibit 27, what is that (indicating)?

A.    Okay.  That was narcotics that was found in that plate.

Q.    Okay.  Can you point to the narcotics?

A.    Right here (indicating).  That's one of the bags or the bricks, as you can say.  And there's another one right here, and there's some right here, there (indicating).  It was loaded all over that box.  I would say that from that, you know, just to give you an idea, I think it was maybe 4x4, maybe four feet across or wide.

Q.    Does this photograph, Government's 27 show the metal piece that you are talking about?

A.    Yes, it does.  This was the metal plate that was right there that had to be pried open or cut with some steel saw that the agents had there at their facility.

Q.    Explain what cavity that is.  What is that emptiness?  Is that a natural void in the trailer?

A.    Some of the flatbeds do, should have that, that void. They normally they all have them; but I had never seen the steel on a flatbed like that.  Normally right here where this,

1    where the narcotics are right here that's where you have your

2    service lines that come through here, and there will be two

3    holes in the front where when water comes in it will come out;

4    but in this case this was completely covered.  I mean it was a

04:28 5    good concealment method.  I had never seen it before.

6    Q.    So the cavity is natural; but the metal piece was added?

7    A.    No, the metal piece was not normal.

8    Q.    Okay.  I'm showing you Government's Exhibit -- let me back

9    up.  Did you witness the bundles being pulled out of there?

04:28 10   A.    Yes, sir, I did.

11          MR. GYIRES:  Your Honor, I'm not sure how to take the

12   markings off.  Can I do that, or is that only --

13          THE COURT:  I just did it.

14          MR. GYIRES:  Okay.  But am I --

04:28 15         THE COURT:  You should be able to do it; but I've --

16          MR. GYIRES:  Okay.  It doesn't actually --

17          THE COURT: -- got it here in front of me.

18          MR. GYIRES:  -- show up on mine.

19          THE COURT:  Okay.

04:28 20         MR. GYIRES:  But that's okay.

21   Q.    (BY MR. GYIRES)  Government's Exhibit 29, what is that

22   (indicating)?

23   A.    Those are the bundles that were retrieved from the area

24   that we were searching.

04:29 25   Q.    And who is that in the photo (indicating)?

1    A.    That would be me.

2    Q.    Okay.  I'm also showing you -- I'm going to show you a

3    sample from what is marked as Government's Exhibit 1.

4              MR. GYIRES:  May I approach the witness, Your Honor?

04:29 5              THE COURT:  You may.

6    Q.    (BY MR. GYIRES)  I'm showing you a bundle that has been

7    removed from Government's Exhibit 1.  Do you recognize this

8    (indicating)?

9    A.    Yes, sir.

04:29 10   Q.    What is it?

11   A.    That was the contraband that was found inside the

12   semi-trailer.  This was the cocaine.

13             MR. GYIRES:  Your Honor, may I publish it to the jury

14   so they can see it, show it to them?

04:30 15             THE COURT:  You can show it; but don't give it to

16   them.  Not that I don't trust the jury.

17             (LAUGHTER.)

18             THE COURT:  But we'll keep the chain of custody

19   intact.

04:30 20   Q.    (BY MR. GYIRES)  Approximately how many bundles were there

21   total?

22   A.    I would have to guess.  I mean I'm going to say over 100,

23   120.

24   Q.    Okay.  You didn't count them yourself?

04:30 25   A.    No.  The narcotics agents counted the bundles; but it was

```
 1    about 120, 130 bundles.
 2               MR. GYIRES:  May I have just one moment, Your Honor?
 3               THE COURT:  You may.
 4               (Mr. Gyires and Mr. Galdo confer.)
 5               THE COURT:  Go ahead.
 6    Q.   (BY MR. GYIRES)  Backing up to the very beginning, I think
 7    the only thing I forgot to ask was why were you out there in
 8    the first place?
 9    A.   At the county line?
10    Q.   Yes.  Why did you stop this vehicle?
11    A.   We stopped this vehicle because we had a BOLO.
12    Q.   What is a BOLO?
13    A.   Which means "Be On the Look Out."  Intel had advised us
14    that there was a truck/tractor semi-trailer matching the
15    description of this vehicle possibly loaded with narcotics.
16    They didn't know where; but there was a lookout.
17    Q.   Okay.  Thank you.
18               MR. GYIRES:  I pass the witness, Your Honor.
19               THE COURT:  Mr. Martinez.
20               MR. MARTINEZ:  Thank you, Your Honor.
21                         CROSS EXAMINATION
22    Q.   (BY MR. MARTINEZ)  My name is Ralph Martinez.  I represent
23    Mr. Castaneda.  Good afternoon, sir.
24    A.   Good afternoon, sir.
25    Q.   How long was Mr. Cortinas, I guess, in your custody?
```

```
 1    A.    In my custody?  Throughout the whole traffic stop and the

 2    time that Border Patrol arrived and the time we took the X-ray,

 3    I would say about an hour.

 4    Q.    Okay.  And the stories he gave you, his destinations and,

 5    you know, the whole conversation you had with him, you would

 6    characterize it, wouldn't you, as his attempts to conceal the

 7    load he had?

 8    A.    Probably so.  The way, the inconsistencies, yes, and the

 9    body language, yes.

10    Q.    And he also knew you were a police officer; right?

11    A.    Yes, sir.

12    Q.    He never told you he had the dope; did he?

13    A.    No.

14    Q.    You found it?

15    A.    We found it.  We asked him if he had anything in the

16    vehicle and he said "I don't have anything in there.  You're

17    not going to find anything."

18    Q.    Okay.  So basically to sum it up, he lied to you

19    throughout the incident?

20    A.    Yes, he lied.

21    Q.    And in the conversations that you had with him did he ever

22    mention anything about Mr. Castaneda?

23    A.    No, sir, he never mentioned.  I never heard that name.

24          MR. MARTINEZ:  Thank you.

25          THE COURT:  Mr. Gyires.
```

```
        1               MR. GYIRES:  No more questions, Your Honor.
        2               THE COURT:  You may step down.
        3               THE WITNESS:  Thank you.
        4               THE COURT:  Call your next witness.
04:34   5               MR. GALDO:  Your Honor, the government calls Roger
        6      Dixon.
        7               (OATH ADMINISTERED.)
        8               THE WITNESS:  I do.
        9               MR. GALDO:  May I proceed, Your Honor?
04:35  10               THE COURT:  You may.  Mr. Dixon, you might need to
       11      sit closer to that microphone.
       12               THE WITNESS:  Yes, ma'am.
       13                          DIRECT EXAMINATION
       14      Q.   (BY MR. GALDO)  Sir, can you please state and spell your
04:35  15      name for the record?
       16      A.   It's Roger Dixon, R-o-g-e-r D-i-x-o-n.
       17      Q.   And, sir, what is your current occupation?
       18      A.   I am a Texas Ranger assigned to Company Unit El Paso.
       19      Q.   What is a Texas Ranger?
04:35  20      A.   We investigate most felony crimes assigned to the state
       21      for investigation.
       22      Q.   How long have you been with the Rangers?
       23      A.   One month.
       24      Q.   One month.  And where were you before you were a Texas
04:35  25      Ranger?
```

            1    A.    I was a narcotics agent here in Del Rio.

            2    Q.    With what organization?

            3    A.    DPS.

            4    Q.    And what were your -- what are your assignments and duties

04:36       5    as a narcotics agent?

            6    A.    Investigate crimes involving narcotics laws of the State

            7    of Texas.

            8    Q.    And about how many, approximately how many narcotics

            9    investigations were you a part of?

04:36      10    A.    Hundreds.

           11    Q.    And how long were you with DPS total?

           12    A.    Sixteen years, 10 in narcotics.

           13    Q.    Sir, I want to direct your attention to Sunday, February

           14    24, 2008, around 1:40 p.m.

04:36      15    A.    Yes, sir.

           16    Q.    Do you recall where you were at that date in time?  I know

           17    that was a few years ago.

           18    A.    I was on Highway 90.  The address was 11664 West Highway

           19    90, a storage building.

04:36      20    Q.    And where is that in relation to Del Rio?

           21    A.    West of Del Rio near Lake Amistad.

           22    Q.    I'm showing you Government's Exhibit 5.  Do you recognize

           23    that (indicating)?

           24    A.    Yes, sir.

04:37      25    Q.    What is that (indicating)?

```
        1    A.    That's Lake Amistad.

        2    Q.    And do you see the area of Highway 90 you are referring

        3    to?

        4    A.    Yes, sir.

04:37   5    Q.    And where is that?  If you could, I think you can just, as

        6    described, "John Madden" it.  You can touch it.  Did you --

        7          THE COURT:  Touch it hard.

        8          THE WITNESS:  There (indicating).

        9    Q.    (BY MR. GALDO)  Did you circle it?

04:37  10    A.    Yes, sir.

       11    Q.    Is that showing up?

       12          THE COURT:  Yes, it is.

       13          MR. GALDO:  It doesn't show up here.

       14    Q.    (BY MR. GALDO)  And what were you doing at that date and

04:37  15    time?

       16    A.    I was conducting surveillance on a while Volvo

       17    truck/tractor.

       18    Q.    And, sir, did you see that Volvo truck/tractor there?

       19    A.    Yes, sir.

04:37  20    Q.    Were there any other truck tractors there?

       21    A.    No, sir.

       22    Q.    I'm showing you Government's Exhibit 12.  Do you recognize

       23    that (indicating)?

       24    A.    That's the truck/tractor, sir, I was watching.

04:38  25    Q.    Did that truck/tractor remain at the warehouse?
```

1   A.   At approximately 1:30 it parked, drove to the front of

2   warehouse.  The front door was lifted up.  It backed partially

3   inside, and a short time later it departed pulling or hauling a

4   flatbed trailer.

04:38 5   Q.   And that area around that warehouse, are you familiar with

6   that area?

7   A.   Yes, sir.

8   Q.   I'm showing you Government's Exhibit 31.  And what is that

9   (indicating)?

04:38 10   A.   That's a closer picture of the lake area, Highway 90.

11   Q.   And the arrow with the lettering with the words "Stash

12   WHSE," what does that indicate?

13   A.   That's the location where that warehouse was at where we

14   were conducting surveillance where the truck/tractor was

04:38 15   parked.

16   Q.   And there is also an area labeled "boat dock."  Are you

17   familiar with that area?

18   A.   Yes, sir.

19   Q.   What is Government's 33 (indicating)?

04:38 20   A.   That's the boat dock near the warehouse.  I believe it is

21   called Diablo East.

22   Q.   So you said it was around 1:40 or 1:30?

23   A.   1:30, approximately 1:30 when the truck/tractor

24   repositioned itself to the front of the warehouse and about

04:39 25   1:40, 1:45 when it departed.

```
 1    Q.    And 35, do you recognize (indicating)?
 2    A.    Yes, sir.  That's the address or the warehouse where I
 3    conducted surveillance.
 4    Q.    And does this picture show where the truck was positioned,
 5    repositioned to?
 6    A.    If you are looking at the picture, it would be more on the
 7    left.  There is an alleyway and it was parked there.
 8    Q.    After it repositioned did it stay at the warehouse?
 9    A.    It was at the front of the warehouse for a very short
10    period of time.
11    Q.    And where did it go?  Or what did it do after it was at
12    the front of the warehouse?
13    A.    It departed and went on 90 going back towards Del Rio, and
14    me and the other officers continued to follow it, and I --
15    Q.    What, if anything, was attached to the truck?
16    A.    The flatbed trailer.
17    Q.    Sorry to interrupt.  You said you were following it.  Did
18    you communicate with anyone else?
19    A.    Yes, sir.  I had other officers there assisting the
20    surveillance.
21    Q.    And what happened with that flatbed truck?
22    A.    I arranged for the trooper to get it stopped.
23    Q.    And do you know who that trooper was?
24    A.    Trooper Esteban Luna.
25    Q.    Now I want to direct your attention to 3:30, a little
```

04:39  5
04:39 10
04:40 15
04:40 20
04:40 25

1    later in the day.  Do you recall where you were at that time?

2    A.    We were at the county line at Val Verde and Kinney County,

3    and Trooper Luna had already had stopped the truck and was

4    doing an inspection on it.

04:40  5    Q.    And that truck that was stopped, how does that truck

6    compare to the truck you saw at the warehouse?

7    A.    It was the same one, sir.

8    Q.    Now did you interact with the truck driver at all at that

9    time?

04:40  10   A.    Not until approximately 3:30, 2:45 Trooper Luna asked me

11   to come up, and we examined the front part of the trailer.

12   Q.    And what did you notice when you examined it?

13   A.    That right by the kingpin area where the truck actually

14   attached to the -- the trailer actually attaches to the

04:41  15   truck/tractor there was no weep holes.  It looked like it was

16   modified, and Trooper Luna also noticed some handprints on the

17   skid plate of the truck/tractor.

18   Q.    After those irregularities were noticed what happened?

19   A.    We asked and I believe that was when we had written

04:41  20   consent from the driver to search it further.

21   Q.    And where did you search it further?

22   A.    We drove it to the bridge where we could have a VACCIS

23   radar X-ray machine X-ray the truck.

24   Q.    And how exactly did you ride from the location of the stop

04:41  25   to the location where the VACCIS X-ray was conducted?

```
 1   A.   I drove in the truck with the driver.  I sat in the
 2   passenger seat.
 3   Q.   What communications did you have while you were in the
 4   trailer with him?
 5   A.   We just passed casual conversation.  I was trying to build
 6   rapport with him.
 7   Q.   And what forms of communication did the driver have on
 8   him?
 9   A.   He had a phone.  I believe it rang while we were at the
10   traffic stop on the way back.
11   Q.   And did he answer the phone?
12   A.   No, sir.  I asked his permission to just not use it, and
13   it was placed on the dash of the truck while we were driving it
14   back into town.
15   Q.   After you arrived at the port of entry where were you
16   while the search or while the X-ray was going on?
17   A.   I stayed with the driver.
18   Q.   And do you know what was found in the trailer?
19   A.   It was 142 small bundles of cocaine wrapped in brown tape.
20   It was in the same location that we saw the handprints, the
21   weep holes that were covered up.
22            COURT REPORTER:  Where you saw the handprints and
23   what?
24            THE WITNESS:  The weep holes.
25            COURT REPORTER:  Okay.
```

1          THE WITNESS:  The weep holes that were covered up.

2     Q.   (BY MR. GALDO)  Now you said you were with the driver.

3     What was the driver's name again?

4     A.   Aurelio Cortinas.

04:43 5     Q.   And what type of conversations, without saying what he

6     said, what type of conversations did you have with him?

7     A.   I don't recall the exact conversations; but they weren't

8     really involving the truck.  We were just trying to, you know,

9     pass the day.  We suspected there was drugs there and we were

04:43 10    just trying to, like I said, build rapport with him.  That way

11    if we did find something, it would be easier to talk to him.

12    Q.   After the narcotics were found what did you discuss?

13    A.   We took him to our office, the DPS office in Del Rio and

14    accompanied by Agent Pritchard with DEA, and read him his

04:43 15    rights and interviewed him there.

16    Q.   After speaking with him did he stay at the DPS office?

17    A.   No.  He started cooperating, and we drove out to the lake

18    at Highway 90 and he pointed out the warehouse where he picked

19    up the flatbed trailer.

04:43 20    Q.   Now at this point had you communicated to him that you

21    knew, that you were watching the warehouse?

22    A.   He was unaware that we were surveilling.

23    Q.   And did you drive straight to the warehouse?

24    A.   No.  I was a passenger in the vehicle.  Special Agent

04:44 25    Pritchard drove.  We just drove all the way to dam just past

1    the warehouse, turned around, and on the way back he pointed

2    that out.

3    Q.    Now based on that interaction with Cortinas what decision

4    was made?

04:44 5    A.    Special Agent Pritchard requested a search warrant,

6    federal search warrant of that warehouse.

7    Q.    And what is a search warrant?

8    A.    A search warrant is a Court Order authorizing a search

9    based on probable cause authorizing the search of a specific

04:44 10   place for a specific item.

11   Q.    And can you just describe -- or was that search conducted?

12   A.    Yes, sir, later on that morning.

13   Q.    And about how many people were there when the search was

14   conducted?

04:44 15   A.    It was approximately 20 people from our agency, one Border

16   Patrol agent or agent and his dog and DEA.

17   Q.    And where were you?  Can you describe your role in that

18   search?

19   A.    I was at the door when we entered the door.  The first

04:45 20   picture we saw of the warehouse there is an almost identical

21   door and a large door in the back.  The walk-in door had the

22   hinges on the outside, so we pulled the pins and that's how we

23   gained access, took the door off and then went in.

24   Q.    Were there windows on the door?

04:45 25   A.    There was windows on the pedestrian door on the back and

1 the front; but they were covered with tin with a little peep

2 hole.

3 Q. So after you took the hinges off the door what did you do?

4 A. Well, after I took the hinges off the door most of the

5 guys went in and I followed suit.

6 Q. Could you describe the interior of the warehouse?

7 A. It is probably half the size wider than this courtroom and

8 just a little bit longer.  Long enough if you can imagine an

9 18-wheeler or semi-trailer parked sufficiently on both ends so

10 you could walk around easily.

11 Q. And were there any other vehicle -- were there any

12 vehicles or modes of transportation inside the warehouse?

13 A. There were three boats in the warehouse.  As I entered

14 from the back door there were two boats, two boats on the

15 right, a boat and trailer on the left, and then there was an

16 empty space in the center where the semi trailers would park.

17 Q. Now I want to direct your attention to if you could

18 specifically talk about the what you saw inside the warehouse.

19 What were you doing during the search of the warehouse?

20 A. We tried to -- we cleared the room of any threat.  There

21 was nobody there; and then everybody started searching in a

22 systematic fashion, and most of the agents and officers there

23 were looking at the boats.  And when I was walking around I

24 noticed other items like Bondo, grease, tools all consistent

25 with maintaining a hidden compartment or construction of a

1    hidden compartment.

2    Q.    I'm going to show you Government's Exhibit 37.  Do you

3    recognize that (indicating)?

4    A.    Yes, sir.

04:47  5    Q.    And what is that?

6    A.    That's two cans of dog spray.  It is a training aid.  It

7    is dog repellant, yes.

8    Q.    This is 38 (indicating)?

9    A.    Yes, sir.  And there were two tubes of grease and there

04:47 10    were some blades for a sawzaw in that bag.

11    Q.    Now were there any dogs inside the warehouse?

12    A.    No, sir.

13    Q.    And you said you conducted surveillance earlier that day.

14    Did you see any dogs around that area?

04:47 15    A.    There were no dogs in the area.

16    Q.    I'm showing you 39.  Do you recognize that (indicating)?

17    A.    That looks like one of the boats that was in the

18    warehouse.

19    Q.    Now did you inspect any of the boats in the warehouse?

04:48 20    A.    I did a cursory look at them.  All the other agents and

21    officers were kind of honing in on the boat, so I kind of

22    stayed back and watched.

23    Q.    And you said they were honing in on a boat.  Is

24    Government's Exhibit 39 is that a picture of that boat

04:48 25    (indicating)?

1    A.    I believe so.  Without looking at the plate and comparing

2    it to my report, I believe that is the boat that they actually

3    found the contraband.

4    Q.    You said they found the contraband.  Can you talk a little

04:48  5    bit about that?  Was it just lying on the boat?  How did they

6    find the contraband?

7    A.    No.  As we were looking for the contraband one of the

8    agents, and I don't recall his name, stated he found what

9    appeared to be a seam in front of the housing where the

04:49 10    steering wheel is, and it looked like it had been like somebody

11    had cut something and tried to cover it back up and it was like

12    a bump.

13    Q.    That's Government's Exhibit 45.  Does that show that area

14    he was talking about (indicating)?

04:49 15    A.    Roughly.  It is difficult to see on the picture; but you

16    could see and feel it.  It looked like there was a seam there

17    that wasn't on the other boats.

18    Q.    Now what did they do?  Did you witness the search of that

19    area?

04:49 20    A.    Off and on as they were trying to get into it.  I think

21    they ended up using a saw to cut through the floor of the boat.

22    Q.    What else were you doing while they were conducting that

23    search with the saw?

24    A.    During the search I started taking notes and drawing a

04:49 25    diagram of the warehouse and the boats and stuff that I saw.

1          MR. GALDO:  I'm showing counsel what has been marked

2     as Government's Exhibit 80.

3               (MR. MARTINEZ REVIEW GOVERNMENT'S EXHIBIT 80.)

4          MR. MARTINEZ:  Thank you.

04:50  5          MR. GALDO:  Your Honor, permission to approach the

6     witness?

7          THE COURT:  You may.

8     Q.   (BY MR. GALDO) Ranger Dixon, I've just handed you what has

9     been marked as Government's Exhibit 80.  Do you recognize that

04:50 10     (indicating)?

11    A.   Yes, sir.  That's my bag I put the dog repellants in.

12    Q.   And if you wouldn't mind, could you open it up?  I know it

13    is just a sealed brown bag.  Could you open that up for me?  I

14    know there is tape involved.

04:51 15    A.   Do you have a pair of scissors?

16              (SCISSORS PROVIDED BY COURTROOM DEPUTY.)

17              THE WITNESS:  Thank you, ma'am.

18              (RANGER DIXON OPENS EXHIBIT 80.)

19    Q.   (BY MR. GALDO) For the record, Ranger Dixon is opening up

04:51 20    the bag and reaching inside with his gloves on.  Can you tell

21    me what is inside that bag?

22    A.   It is one of the cans of spray located at the warehouse.

23    Q.   Are there any markings in terms of ways to identify that

24    on the can?

04:51 25    A.   I didn't mark the can because we were saving it for prints

1    and looking at it.  I can see where somebody at the lab circled

2    where they had retrieved prints from.

3    Q.   Is there a number on the bag that you took it out of, an

4    evidence number?

04:51 5    A.   Yes, 5.001.

6    Q.   And who gave that item that number?

7    A.   I assigned that number when I was writing my report to

8    label the pieces of evidence that we took out of that

9    warehouse.

04:52 10    Q.   And is that can, is there a number on the can?

11    A.   Again, the numbers on the can would be put on there by the

12    lab.  We didn't want to touch it.  We just marked them and put

13    two in there initially.

14    Q.   Can you please, looking at it now, can you see a number on

04:52 15    it?

16    A.   I don't have any glasses.  I think it says "A" on it.  I

17    know it is the one that says A because it is the one they found

18    the prints off, because we looked at it earlier.

19    Q.   Could you please place it back inside the bag?

04:52 20    A.   Yes, sir.

21         MR. GALDO:  May I approach, Your Honor?

22         THE COURT:  You may.

23         MR. GALDO:  Your Honor, at this time the government

24    moves to introduce Government's Exhibit 80 into evidence.

04:53 25         MR. MARTINEZ:  No objections, Your Honor.

```
 1              THE COURT:  You said 80?

 2              MR. GALDO:  80, Your Honor.

 3              MR. GYIRES:  It is not on the list.

 4              MR. GALDO:  It is not on the list.  It is an

 5    additional one.

 6              THE COURT:  Why is it not on the list?

 7              MR. GALDO:  Oversight, Your Honor.

 8              THE COURT:  So admitted.  Proceed.

 9    Q.    (BY MR. GALDO)  Now, Ranger Dixon, I want to direct your

10    attention back to the search of that boat.

11    A.    Yes, sir.

12    Q.    I'm showing you 46.  What is that (indicating)?

13    A.    That's the hull of the boat after they cut the hole

14    through the deck.

15    Q.    And then 48, what is that (indicating)?

16    A.    That's the same picture from a different angle showing the

17    bundles are still in the hull.

18    Q.    And try one more.  49 (indicating)?

19    A.    I think that's where they stuck the camera inside the hole

20    to take pictures of some that were still left in the void.

21              MR. GALDO:  Permission to approach the witness, Your

22    Honor?

23              THE COURT:  You may.

24    Q.    (BY MR. GALDO)  Ranger Dixon, I've just showed you two

25    items in my hand when I walked close to you.  Do you recognize
```

1    those (indicating)?

2    A.    Those appear to be the type of bundles we pulled out of

3    the storage or the void in that boat.

4    Q.    And do you recall how many bundles were taken out of that

04:54  5    boat?

6    A.    The boat had 123, if my memory is correct, so about 320

7    pounds worth.

8    Q.    For the record, I've just got five of them today.  And how

9    many did you say there were again?

04:55 10    A.    123.

11    Q.    Ranger Dixon, what did you do with Exhibit 80, that can?

12    A.    Later we tagged it, bagged it and then submitted it to the

13    lab at a later date for latent print examination.

14    Q.    And do you recall?  You wrote reports about this case;

04:55 15    correct?

16    A.    Yes, sir.

17    Q.    Do you recall the case number given to this case?

18    A.    M4B7080010, that's my report number.

19             MR. GALDO:  The government passes the witness, Your

04:56 20    Honor.

21             THE COURT:  Mr. Martinez.

22             MR. MARTINEZ:  Yes, ma'am.  Thank you, Your Honor.

23                        CROSS EXAMINATION

24    Q.    (BY MR. MARTINEZ)  Good afternoon, Ranger Dixon.  My name

04:56 25    is Ralph Martinez.  I represent Mr. Castaneda.

A.    Good afternoon, sir.

Q.    How long were you surveilling the warehouse?

A.    That day at 11:30 on the 24th is when I started the surveillance.  We had watched it the day before.

04:57 Q.    Okay.  But you had never, other than that day -- did you say the day before as well?

A.    Yes, sir.

Q.    You had never seen that warehouse before that?

A.    I had seen it.  I work the area.  I had seen it.

04:57 Q.    Okay.  Did you when you started actually surveilling that's when you had a suspicion about it; correct?

A.    Based on Special Agent Pritchard's information on the warehouse.

Q.    Did you ever suspect there might be a problem at the

04:57 warehouse before the day before?

A.    No, sir.

Q.    The same thing with the truck, was that the first time you every saw the truck?

A.    Yes, sir.

04:57 Q.    All right.  You spoke to -- who was driving the truck? Did you speak to the driver?

A.    Yes, sir, Aurelio Cortinas.

Q.    And did he tell you -- how long did you interview him?

A.    I was with him since around 3:30, and I want to say

04:58 approximately 5:00 o'clock is when we started interviewing him;

1      and I think we actually spoke with him throughout the night

2      even to the point where we started, Special Agent Pritchard

3      started drafting the probable cause affidavit.

4      Q.     So he then took you to the warehouse and showed you

04:58 5      around; right?  Mr. Cortinas; correct?

6      A.     He drove us by the warehouse and that was the last thing.

7      Q.     So how long would you say you were talking to him?

8      A.     3:30 to probably six hours.  That's an estimate about,

9      because I know it was getting dark when we drove by the

04:59 10     warehouse.

11     Q.     After talking to him and based on your activity that day

12     did you do anything after that day that focused on Mr.

13     Castaneda?

14     A.     No, sir, I did not.

04:59 15     Q.     Okay.  So at least after that day you had not heard of

16     Mr. Castaneda; correct?

17     A.     Sometime during the course of the three years --

18     Q.     No.  I'm talking about that day.

19     A.     Oh, that day?  No, sir.

04:59 20              MR. MARTINEZ:  Nothing else.  Thank you, sir.

21              THE COURT:  Mr. Galdo.

22              MR. GALDO:  No redirect, Your Honor.

23              THE COURT:  You may step down.  Does anybody on the

24     jury need a break, coffee or anything?

04:59 25              JURY PANEL:  (NOD NEGATIVELY.)

```
 1              THE COURT:  No?  All right.  Call your next witness.
 2              MR. GALDO:  Before that, Your Honor, the government
 3       would like to read into evidence a stipulation.
 4              THE COURT:  You may do so.  Mr. Dixon, you may step
 5       down.
 6              THE WITNESS:  Thank you, Your Honor.
 7              MR. GALDO:  May I proceed, Your Honor?
 8              THE COURT:  Go ahead.
 9              MR. GALDO:  In the case of the United States vs. Luis
10       Roel Castaneda, stipulation:  It is hereby stipulated and
11       agreed between the United States of America through the
12       undersigned Assistant United States Attorney and Defendant Luis
13       Roel Castaneda and his attorney Ralph Martinez in open court
14       that if a forensic chemist were to testify in court in this
15       case, the testimony would confirm beyond a reasonable doubt
16       that the substances tested in connection with this case which
17       are marked Government's Exhibit 1 and 2 are in fact cocaine, a
18       Schedule II controlled substance.
19              The cocaine that is marked as Government's Exhibit 1 was
20       removed by law enforcement officers in Del Rio, Texas on
21       February 24, 2008, from a flatbed tractor/trailer bearing Texas
22       registration number X45-452 which was attached to a white Volvo
23       tractor/truck displaying Texas registration number 2FF-962.
24              The parties stipulate that Government's Exhibit 1 is a
25       portion of the cocaine seized from the tractor/trailer and is
```

1    admissible as evidence in the government's case in chief during

2    the trial of this case.

3         The cocaine that is marked as Government's Exhibit 1 was

4    removed by law enforcement officers on February 25, 2008, from

05:01  5    a fishing boat displaying Texas boat registration number

6    TX-8638AF which was located inside a metal warehouse located at

7    11664 West Highway 90, Del Rio, Texas.

8         The parties stipulate that the Government's Exhibit 2 is a

9    portion of the cocaine seized from the boat and is admissible

05:01  10   as evidence in the government's case in chief during the trial

11   of this case.

12        It is further stipulated that the total amount of cocaine

13   seized on February 24th and 25th, 2008, in relation to this

14   case has a total net weight of about 280 kilograms.

05:02  15   Approximately 140 kilograms were removed from the flatbed

16   trailer and approximately 140 kilograms were removed from the

17   boat.  Signed by all parties.

18             THE COURT:  It has been preadmitted.  You may

19   proceed.

05:02  20             MR. GYIRES:  The government calls Aurelio Cortinas.

21             (OATH ADMINISTERED.)

22             THE WITNESS:  I don't speak English.

23             (OATH ADMINISTERED VIA SPANISH INTERPRETATION.)

24             THE WITNESS:  I do.

05:03  25                       DIRECT EXAMINATION

```
 1    Q.    (BY MR. GYIRES)  Good afternoon, sir.  Can you please
 2    state your name for the record.
 3    A.    Aurelio Cortinas.
 4          THE COURT:  Just a second, Mr. Gyires.  Both of you
05:03  5    gentlemen are going to have to speak louder.  Mr. Cortinas, I
 6    know you are speaking in Spanish; but I still need for you to
 7    speak loudly into the microphone.  You are not speaking to the
 8    interpreter.  You are speaking to everyone in the courtroom.
 9    Proceed.
05:03 10    Q.    (BY MR. GYIRES)  Say your name again, please.
11    A.    Aurelio Cortinas.
12    Q.    Are you currently incarcerated?
13    A.    Yes.
14    Q.    Did you plead guilty to possession of cocaine with intent
05:04 15    to distribute?
16    A.    Yes.
17    Q.    You did that pursuant to a plea agreement?
18    A.    Yes.
19    Q.    Do you know what your sentence was?
05:04 20    A.    Six and a half years.
21    Q.    Seventy-eight months; correct?
22    A.    Yes.
23    Q.    How were you caught?
24    A.    A state trooper stopped me for a routine inspection on my
05:05 25    trailer like right on 90 Brackettville bound, and when they
```

1    were done with all the search the officer asked me if he could

2    take me over to the bridge for an X-ray check.

3    Q.   What happened next?

4    A.   Over there at the bridge after the X-ray inspection is

05:06 5   when they found a hidden compartment in the trailer.

6    Q.   Were you arrested that day?

7    A.   Yes.

8    Q.   Was that February 24th, 2008?

9    A.   That is correct.

05:06 10  Q.   Were you working by yourself or for an organization?

11   A.   For an organization.

12   Q.   Who would you say was your most immediate boss?  And you

13   can use a nickname.

14   A.   Down in Mexico, or in the United States?

05:07 15  Q.   Both.

16   A.   Pajaro.

17   Q.   How long did you work for this organization?

18   A.   For 10 months.

19   Q.   So you started in approximately when?

05:07 20  A.   April or May of 2007.

21   Q.   What was your role in that organization?

22   A.   Transportation of cocaine.

23   Q.   How?

24   A.   On a flatbed.

05:08 25  Q.   Let me show you a photograph that is marked Government's

```
 1   Exhibit 11.  Do you recognize that (indicating)?
 2   A.   That's my truck.
 3   Q.   When you say "your truck," was it did you purchase it?
 4   A.   No.  It belonged to the organization.
 5   Q.   Whose name was it registered in, if you know?
 6   A.   Cortinas Trucking.
 7   Q.   Whose name was on the paper as the owner of that tractor?
 8   A.   Aurelio Cortinas.
 9   Q.   That's you; right?
10   A.   That is correct.
11   Q.   Where did you drive that tractor/truck from when you
12   transported cocaine?
13   A.   From Del Rio to Houston.
14   Q.   Was it always from Del Rio?
15   A.   No.
16   Q.   Where else was it from?
17   A.   Roma, Texas.
18   Q.   I'm showing you a photograph marked Government's Exhibit
19   6.  Is that a fair representation of Del Rio, Houston and Roma
20   (indicating)?
21   A.   That is correct.
22   Q.   Did you know you were transporting cocaine?
23   A.   Yes.
24   Q.   Did you ever transport any other drugs?
25   A.   No.
```

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | Q.   Did you have any other role in the operation of this    |
|        | 2  | organization?                                                |
|        | 3  | A.   I would bring in drugs over Amistad Dam.                |
|        | 4  | Q.   With what vehicle?                                       |
| 05:11  | 5  | A.   On a boat.                                               |
|        | 6  | Q.   What kind of boat?                                       |
|        | 7  | A.   A boat.                                                  |
|        | 8  | Q.   What sort of boat?  A fishing boat, a sailboat?         |
|        | 9  | A.   A fishing boat.                                          |
| 05:11  | 10 | Q.   I'm showing you a document, a photograph that's marked as |
|        | 11 | Government's Exhibit 36.  Do you recognize that (indicating)? |
|        | 12 | A.   Yes.                                                     |
|        | 13 | Q.   What is that (indicating)?                               |
|        | 14 | A.   That's a boat that was inside the warehouse where we would |
| 05:12  | 15 | do the switch.                                                |
|        | 16 | Q.   How many times did you personally drive a boat across the |
|        | 17 | lake?                                                         |
|        | 18 | A.   Seven or eight times.                                    |
|        | 19 | Q.   I'm showing you a document marked Exhibit 39.  Do you   |
| 05:13  | 20 | recognize that (indicating)?                                  |
|        | 21 | A.   Yes.                                                     |
|        | 22 | Q.   What is it?                                              |
|        | 23 | A.   That's the boat that I would use.                        |
|        | 24 | Q.   So you personally drove this boat?                       |
| 05:13  | 25 | A.   Yes.                                                     |

1    Q.    I'm showing you a document marked Government's Exhibit 35.

2    Do you recognize that?

3    A.    Yes.

4    Q.    What is that?

05:13  5    A.    That's the warehouse where the boat and the drugs would

6    be.

7    Q.    Approximately where is that located?

8    A.    That's right around 90 on the way out of Del Rio right

9    near the bridge to go across the dam.

05:14  10   Q.    I'm showing you Government's 32.  Before I ask you

11   anything about this, how far was the boat dock from that stash

12   house?

13   A.    No more than a mile.

14   Q.    Is Exhibit 32 a fair representation of the map

05:15  15   representing the warehouse and the boat dock, if you recognize

16   it?

17   A.    Yes.

18   Q.    I'm going to show you Government's Exhibit 31.  I don't

19   know if that is more helpful or not.  Is that about the same

05:15  20   (indicating)?

21   A.    It is the same.

22   Q.    How often, how many times did you drive the

23   tractor/trailer loaded with cocaine to Houston?

24   A.    Between 17 and 19 times.

05:16  25   Q.    Let me ask you a few more questions about your trips

1  across the lake.  How did that generally happen?  What is the

2  first thing you did to begin your trip across the lake?

3  A.    We would go down, make them believe we were going out

4  fishing, and we would cross over to the Mexican side.  In

05:16 5  Mexico we would get another boat which was identical to this

6  one, so we would only switch.  If I was bringing in money into

7  Mexico, I would go in with the boat that was not loaded with

8  drugs, and then I would switch to the other one loaded with

9  drugs into the United States.

05:17 10  Q.    Did you go at nighttime or daytime?

11  A.    Daytime.

12  Q.    Who did you go with, if anybody?  And you can use

13  nicknames.

14  A.    I did go once with Chaparro, and the other times I would

05:18 15  go with this person we used to call Neto.

16  Q.    Who -- and let me ask the question again for clarity.

17  Would it be fair to say you had a supervisor or a boss or not?

18  A.    Yes.

19  Q.    Who was it on the Mexican side?

05:18 20  A.    Max.

21  Q.    And how long did you work for him?

22  A.    For the eight or 10 months that I was working for them.

23  Q.    Did you say you also took cash back into Mexico?

24  A.    That is correct.

05:19 25  Q.    How was the cash packaged?

1    A.    Bundles of cash.  That's all.

2    Q.    Did you have a name for those bundles?

3    A.    They were marked; but I don't recall what they were marked

4    as.

05:19  5    Q.    How do you know you were transporting cash back?

6    A.    The person in Houston would let me know that I was

7    bringing down cash to Del Rio or to Roma.

8    Q.    Let me ask you about your tractor/trailer.  Where was the

9    cocaine inside that tractor/trailer?

05:20  10   A.    It was in a compartment where the kingpin is located.  It

11   was worked up so that it could be removed, and in there were

12   stashed the money or the drugs.

13   Q.    Did you always go to Houston?

14   A.    That is correct.

05:21  15   Q.    Were there any other warehouses involved or just this one?

16   A.    There was another one in Houston.

17   Q.    How were you paid?

18   A.    Cash down in Mexico.

19   Q.    Did you receive any amount of money from anybody else?

05:21  20   A.    I don't understand the question.

21   Q.    I'll get back to the money in a little bit.  Let me ask

22   you about with your first, how you first got involved with

23   transporting cocaine.  Describe how you first got involved, the

24   very first thing that happened.

05:22  25   A.    Well, in Mexico at my mom's house a lifetime friend came

down.  He knew that I did have a transportation company in the United States.  He asked me if I knew some tractor/trailer driver with a residence in the United States who would agree to put a tractor/trailer under his name.

05:23  Q.    What did you say?

A.    At the moment I told him "No, I did not know anyone;" but personal problems led me to go and search for him and tell him that I would take care of that.

Q.    Generally what sort of personal problems?

05:24  A.    Separation from my wife, and I went down to live in Mexico.

Q.    Where in Mexico?

A.    Piedras Negras.

Q.    So describe what happened next.

05:24  A.    I let them know that I was willing to work for them, so it took them about two hours to talk to -- I don't know to whom. So he came back to me with money and with -- how can I say it? With an address in Houston for me to pick up the truck.

Q.    So tell us about your first load.  About when was that?

05:25  June of 2007?

A.    Around April.

Q.    Okay.  I might have done my math wrong.  What happened first, that first time?

A.    That friend comes to my house and tells me that there is

05:25  work to be done.  At the time I did not have that truck

248

1    registered or anything.

2    Q.    So what did you do?

3    A.    This person, this friend takes me to this other person in

4    Piedras Negras, Max.  And Max brings me up into Del Rio where

05:26 5    there is another truck hitched to another trailer.

6    Q.    What happened next?

7    A.    That night is when I met Chaparro.

8    Q.    Let me show you a photograph that is marked Government's

9    Exhibit 64.  Do you recognize this (indicating)?

05:27 10    A.    Yes, sir.

11    Q.    Can you describe what this is?

12    A.    That's Chaparro's picture.

13    Q.    Is that your initial next to his photograph?

14    A.    Yes.

05:27 15    Q.    How were you presented this entire photo lineup?

16    A.    I don't understand.

17    Q.    Were you asked to pick Chaparro out of that lineup?

18    A.    They were showing pictures to me for me to identify

19    people.

05:28 20    Q.    Did they tell you who to point to?

21    A.    No.

22    Q.    So what happened after you met Chaparro at the warehouse

23    that first time?

24    A.    That day I came by and the trailer was already loaded; but

05:28 25    the truck was not working, so not until the following day in

249

1      the morning is when we left for Houston.

2      Q.    Why wasn't the truck working?

3      A.    It had a flat tire.

4      Q.    So what did you do the next day the first thing?

05:29  5      A.    We did work on repairing the tire.

6      Q.    And then what?

7      A.    We drove all day to Houston.

8      Q.    When you say "we" was someone else in your tractor?

9      A.    No.  I was driving my tractor and Chaparro was driving his

05:29  10     truck.

11     Q.    Did you see the cocaine loaded?

12     A.    No, not at that time.

13     Q.    Okay.  So what happened next as you were driving?

14     A.    When we got to Houston Chaparro parked by a Home Depot

05:30  15     right around Houston, and we were waiting for Pajaro to arrive

16     to let us know where we were going to be unloading.

17     Q.    I'm showing you a photograph marked Government's Exhibit

18     65.  Do you recognize this (indicating)?

19     A.    That's Pajaro.

05:31  20     Q.    And describe how this photo lineup took place.

21     A.    In the same fashion that they did with the one with

22     Chaparro, they were showing me pictures for me to identify

23     people in the organization.

24     Q.    Did they tell you who to point to?

05:31  25     A.    No.

```
  1   Q.   Do you see Pajaro in the courtroom today?

  2   A.   No.

  3   Q.   Can you stand up and look?

  4   A.   He's not here.

05:32  5   Q.   Do you need -- do you have eyeglasses?

  6            MR. MARTINEZ:  I'm going to object, Your Honor.

  7            THE COURT:  Counsel, he said --

  8            MR. MARTINEZ:  Asked and answered.

  9            THE COURT:  -- he didn't see him.

05:32 10            MR. GYIRES:  I don't know if the record -- can I

 11   approach, Your Honor?

 12            THE COURT:  You may.

 13            (ON-THE-RECORD BENCH CONFERENCE, TO WIT:)

 14            MR. GYIRES:  I don't know if he can see from the

05:32 15   witness stand.  There is a screen in front of him.

 16            THE COURT:  You can speak normally.

 17            MR. GYIRES:  There is a screen in front of him.

 18            MR. MARTINEZ:  The thing is he doesn't recognize him

 19   because he has only seen him from a photo is my contention; and

05:33 20   if he gets close, you basically run the risk of suggesting to

 21   him.

 22            THE COURT:  Well, here is my question:  From the

 23   photo lineup, your client has also had physical changes; right?

 24   He shaved his head?

05:33 25            MR. MARTINEZ:  Yes, he has.
```

1        MR. GYIRES:  And he's behind the TV screen.

2        THE COURT:  Well, let's do this, Mr. Gyires.  Let's

3   establish if he can see everybody well enough before I ever let

4   him do anything else.  If he says he can see all parties well

05:33   5   enough, then you have got your identification.

6        MR. GYIRES:  How do I develop that --

7        THE COURT:  Just ask him.

8        MR. GYIRES:  -- so I don't suggest anything?

9        THE COURT:  Just ask him "Can you see everybody

05:33  10   within this courtroom properly?"  Just, you know, Can you see

11   all the bodies properly if you stand up?  Do you all the

12   bodies" --

13        MR. GYIRES:  Can I say "Do you see the defendant?"

14        THE COURT:  No.  I'm telling you what to say, Mr.

15   Gyires.  Listen.

16        MR. GYIRES:  "Can you see all the parties."

17        THE COURT:  "Can you see everybody in this courtroom

18   fine without any obstruction or interference?"  Let's start off

19   with that.

05:34  20        (BENCH CONFERENCE CONCLUDED.)

21   Q.   (BY MR. GYIRES)  Can you see everybody in the courtroom

22   properly?

23   A.   (Shrugs.)

24        THE COURT:  Stand up.

05:34  25        THE WITNESS:  (Complied.)

1            THE COURT:  Now there are people in the courtroom.

2    Can you see everybody fine without any kind of obstruction or

3    interference?

4            THE WITNESS:  Yes.

05:34  5            THE COURT:  Go ahead.

6    Q.   (BY MR. GYIRES)  Can you see me?

7    A.   Uh-huh (yes).

8            THE COURT:  "Yes" or "no"?

9            THE WITNESS:  Yes.

05:35 10    Q.   (BY MR. GYIRES)  Can you see everyone sitting at the other

11    table?

12    A.   Yes.

13    Q.   How many people do you see at my table?

14    A.   Three people.

05:35 15    Q.   How many at the other table?

16    A.   Two people.

17    Q.   Let me ask you a question.  You can sit back down.

18    A.   (Complied.)

19    Q.   I'm showing you again Government's 65.  Did Pajaro always

05:35 20    have a full head of hair?

21            MR. MARTINEZ:  I'm going to object, Your Honor.  I'm

22    going to object that the witness has been asked already.

23            THE COURT:  This a different question, Mr. Martinez.

24    He's not asking him to identify any person in the courtroom.

05:35 25    Q.   (BY MR. GYIRES)  Did Pajaro always have a full head of

1    hair?

2    A.    Yes.

3    Q.    Did he always have a mustache?

4    A.    Yes.  And he was fat like that.

05:36  5    Q.    About what do you think he weighed?

6    A.    Two hundred pounds.

7    Q.    Okay.  What happened next after you met Pajaro that day?

8    A.    He took us to a place to unload.

9    Q.    To where?

05:36 10    A.    It was -- I don't remember the place.  He was leading us

11    driving a pickup truck.

12    Q.    And describe the place where you arrived.

13    A.    It was a house; but it had like a large property and there

14    was a shop there.

05:37 15    Q.    What did you do when you arrived?

16    A.    I got there and I did park the trailer and I did unhitch

17    the trailer from the tractor.

18    Q.    Then what happened?

19    A.    Between Chaparro and Pajaro they removed the kingpin to

05:38 20    extract the cocaine that was inside.

21    Q.    Did you personally see them doing that?

22    A.    Yes.

23    Q.    What did you see next?

24    A.    They loaded the drugs into a van that they were carrying

05:38 25    and then they dropped me off at the hotel and they left me

1    there.

2    Q.    Did they know you saw them unload the cocaine?

3    A.    Yes.

4    Q.    Did you think they trusted you?

05:38  5    A.    At that time, yes.

6    Q.    Who took you to the hotel?

7    A.    Both Pajaro and Chaparro.

8    Q.    Did you overhear their conversations?

9    A.    No.  I was riding behind them.

05:39 10    Q.    Did you overhear them while they were unloading the

11    cocaine?

12    A.    Yes.

13    Q.    How would you describe those conversations?

14    A.    They were only talking about the quantity and they were

05:40 15    making reports about the quantity that had arrived; and they

16    were talking about personal things because they knew each

17    other.  I do not know what they were talking about.

18    Q.    And you're talking about Pajaro and Chaparro?

19    A.    That is correct.

05:40 20    Q.    What happened after you got to the hotel?

21    A.    No.  They just left me in there, and I did spend three or

22    four days until some money came and I could go back down.

23    Q.    Who gave you the money?

24    A.    Pajaro put it inside like the stash for the trailer.

05:41 25    Q.    Do you mean hidden cash is what you would take back?

```
  1    A.    Yes.

  2    Q.    Did you see Pajaro load that cash?

  3    A.    He would be the one to do it always.

  4    Q.    Did you ever actually see him do it?

05:41  5   A.    Yes.

  6    Q.    About how many times?

  7    A.    Thirteen, 12 times.

  8    Q.    How did you communicate with all these people involved in

  9    the organization generally?

05:42 10   A.    I would only talk to them when I would be heading to

 11    Houston only to agree about ETAs or what time I would get

 12    there.

 13    Q.    How would you do that?  With a phone?

 14    A.    That is correct.

05:43 15   Q.    Did you-all just have one phone number, or did you have

 16    several phone numbers?

 17    A.    There were several phone numbers for Pajaro.  I can't

 18    recall whether it was three of them.  And Chaparro had two

 19    numbers.

05:43 20   Q.    Explain how the organization used phones.

 21    A.    They were nothing explicit.  We would do it the

 22    conventional way.  We would dial.  That's it.

 23    Q.    Was the phone registered in your name?

 24    A.    I don't understand that.

05:44 25   Q.    What kind of phones did you have?  Did you have prepaid
```

| | | |
|---|---|---|
| | 1 | phones or did you have an account with a company or what? |
| | 2 | A.    I had a prepaid one and I had a T-Mobile. |
| | 3 | Q.    Is there any reason you used a prepaid phone? |
| | 4 | A.    Just to talk openly about the drugs. |
| 05:45 | 5 | Q.    What do you mean by that? |
| | 6 | A.    Well, just to say "I'm about to arrive.  I am bringing in |
| | 7 | the cocaine" openly like that. |
| | 8 | Q.    How does having a prepaid phone help that? |
| | 9 | A.    Because it is not registered under your name. |
| 05:45 | 10 | Q.    Did you usually keep a number for a long time or switch |
| | 11 | numbers? |
| | 12 | A.    The prepaid one would be changed often. |
| | 13 | Q.    Why did you change it often? |
| | 14 | A.    You do it to protect yourself when the federals are |
| 05:46 | 15 | following up on those numbers.  That's all. |
| | 16 | Q.    Do you remember what, how you had Pajaro's phone number? |
| | 17 | You said you had more than one phone number on your phone; is |
| | 18 | that correct? |
| | 19 | A.    Yes.  Chaparro gave it to me, and then when he would |
| 05:46 | 20 | switch numbers he would give me the new numbers. |
| | 21 | Q.    How was Pajaro's number labeled in your phone? |
| | 22 | A.    Just like that, "Pajaro."  That's it. |
| | 23 | Q.    Do you know Pajaro's real name? |
| | 24 | A.    No. |
| 05:47 | 25 | Q.    Who -- did anyone ever pay you in Houston? |

| | | |
|---|---|---|
| | 1 | A.    They would give me money for expenses. |
| | 2 | Q.    Who did? |
| | 3 | A.    Pajaro. |
| | 4 | Q.    How many times did he give you money? |
| 05:47 | 5 | A.    I don't recall. |
| | 6 | Q.    More than once? |
| | 7 | A.    More than 10 times. |
| | 8 | Q.    How were you paid?  In cash? |
| | 9 | A.    Yes. |
| 05:48 | 10 | Q.    What type of bills? |
| | 11 | A.    Twenties and hundreds. |
| | 12 | Q.    Were you also paid a salary? |
| | 13 | A.    No.  I was being paid by the trip. |
| | 14 | Q.    How much was that? |
| 05:48 | 15 | A.    Between $20,000 and $25,000. |
| | 16 | Q.    Where were you paid?  Where were you present when you were |
| | 17 | paid? |
| | 18 | A.    Down in Mexico. |
| | 19 | Q.    Who delivered it to you? |
| 05:49 | 20 | A.    Sometimes Max would do it or Max would send people with |
| | 21 | the money. |
| | 22 | Q.    How often did you come out -- of your 15, 16 or 17 loads |
| | 23 | how many times did you bring back cash hidden in the secret |
| | 24 | compartment? |
| 05:49 | 25 | A.    Thirteen or 14 times. |

```
 1    Q.   Out of your all of your trips how many times did you see
 2    Pajaro in Houston?
 3    A.   All the time.
 4    Q.   Was this organization associated with any drug cartel in
 5    Mexico?
 6    A.   The Cartel of the Gulf.
 7    Q.   Is that the Gulf Cartel?
 8    A.   Yes.
 9    Q.   Do you know any other drivers in the organization?
10    A.   Yes.
11    Q.   Who?
12    A.   Barrientos.
13    Q.   Do you know his first name?
14    A.   No.
15    Q.   How many times did you see him in person?
16    A.   Twice.
17    Q.   Where?
18    A.   Once in Houston and once in Del Rio.
19    Q.   Did you have a nickname?
20    A.   Pajaro would call me "brother."
21    Q.   Were you ever stopped by law enforcement any other time or
22    just on February of 2008?
23    A.   Only in February.
24    Q.   You were never pulled over any other time?
25    A.   I was arrested once before in Eagle Pass for a ticket.
```

259

Q.   So no law enforcement officer ever tried to find cocaine
in any of your other loads?

A.   No.

Q.   You were never pulled over by -- while you were driving
05:53  your tractor/trailer were you ever pulled over?

A.   No.

        MR. GYIRES:  May I have just one moment, Your Honor?

        THE COURT:  You may.

        (MR. GALDO AND MR. GYIRES CONFER.)

05:54  Q.   (BY MR. GYIRES)  Let me show you another photograph.  This
one is marked as Government's Exhibit 68.  Do you recognize
this (indicating)?

A.   That's Barrientos.

Q.   Are those your initials next to his photograph?

05:54  A.   Yes.

Q.   Did the agents showing you this photograph tell you that
was Barrientos before you initialed it (indicating)?

A.   No.

Q.   Let's talk just briefly about your plea agreement in this
05:55  case.  You received a 78-month sentence; right?

A.   Yes.

Q.   And at your sentencing hearing did the government help you
get a lower sentence at that time?

A.   Yes.

05:56  Q.   And was that because you were -- why was that?  Why did

1    the government recommend a lower sentence at your sentencing

2    hearing?

3    A.    Because I did cooperate with them.

4    Q.    Do you remember testifying in Grand Jury?

05:56  5    A.    That is correct.

6    Q.    Do you remember your plea agreement with the government?

7    A.    No.

8    Q.    You don't remember signing a plea agreement?

9    A.    Yes.

05:56  10   Q.    And as part of that plea agreement the government -- let

11   me show it to you.

12          MR. GYIRES:  Your Honor, it is not marked.  Do I need

13   to mark it if I want to show it to him to refresh his memory?

14          THE COURT:  It is up to you.

05:57  15         (MR. GYIRES AND MR. MARTINEZ CONFER.)

16          MR. GYIRES:  May I approach the witness, Your Honor?

17          THE COURT:  You may.

18   Q.    (BY MR. GYIRES)  I'm showing you a plea agreement in your

19   case.  Do you recognize this (indicating)?

05:57  20   A.    Yes.  That's my signature.

21   Q.    As part of this plea agreement did the government agree to

22   make known to the Court any cooperation that you provide to the

23   government?

24   A.    Yes.

05:58  25   Q.    But that cooperation has to be truthful, doesn't it?

1    A.   That is correct.

2    Q.   Are you telling the truth today?

3    A.   Yes.

4    Q.   Are you scared?

05:58 5    A.   Yes.

6    Q.   Why?

7    A.   Because I'm going to have problems when this is over.

8    Q.   What sort of problems?

9         MR. MARTINEZ:  I'm going to object to that.  Your

05:59 10   Honor, may I approach the Court?

11        THE COURT:  Approach.

12        (ON-THE-RECORD BENCH CONFERENCE, TO WIT:)

13        MR. MARTINEZ:  I would --

14        THE COURT:  You can speak normally.

05:59 15   MR. MARTINEZ:  Okay.  I would object to any testimony

16   that the witness might give, "in fear for his life."  There is

17   no evidence my client ever threatened him or will threaten him.

18   It is pure speculation and it is just going to imply my client

19   is some kind of a threat or has made threats.

05:59 20        MR. GYIRES:  I don't want to make that implication.

21   Maybe my question might be more appropriate on redirect when

22   his credibility is at issue, to test it or rebut and any

23   implication that he's not telling the truth.

24        THE COURT:  I think it would be fine now, Mr. Gyires,

06:00 25   if you would make clear that it is not his client that he is

worried about.  He is just worried about general reprisals.
Because I think it is a pretty safe bet and it's a pretty
obvious situation that people that cooperate and testify are
not going to be in the same position as those who don't in
terms of possible retribution from an organization.

        If you will just clarify that you have no information that
it's this defendant that he is worried about, just the
organization generally, I'll allow you to ask it at this time
if you want; but we need to clear it up that it is not Mr.
Martinez's client, that there is no evidence that it's Mr.
Martinez' client that is a direct threat.

                MR. MARTINEZ:  It is up to the government and
yourself, of course.  If it's easier for the government --

                THE COURT:  Actually, Mr. Martinez, in my Court it is
never up to the government.  It is always up to the Court.

                MR. MARTINEZ:  I caught myself.  I figured that out
now.

                (LAUGHTER.)

                MR. MARTINEZ:  We can make a stipulation, if you will
allow it, that he could say that.  I don't have a problem with
him making that pronouncement to the jury.

                THE COURT:  That he is worried about his safety.

                MR. MARTINEZ:  Or that my client had nothing to do
with and he has no evidence of specific threats; and then he
can go on and ask --

```
 1              THE COURT:  That's not going to be a stipulation; but

 2      what we need to make sure is that the witness is clear that he

 3      has fear for his life.  And, Mr. Gyires, I'll let you follow-up

 4      with a leading question that he's not suggesting that it is

06:01  5  this defendant.

 6              MR. GYIRES:  Or somebody in this courtroom.

 7              THE COURT:  Yes, somebody in this courtroom.

 8              MR. GYIRES:  Or should I say "this defendant"?

 9              THE COURT:  You can say "this courtroom" or "this

06:01 10  defendant," --

11              MR. GYIRES:  Okay.

12              THE COURT:  -- because that's the main thing.

13              MR. MARTINEZ:  Right.

14              (BENCH CONFERENCE CONCLUDED.)

06:01 15            MR. GYIRES:  May I proceed?

16              THE COURT:  You may.

17      Q.   (BY MR. GYIRES)  Are you afraid of people in Mexico?

18      A.   Yes.

19      Q.   You're not afraid of somebody in this courtroom hurting

06:02 20  you; right?

21      A.   No.

22      Q.   Why are you afraid of the people in Mexico?

23      A.   Because I am testifying against someone, against an

24      organization in Mexico.

06:02 25            MR. GYIRES:  May I have another brief moment, Your
```

1    Honor?

2              THE COURT:  You may.

3                (MR. GYIRES AND MR. GALDO CONFER.)

4              MR. GYIRES:  May I briefly approach the Court with

06:03  5    one quick question?

6              THE COURT:  You may.

7                (ON-THE-RECORD BENCH CONFERENCE, TO WIT:)

8              MR. GYIRES:  Isn't voice identification an option?

9              THE COURT:  It always is.

06:03 10              MR. GYIRES:  If I say "Out of all the people you

11    dealt with if someone spoke in the courtroom, would you be able

12    to identify them?"  And then --

13              THE COURT:  Yes, it is possible; but you have got to

14    lay the predicate.

06:03 15              MR. MARTINEZ:  Right.

16              THE COURT:  Lay the predicate that he can, that he

17    would be able to identify and it would be a particular person's

18    voice and if he heard it again.

19              MR. GYIRES:  But I just don't want to put the words.

06:04 20    I don't want to say "If you heard Pajaro's voice" and then ask

21    him to talk.

22              THE COURT:  Then don't lead him.  Just ask him "Did

23    you ever speak to Pajaro before on the telephone or in person?"

24    "Yes."  "If you heard his voice again, would you be able to

06:04 25    recognize it?  How many times did you hear it?"

1          MR. GYIRES:  Should I do it with somebody else first

2     just so we are not?  No?

3          THE COURT:  How would you being do it with somebody

4     else if you want this person to be the one that identifies him?

06:04 5          MR. MARTINEZ:  What if he says "Yes," Your Honor?

6     What if he says "Yes"?  Part of the predicate would be to

7     establish familiarity with the voice.

8          THE COURT:  Sure.  He has got to establish the

9     predicate that he is familiar, how many times he talked to the

06:04 10    person, if he would be able to recognize the voice again if he

11    talked to him again and he heard his voice.  Keep in mind

12    Mr. Gyires doesn't know the answer to his question.

13         MR. GYIRES:  Right.

14         MR. MARTINEZ:  But if he says "Yes," maybe I don't

06:05 15    know.  He has got a purpose and I should know and I don't know.

16         THE COURT:  I am assuming, and this is my assumption,

17    Mr. Gyires.  That if this man says "I talked to Pajaro quite a

18    bit," he talked to Pajaro quite a bit and he could recognize

19    the voice and if he had heard it again, he would be able to

06:05 20    recognize it, then Mr. Gyires is going to ask or have your

21    client get up and read something.  Let's find something neutral

22    that he can read just for the voice so that this witness can

23    hear the voice.  And then Mr. Gyires is going to ask him "Based

24    on the voice, can you identify this person" is what I am

06:05 25    assuming is where we're going.

1          MR. MARTINEZ:  The problem with that though is if he

2     stands up again, would that be suggesting?

3          THE COURT:  He wouldn't be standing.  It is going to

4     be suggestive; but the only thing I can do is at that point is

06:05 5     find a way to cover the witness from hearing who is doing the

6     speaking so that he can't see that it is your client speaking.

7          MR. MARTINEZ:  Can we do that?

8          THE COURT:  Sure.  We can cover him from his view so

9     that he can't see who the person speaking is.

06:06 10          MR. MARTINEZ:  So he "cannot"?

11          THE COURT:  Cannot.

12          MR. MARTINEZ:  That's it.

13          MR. GYIRES:  Can I have 30 seconds to think about if

14     I want to do that?

06:06 15          THE COURT:  Okay.

16          MR. GYIRES:  Ten seconds.

17          THE COURT:  Hurry up, because I'm going to give --

18     let me do this:  Let me give the jury a break while you hash

19     this out.

06:06 20          MR. GYIRES:  All right.  Thank you.

21          (BENCH CONFERENCE CONCLUDED.)

22          THE COURT:  Ladies and gentlemen of the jury, I don't

23     know about you-all; but I think I'm going to need a break right

24     now while we take care of some matters.  So let me go ahead and

06:06 25     let you, excuse you to go to the jury room for just a few

```
 1    minutes.
 2              (JURY OUT.)
 3              THE COURT:  Let's take a short break while you-all
 4    discuss it.  Just have a seat, Mr. Cortinas.  That's his name,
06:07  5  Mr. Cortinas (indicating)?
 6              MR. MARTINEZ:  Yes.
 7              THE COURT:  Don't speak to anyone.  We are in a short
 8    recess.
 9              (RECESS.)
06:33 10            THE COURT:  Okay.  Let me get on the record in
11    DR-10-CR-361; United States of America vs. Defendant Number 2
12    Luis Roel Castaneda.  All parties are present including the
13    defendant.  Mr. Gyires, you are not going to do the experiment
14    we were talking about here at the bench?
06:33 15            MR. GYIRES:  Correct, Your Honor.
16              THE COURT:  Do you have more questions?
17              MR. GYIRES:  I have one or two more questions of this
18    witness.
19              THE COURT:  Here is my inclination at that point:  To
06:34 20  recess for the day.  This jury has actually been here since
21    7:30 this morning.  I would recess for the day.  Mr. Martinez,
22    you would begin with cross examination in the morning.
23              MR. MARTINEZ:  Yes, ma'am.
24              THE COURT:  No one could have any contact with Mr.
06:34 25  Cortinas between now and the morning, and I would so admonish
```

1    the witness when we finish for the day.  My suggestion is we

2    wrap it up for the day.

3                MR. GYIRES:  Yes, Your Honor.

4                THE COURT:  Do you want to check and see if the

06:34 5    jurors are ready?

6                COURT SECURITY OFFICER:  Yes, they are.

7                THE COURT:  Let's bring in the jury.

8                (JURY IN.)

9                THE COURT:  You may be seated.  Mr. Gyires, you were

06:35 10   on direct.

11   Q.   (BY MR. GYIRES)  Just a couple of more questions:  Who is

12   in charge of your sentence?

13   A.   I don't know.

14   Q.   Is it the judge?  Is it the government?

06:35 15   A.   The judge.

16   Q.   Has the government made you any promises?

17   A.   No.  Nothing.

18               MR. GYIRES:  Pass the witness, Your Honor.

19               THE COURT:  I'm anticipating we are going to have

06:35 20   quite a lengthy cross examination, and I know you have been

21   here since at least 7:30 this morning.  My inclination at this

22   point is to go ahead and recess for the day and have you come

23   back at 9:30 and pick up at that time.

24               Remember my instructions.  Do not investigate this case.

06:36 25   Do not investigate the law.  Don't look anything up on the

1    internet.  Don't read or listen or talk to anyone about it.  Do

2    not talk to each other about it, because that would be a form

3    of deliberation and you can't do it at this point.  I will see

4    you tomorrow at 9:30.  You may be excused.

06:36  5              (JURY OUT.)

6              THE COURT:  Mr. Cortinas, the defense attorney is

7    going to begin at 9:30 in the morning with cross examination.

8    He has the right now to make sure that no one talks to you

9    about your testimony between the direct examination by Mr.

06:37 10   Gyires and when he starts asking you questions.  Do not speak

11   to anyone, not agents, not people at GEO, not the attorneys,

12   not anyone about your testimony until after you have been

13   excused from testifying.  And you're not yet excused.  Do you

14   understand?

06:37 15             THE WITNESS:  Yes.

16             THE COURT:  All right.  You may be excused as well.

17             MR. MARTINEZ:  Thank you, Your Honor.

18             THE COURT:  Marshals, you may take him.

19             MR. GYIRES:  Can I advise of Court of one thing?

06:38 20             THE COURT:  Go ahead.

21             MR. GYIRES:  The government, in light of his

22   testimony, might add one quick witness tomorrow, a custodian of

23   records from the DPS license.

24             THE COURT:  Was he on your witness list?  If he

06:38 25   wasn't, you didn't voir dire this jury panel on it.

1          MR. GYIRES:  That's true, Your Honor.  The testimony
2    would only be to prove up --
3          THE COURT:  That wasn't my question.
4          MR. GYIRES:  No, he was not on the witness list.
06:39 5          THE COURT:  We have not voir dired the jury.
6          MR. GYIRES:  Can we do that?
7          THE COURT:  Let's say six people would say "yes" and
8    "it would affect them."
9          MR. GYIRES:  Then I wouldn't call them.
06:39 10          THE COURT:  Why are you calling a custodian of
11    records if all the exhibits have been introduced?
12          MR. GYIRES:  We would like to introduce the
13    photograph associated with the defendant's drivers license
14    photo to show the photo he was looking at, to show the photo he
06:39 15    was looking at was in fact the defendant.
16          THE COURT:  Did anybody seize his driver's license
17    when he was arrested?
18          MR. GYIRES:  I don't know if we have his driver's
19    license.  He was in jail in Mississippi.
06:39 20          THE COURT:  When he was arrested.
21          MR. GYIRES:  We pulled him out of the Mississippi
22    jail.  The marshals also have a database that shows photos when
23    they booked him.  That would be another thing we may try to do
24    is show photographs of the defendant to show that is him.
06:40 25          THE COURT:  Mr. Martinez, do you have any objection

271

1    to the drivers license coming in?

2            MR. MARTINEZ:  Actually I don't.  I don't see the

3    relevance; but if he wants to do that.

4            THE COURT:  Do you have any objection to the driver's

06:40  5    license, photocopy of it being introduced as an exhibit?

6            MR. MARTINEZ:  No.

7            THE COURT:  Would you need to call a witness?

8            MR. MARTINEZ:  With a custodian, I would never object

9    to a custodian.

06:40  10           THE COURT:  Okay.

11           MR. GYIRES:  We also have another, a different.

12    There are different, numerous photographs.

13           THE COURT:  Mr. Gyires, find a drivers license

14    picture with information you are wanting to introduce.

06:41  15           MR. GYIRES:  This is it.

16           THE COURT:  Show it to Mr. Martinez.  He said he

17    would agree to its admission without a custodian to testify.

18           MR. GYIRES:  It is the same photo.

19           THE COURT:  Listen to what I'm telling you.  He is

06:41  20    willing to allow it without a custodian.  If that's the case,

21    you are not going to have to call a witness to show he is

22    custodian.

23           MR. GYIRES:  Okay.  Then this is Exhibit 81

24    (indicating).

06:41  25           THE COURT:  Then it is so admitted.  Okay.  So you

1    don't need to add a witness to your witness list.

2             MR. GYIRES:  Correct.  Just one exhibit to the

3    exhibit list.

4             THE COURT:  I just added it to mine.  If anybody

06:41  5    needs to add it to theirs, they can add it.  Anything else?

6             MR. MARTINEZ:  No, Your Honor.

7             THE COURT:  Do you need to speak to your client

8    before the marshals take him downstairs?

9             MR. MARTINEZ:  No.

06:41 10            THE COURT:  You may go with the marshals.  We are in

11   recess.  If the attorneys need me, let Ms. Green know by 9:00

12   o'clock.  If not, I will be here about 9:15 and I will see you

13   at 9:30.

14             MR. MARTINEZ:  Thank you, judge.

06:42 15             (RECESS.)

16

17

18

19

20

21

22

23

24

25

```
 1        UNITED STATES DISTRICT COURT       )

 2        WESTERN DISTRICT OF TEXAS          )

 3

 4             I, ANNA RENKEN LAFRENZ, Official Court Reporter

 5   for the United States District Court, Western District of

 6   Texas, do hereby certify that the foregoing is a correct

 7   transcript from the record of proceedings in the above matter.

 8

 9             Certified to by me this 30th day of December,

10   2011.

11

12

13

14                  /s/ Anna Renken Lafrenz, CSR, RPR

15                  ANNA RENKEN LAFRENZ, CSR, RPR
                    United States District Court
16                  Western District of Texas
                    111 E. Broadway
17                  Suite 214
                    Del Rio, Texas  78840
18
                    CSR #2343
19                  Expires 12/31/12

20

21

22

23

24
          #6639AR
25
```