1          UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF TEXAS
2                  DEL RIO DIVISION

3

4

UNITED STATES OF AMERICA      )
5                             )
                              )      DR-10-CR-361(02) AM
6     VS.                     )
                              )      DEL RIO, TEXAS
7                             )      MARCH 16, 2011
LUIS ROEL CASTANEDA           )
8

9

10

11

12    _____

13                **TRIAL ON THE MERITS**

14       **BEFORE THE HONORABLE ALIA MOSES**
              **UNITED STATES DISTRICT JUDGE**

15
                      **Volume 4**
16    _____

17

18

19

20

21

22

23

24    Proceedings reported by stenotype, transcript produced by

25    computer-aided transcription.

1                          **A P P E A R A N C E S**

2     FOR THE UNITED STATES OF AMERICA:
              UNITED STATES ATTORNEY'S OFFICE
3             MARTON GYIRES
                   -AND-
4             MICHAEL GALDO
              Assistant U.S. Attorney
5             Third Floor, U.S. Courthouse
              111 East Broadway
6             Suite 300
              Del Rio, Texas  78840

7


8

9     FOR THE DEFENDANT:
              RALPH R. MARTINEZ
              ATTORNEY AT LAW
10            2900 Woodridge Drive
              Suite 306
11            Houston, Texas  77087

12

13    FEDERAL INTERPRETER:
              ENRIQUE NORIEGA
14            United States District Court
              Western District of Texas
15            111 E. Broadway
              Del Rio, Texas  78849

16

17

18    OFFICIAL COURT REPORTER:
              ANNA RENKEN LAFRENZ, CSR, RPR
              United States District Court
19            Western District of Texas
              111 E. Broadway
20            Suite 214
              Del Rio, Texas  78840

21

22

23

24

25

I N D E X

PAGE

GOVERNMENT WITNESSES
EDUARDO BARRIENTOS
Direct Examination by Mr. Gyires                    281

WILLIAM PRITCHARD
Direct Examination by Mr. Galdo                     301
Cross Examination by Mr. Martinez                   303

SANTIAGO GAMEZ
Direct Examination by Mr. Gyires                    305
Cross Examination by Mr. Martinez                   316
Redirect Examination by Mr. Gyires                  334
Recross Examination by Mr. Martinez                 345
Further Direct Examination by Mr. Gyires            351

WILLIAM MEHOLIF
Direct Examination by Mr. Gyires                    352

GOVERNMENT RESTS                                    358

RULE 29 MOTION                                      358

DEFENSE CLOSES                                      370

GOVERNMENT CLOSES                                   370

JURY CHARGE CONFERENCE                              370

CLOSING ARGUMENTS BY MR. GYIRES                     383

CLOSING ARGUMENTS BY MR. MARTINEZ                   388

CLOSING ARGUMENTS BY MR. GYIRES                     398

FINAL JURY CHARGE READ                              401

JURY QUESTION NUMBER ONE                            418

JURY VERDICT                                        422

ADJOURNED                                           425

**E X H I B I T S**

| GOVERNMENT EXHIBIT | IDENTIFIED | ADMITTED |
|---|---|---|
| 62 | 315 | preadmitted |
| 65 | 306, 332 | preadmitted |
| 66 | 293, 300, 332 | preadmitted |
| 74 | 310, 314, 337 | preadmitted |
| 75 | 314, 335, 340 | preadmitted |
| 81 | 294, 300, 301, 308, 309 | 272 |
| 82 | 300, 301, 308, 309, 316 | 279 |

|  |  |  |
|---|---|---|
|  | 1 | **(MARCH 16, 2011, OPEN COURT.)** |
|  | 2 | THE COURT:  DR-10-CR-361; United States of America |
|  | 3 | vs. Luis Roel Castaneda.  Announcements, please. |
|  | 4 | MR. GYIRES:  Marton Gyires and Mike Galdo for the |
| 10:05 | 5 | United States, Your Honor. |
|  | 6 | MR. MARTINEZ:  Ralph Martinez for Mr. Castaneda. |
|  | 7 | We're ready, Your Honor. |
|  | 8 | MR. GYIRES:  A couple, two small minor, very minor |
|  | 9 | things.  One, we have -- |
| 10:05 | 10 | THE COURT:  I said 9:00 o'clock, Mr. Gyires. |
|  | 11 | MR. GYIRES:  It won't take but 10 seconds. |
|  | 12 | THE COURT:  I said 9:00 o'clock, Mr. Gyires.  Why |
|  | 13 | couldn't you have told Ms. Green at 9:00 o'clock?  I have been |
|  | 14 | waiting in my chambers waiting for the juror.  I could have |
| 10:05 | 15 | taken care of it before. |
|  | 16 | MR. GYIRES:  I'm sorry.  Really one is five seconds. |
|  | 17 | We just have extra exhibit. |
|  | 18 | THE COURT:  Did you show it to -- |
|  | 19 | MR. MARTINEZ:  I have no objection, Your Honor. |
| 10:05 | 20 | THE COURT:  All right.  That's 81? |
|  | 21 | MR. GYIRES:  82. |
|  | 22 | THE COURT:  82 is admitted. |
|  | 23 | MR. GYIRES:  And the second, we'd like to -- assuming |
|  | 24 | defense counsel agrees, we are going to not call the |
| 10:05 | 25 | fingerprint expert and not call evidence of fingerprints as |

1    long as defense counsel doesn't argue that the government

2    didn't try to get fingerprints.

3            MR. MARTINEZ:  And I'm not going to make that

4    argument.  I will agree not to make that argument.

5            THE COURT:  It is up to you-all.

6            MR. GYIRES:  Okay.  That's it.

7            THE COURT:  Okay.

8            MR. MARTINEZ:  Your Honor, if I could state I'm not

9    even asking questions to this witness, and the reason is is

10:06 10  because, and I want the record to reflect this, I discussed

11   this with my client and the reason I'm not is because I don't

12   want to invite rebuttal from the government.

13           THE COURT:  It is up to you.

14           MR. MARTINEZ:  I just want the record to reflect it

10:06 15  as to Sixth Amendment due process.

16           THE COURT:  Okay.  And do you want your client to

17   affirm that on the record for you?

18           MR. MARTINEZ:  Yes.  Can we do that, Your Honor?

19           THE COURT:  Yes.  Is that correct, Mr. Castaneda, you

10:06 20  are in agreement with your attorney's trial strategy not to

21   cross examine this witness?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Mr. Martinez, let me ask you a question.

24   Do you want to say in front of the jury that you don't have any

10:06 25  cross examination and we can excuse him formally in front of

```
  1    the jury?
  2              MR. MARTINEZ:  Yes, Your Honor.
  3              THE COURT:  Okay.  That's fine.  Let's bring them in.
  4              (JURY IN.)
  5              THE COURT:  You may be seated.  And we were at the
  6    cross examination stage.  Mr. Martinez, do you wish to cross
  7    examine the witness?
  8              MR. MARTINEZ:  No, ma'am.  I have no questions.
  9              THE COURT:  All right.  Mr. Cortinas, you may step
 10    down.  Mr. Gyires or Mr. Galdo, you may call your next witness.
 11              MR. GYIRES:  The government calls Eduardo Barrientos.
 12              THE COURT:  Okay.
 13              MR. GYIRES:  Your Honor, can we approach really fast
 14    about one minor thing?
 15              (ON-THE-RECORD BENCH CONFERENCE, TO WIT:)
 16              MR. GYIRES:  There's only 12 jurors.
 17              THE COURT:  Uh-huh (yes).
 18              MR. GYIRES:  Okay.
 19              THE COURT:  It's just that one juror.  That's why we
 20    pick an alternate.  One juror just failed to show up this
 21    morning.  I've issued a warrant for her arrest.
 22              MR. GYIRES:  Okay.  Thank you.
 23              (BENCH CONFERENCE CONCLUDED.)
 24              (OATH ADMINISTERED.)
 25              THE WITNESS:  Yes.
```

10:07 (line 5)
10:07 (line 10)
10:09 (line 15)
10:11 (line 20)
10:11 (line 25)

1          THE COURT:  Just be sure to speak into that black

2    microphone.

3          THE WITNESS:  Okay.

4          THE COURT:  Okay.  And you may proceed.

10:11  5                    DIRECT EXAMINATION

6    Q.   (BY MR. GYIRES) Good morning, sir.  Can you please

7    introduce yourself to the jury.  What is your name?

8    A.   Eduardo Barrientos.

9    Q.   Are you comfortable with doing this in English, or would

10:11 10   you prefer an interpreter?

11   A.   I'm comfortable in English; but there's a couple of

12   phrases that I might speak in Spanish.

13          THE COURT:  If you need an interpreter, let me know.

14   We'll get one for you.

10:11 15          THE WITNESS:  Okay.

16   Q.   (BY MR. GYIRES) Are you currently incarcerated?

17   A.   Yes, sir.

18   Q.   How long have you been incarcerated?

19   A.   I'm going on 18 months.

10:11 20   Q.   Do you remember pleading guilty to conspiracy to possess

21   with intent to distribute more than five kilograms of cocaine?

22   A.   Yes.

23   Q.   Do you remember have you been sentenced yet?

24   A.   No, sir.  Not yet.

10:11 25   Q.   Not in reference to that case.  But have you ever

1    transported cocaine using a flatbed trailer, tractor/trucks?

2    A.    I have transported some kind of illegal drugs, yes, sir.

3    Q.    Using a tractor/trailer?

4    A.    A tractor/trailer, yes, sir.

10:11 5    Q.    When did you start doing that?

6    A.    Possibly it was around late spring, early summer of '06.

7    Q.    When did you stop doing that?

8    A.    Around '07.

9    Q.    Why did you stop?

10:12 10    A.    Because the truck containing that I guess it was caught.

11    They removed my truck from me.  They took the truck that I was

12    using.  At the time they took it from me.

13    Q.    Describe the truck that you drove.

14    A.    It was a blue Kenwood.  '86 I believe was the model.

10:12 15    Q.    What did you pull with it?

16    A.    It was a split-axle flatbed.

17    Q.    Where were the drugs?

18    A.    They were contained underneath the fifth wheel where the

19    kingpin was at, was located.

10:12 20    Q.    Can you explain what a fifth wheel and a kingpin is

21    generally?

22    A.    A kingpin is where the truck actually hooks up to the

23    trailer to be able to haul it.  That's where actually the fifth

24    wheel just clamps onto it, to the trailer.

10:13 25    Q.    How many times did you haul drugs?

```
 1    A.    Several times.  I guess like 40 times at least.
 2          COURT REPORTER:  Four zero?
 3          THE WITNESS:  Yes.
 4    Q.    (BY MR. GYIRES)  Was the truck/tractor registered in your
10:13 5 name, or --
 6    A.    No, sir.
 7    Q.    -- whose name?  Whose name?
 8    A.    It was registered under J&M Express.
 9    Q.    Where did you take the loads?
10:13 10 A.  Several places.  Basically Houston.
11    Q.    Where else?
12    A.    Atlanta, Georgia.
13    Q.    Where else?
14    A.    And North Carolina.
10:13 15 Q.  Where in North Carolina?
16    A.    Raleigh.
17    Q.    Was that a pretty long drive?
18    A.    It is.
19    Q.    How long?
10:13 20 A.  About like 18 hours.  It is 18 hours over to Georgia,
21    Atlanta.  It is like 23 hours over to North Carolina.
22    Q.    Did you ever drive that tractor/trailer doing anything
23    legitimate, or was it all drug related?
24    A.    No, sir.  I did drive that trailer with a couple of loads
10:14 25 legitimate.
```

```
1    Q.    I'm sorry.  Could you say that again?

2    A.    I did drive that truck legitimately on a couple of loads.

3    Q.    What were those loads?

4    A.    Those loads pertained from using the old piping for the

5    drilling.  How do you say it?  The oil rigging.

6    Q.    Okay.

7    A.    The oil rigging.  Pasadena.

8    Q.    Where were the drugs hidden?

9    A.    It was a hidden compartment underneath the kingpin.

10   Q.    About how much quantity of drugs?

11   A.    I have no idea, sir.

12         THE COURT:  You-all are going to have to not speak at

13   the same time.  Let him finish his question before answering

14   because you are going to make it very difficult for the court

15   reporter.

16         THE WITNESS:  Okay.

17   Q.    (BY MR. GYIRES)  It is being recorded, what we are saying.

18   It's being typed out, so we can't talk over each other.  Did

19   you ever haul anything else illegally other than drugs?

20   A.    No, sir.

21   Q.    Like money?

22   A.    I do think that every time that I delivered I guess when I

23   was told to move the truck again it had money in it.

24   Q.    But you don't know for sure?

25   A.    No, sir.
```

1   Q.   Why do you think that there was money in it though?

2   A.   Because several times I was asked to go back towards the

3   border town of Roma.

4        COURT REPORTER:  Roma?

10:15   5        THE WITNESS:  Yes.

6   Q.   (BY MR. GYIRES)  Where is Roma?

7   A.   It is near the border of --

8   Q.   Is it in Texas?

9   A.   Yes, it is in Texas.

10:15  10   Q.   Is it in South Texas?

11   A.   It is in Texas across to the -- how do I say it?  It is

12   close to Zapata, Rio Grande.

13   Q.   Is it south of Del Rio?

14   A.   Yes.

10:16  15   Q.   South of Laredo?

16   A.   South of Laredo.

17   Q.   Would you say you had supervisors or bosses involved in

18   this organization?

19   A.   I'd say caretakers probably.

10:16  20   Q.   And who was that?  Could you name some?  And you can use

21   nicknames.

22   A.   The only one that was always behind me was Chaparro.  That

23   was basically the only person that was always behind me, behind

24   me and the tractor, and he was always at the location where I

10:16  25   was supposed to pick up and deliver.

1    Q.    What do you mean "behind you, behind the tractor"?

2    Explain that.

3    A.    He would just follow.  He would just follow me.

4    Q.    Why would he do that?

10:16  5    A.    I guess, my guess was to be assured that the load got

6    there on time and at the right place.

7    Q.    I'm showing you a document marked Government's Exhibit 7.

8    Do you see something on your screen?

9    A.    Yes.

10:17  10          THE COURT:  Let me make sure that -- yes, everything

11    is on now.

12    Q.    (BY MR. GYIRES)  Do you are recognize this (indicating)?

13    A.    Yes, I do.

14    Q.    What is that?

10:17  15    A.    That's the photo lineup of Chaparro.

16    Q.    Is that your initials next to it?

17    A.    Yes.  Yes.

18    Q.    Did anyone tell you who to point to?

19    A.    No, sir.

10:17  20    Q.    How did this organization generally work?  Do you know how

21    the cocaine came across the border?

22    A.    I have no knowledge of that, sir.

23    Q.    Tell us how you first got involved.  Why did you get

24    involved with this?

10:18  25    A.    I got involved because I was falling behind on bills.  It

1    was coming spring break, I remember, and money was short.

2    Truck driving was kind of slow at the time.  All my bills were

3    backing up.  I was late on my truck payments.  I had to let go

4    a couple of payments on my truck to be able to make my house

10:18  5    payments, light, energy bills, phone bills.  And I guess I got

6    on my boss's nerves when I was always asking for cash advances

7    to be able to make up for it.

8    Q.    Where were you working?

9    A.    Excuse me?

10:18  10    Q.    Where were you working?

11    A.    I was working for a company, Aztec Express.

12    Q.    In what town?

13    A.    In Eagle Pass, Texas.

14    Q.    So what happened?  Who first approached you about drugs?

10:19  15    A.    It was a man that worked for the company, for Aztec.  He

16    is a mechanic.  He overheard me shouting and yelling with me

17    and my boss fighting, crossing over money issues, and he was

18    the one that approached me saying that there was somebody that

19    needed a driver and that I could be able to get some extra

10:19  20    money.

21    Q.    Where did this conversation take place?

22    A.    It took place in Piedras Negras.

23    Q.    Where?  At work, --

24    A.    It was at --

10:19  25    Q.    -- at a restaurant?

```
 1              THE COURT:  One at a time.

 2              THE WITNESS:  I'm sorry.

 3              THE COURT:  Go ahead.  Tell him where.

 4       A.    It was actually at Aztec Express.  There is a yard in

10:19 5  Piedras Negras.

 6       Q.    (BY MR. GYIRES) Okay.  What happened next?

 7       A.    We started talking, and he said he was going to

 8  communicate with the person he had the phone number of.  So he

 9  did, and after a while that person contacted me.

10:20 10  Q.   And what happened?

11       A.    We made arrangements.  He got my number.  He got my

12  license.  He took my details, my information.

13       Q.    Where did that take place?

14       A.    That happened in Tamaulipas, Piedras Negras.

10:20 15  Q.   And next what happened?

16       A.    After that he gave me a phone number to call, which was

17  the second person that was supposed to hand me over the keys or

18  tell me where to pick up the truck.

19       Q.    And when did that happen?  When did you pick up the truck?

10:20 20  A.    It was the following day.

21       Q.    Did you call that person you were asked to call?

22       A.    Yes, sir.

23       Q.    And describe how you went to go get the truck.

24       A.    I took off from Eagle Pass over to Roma, Texas; and before

10:21 25  I got there I was given a number to call Chaparro up, that he
```

1    was supposed to -- he was supposed to meet me at the entrance

2    of the city limits before I got there.  He was supposed to take

3    me over to where the truck was at.

4    Q.    What year was this?

10:21 5    A.    This was in '06.

6    Q.    January, July, December?

7    A.    May, June or something.

8    Q.    What happened when you got to Roma?

9    A.    I encountered Chaparro.  He gave me the keys.  Actually he

10:21 10   is the one that actually gave me the keys to the truck, and he

11   led me to where I was supposed to pick up the truck.

12   Q.    And what happened when you got there?

13   A.    Nothing actually.  We just gave a handshake.  I grabbed

14   the truck and I took it over to Eagle Pass.  When I was in

10:22 15   route I just let him know that I had the truck, and from then

16   they told me that the following morning I had to take off to

17   Del Rio to pick up the flatbed.

18   Q.    Did you go to Del Rio?

19   A.    Yes, I did.

10:22 20   Q.    Describe that trip.  What happened first?

21   A.    That morning I just received a call.  Well, I was the one

22   that made a call saying that I was ready to go in Del Rio, and

23   once I got close to Del Rio I was supposed to call Chaparro and

24   he was supposed to tell me exactly where to go.

10:22 25   Q.    And did that happen?

```
 1    A.    Yes, sir.

 2    Q.    Where did you go?

 3    A.    I went to a warehouse on the outskirts of Del Rio close to

 4    what you call the Amistad Dam.

 5    Q.    Describe the location a little more, if you can.  Close to

 6    the dam.  What else?

 7    A.    It was a warehouse.  It was between -- there's a storage

 8    facility for boats I believe that is on the left-hand side and

 9    a motel on the right-hand side of it.

10    Q.    Is it --

11    A.    It was on --

12    Q.    -- on Highway 90?

13    A.    -- Highway 90.  Sorry about that.

14    Q.    Is it on Highway 90?

15    A.    Yes, sir.

16    Q.    Is it south of the dam, the port of entry?  Do you know?

17    A.    (No response.)

18    Q.    It is okay if you don't know.

19    A.    I don't know.

20    Q.    I'm showing you a photograph marked Government's 35.  What

21    is that (indicating)?

22    A.    That is the actual warehouse.

23    Q.    So what happened when you got to the warehouse?

24    A.    I was supposed to -- they rolled up the garage door.  The

25    trailer was already inside, so all I had to do was just hook up
```

10:22  5
10:23 10
10:23 15
10:23 20
10:24 25

1      to the trailer and just move on out.

2      Q.    So where did you start going?

3      A.    I started my trip.  They told me to go to Houston with

4      that.  I got some money for expenses, for diesel expenses.

10:24  5      Q.    Who gave you that money?

6      A.    Chaparro did.

7      Q.    And how did you know where to actually go?

8      A.    I was just supposed to head to Houston.

9      Q.    And then what?

10:24 10      A.    Before I got to Houston he was supposed to be either real

11      close to me where I can call him again when I got to town so he

12      can lead me to where I was supposed to go.

13      Q.    And what happened when you got into Houston?

14      A.    I was directed over to I-10 over Market Street.  I can't

10:24 15      exactly remember the street; but I was directed over to a

16      repair shop for diesel where I was supposed to park the truck

17      on the back grounds of the facility and just leave the truck

18      there, the keys.

19      Q.    What area of Houston?

10:25 20      A.    Excuse me?

21      Q.    What area of Houston?

22      A.    On the south side of Houston.

23      Q.    What happened when you got to the location?

24      A.    I just got there, parked the truck.  I put the dolly down,

10:25 25      the legs of the trailer, unhooked, gave the keys to the

1    tractor, and I was taken over to a hotel.

2    Q.    Who was present at that warehouse that first day, if you

3    remember?

4    A.    I actually don't know their names; but there were several

10:26  5    people plus Chaparro was also always there.

6    Q.    I'm showing you Government's Exhibit 66.  Let me take it

7    out of the plastic.  Do you recognize this (indicating)?

8    A.    Yes.

9    Q.    What is that?

10:26  10    A.    That was where I initialed the person that could have been

11    somebody called Pajaro.

12    Q.    What was -- how do you know Pajaro?

13    A.    He was later somebody that they put in Houston for I guess

14    for him to find special spots for the truck and trailer where

10:27  15    the stuff could be delivered at.

16    Q.    Do you see Pajaro in the courtroom today?  And you can

17    stand up if you need to.

18    A.    No.  No, sir.

19    Q.    Can you see my table from where you are sitting?

10:27  20    A.    Yes.

21    Q.    How many people are sitting at my table?

22    A.    Three.

23    Q.    Do you see the other table?

24    A.    Yes.

10:27  25    Q.    How many people are sitting there?

```
 1    A.    Two.
 2    Q.    And you don't see anyone in the courtroom and you don't
 3    see Pajaro?
 4    A.    No, sir.
 5    Q.    I'm showing you a document marked Government's Exhibit 81.
 6    Do you see that photograph (indicating)?
 7    A.    Yes.
 8    Q.    Just give me a moment, a second.  Do you recognize that
 9    person (indicating)?
10    A.    Like I said, it was a person that I signed on it.
11    Actually I said he might look like Pajaro.
12    Q.    Is that the same photograph as the one you initialed?
13    A.    Yes, sir.
14    Q.    So this is the same photograph (indicating)?
15    A.    Correct.
16    Q.    Can you read the name that is on this photograph?  If you
17    can, can you read that?  Do you see where it says the name?
18    A.    Yes, sir.
19    Q.    Can you read that?
20    A.    Castaneda, Luis Roel.
21    Q.    Did he have -- when you saw him did he have -- when you
22    saw Pajaro did he have a full head of hair?
23    A.    He always did.
24    Q.    Did he always have a mustache?
25    A.    Sometimes he wore it and sometimes he didn't.
```

10:27 (line 5)
10:28 (line 10)
10:28 (line 15)
10:28 (line 20)
10:29 (line 25)

1    Q.    When was the last time you saw him?

2    A.    Back in '07 like in April.

3    Q.    So about four years ago?

4    A.    Yes.

10:29  5    Q.    How did you get paid?

6    A.    I got paid in cash about a week after the delivery was

7    done wherever I was supposed to drop the trailer at.

8    Q.    Who paid you?

9    A.    Sometimes Pajaro and sometimes Chaparro.

10:29 10    Q.    How much did they pay you?

11    A.    $8,000 for each load.

12    Q.    Did you get paid any additional cash?

13    A.    Only expense money for whatever needs I needed for the

14    trailer.

10:29 15    Q.    How many times did you see Pajaro in Houston out of the 40

16    times?

17    A.    More than seven.  More than seven.

18    Q.    More than 20?

19    A.    Yes, I would say so.

10:30 20    Q.    Most of the time?

21    A.    After he was placed, after he was placed as the delivery

22    person over in Houston, yes, he was the actual person that I

23    would actually see.

24    Q.    When was he placed there approximately?  You started in

10:30 25    '06.  Was it in '06?

|       |    |    |                                                                    |
|-------|----|----|--------------------------------------------------------------------|
|       | 1  | A. | It was in '07, so it was later.                                    |
|       | 2  | Q. | Towards the end of '07, the beginning, the middle?                 |
|       | 3  | A. | Kind of towards the middle.                                        |
|       | 4  | Q. | What did you see Pajaro do in Houston?                             |
| 10:30 | 5  | A. | He was the only person that -- like I say, he was -- I was         |
|       | 6  |    | supposed to call them instead of Chaparro now for him to give      |
|       | 7  |    | me directions to where to actually take the trailer.              |
|       | 8  | Q. | So you had his phone number?                                       |
|       | 9  | A. | Yes, sir.                                                          |
| 10:30 | 10 | Q. | How did you get that phone number?                                 |
|       | 11 | A. | By him.  By him.  Actually I guess he got my phone number          |
|       | 12 |    | from somebody else.                                                |
|       | 13 | Q. | Did you ever see him handling any drugs?                           |
|       | 14 | A. | No, sir.                                                           |
| 10:31 | 15 | Q. | Did you ever see him load or unload the drugs?                     |
|       | 16 | A. | No.                                                                |
|       | 17 | Q. | Do you ever see any bundles ever at all?                           |
|       | 18 | A. | Only once when I was supposed to get out of their way, and        |
|       | 19 |    | I returned back to the tractor/trailer and I had forgotten my     |
| 10:31 | 20 |    | bag.                                                               |
|       | 21 | Q. | And what happened?                                                 |
|       | 22 | A. | And I opened the gate and they were taking the bundles            |
|       | 23 |    | from underneath the trailer.                                      |
|       | 24 | Q. | Who was?                                                           |
| 10:31 | 25 | A. | Chaparro was.                                                      |

|  |  |
|--|--|
| 1 | Q.    Anybody else? |
| 2 | A.    There was other people there; but like I say, I can't |
| 3 | actually recall their names. |
| 4 | Q.    Do you remember Pajaro being there? |
| 10:31 5 | A.    Not at that specific time, no. |
| 6 | Q.    But was he at that location on more -- |
| 7 | A.    Not at that specific time that I recall actually seeing |
| 8 | the bundles, he was not yet with the organization. |
| 9 | Q.    Only.  How many different locations did you go to in |
| 10:32 10 | Houston?  More than two? |
| 11 | A.    Yes. |
| 12 | Q.    More than 10? |
| 13 | A.    No. |
| 14 | Q.    And did you contact Pajaro on each of those times to |
| 10:32 15 | figure out where to go? |
| 16 | A.    Each time I got close to Houston. |
| 17 | Q.    And he told you where to go to drop off your truck? |
| 18 | A.    Correct. |
| 19 | Q.    Did you deal with Pajaro in any other way? |
| 10:32 20 | A.    No, sir. |
| 21 | Q.    But he gave you money; right? |
| 22 | A.    Yes, sir. |
| 23 | Q.    How did he -- was it in cash? |
| 24 | A.    Yes, always in cash. |
| 10:33 25 | Q.    What type of bills? |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | A.    It ranged from fives to hundreds, $5 bills to $100 bills. |
|       | 2  | Q.    How many cell phones did you have personally?          |
|       | 3  | A.    Personally, I had three.                               |
|       | 4  | Q.    Why three?  Why not one?                               |
| 10:33 | 5  | A.    One was for my actual work where I worked at.  The other |
|       | 6  | one was my personal phone for my family, and the third one   |
|       | 7  | belonged to the organization.                                |
|       | 8  | Q.    What do you mean "belonged to the organization"?       |
|       | 9  | A.    Well, it was the only phone I used for them to contact me |
| 10:33 | 10 | and for me to contact them.                                  |
|       | 11 | Q.    Was it registered in your name?                        |
|       | 12 | A.    No.                                                    |
|       | 13 | Q.    Why?                                                   |
|       | 14 | A.    It was prepaid phones.                                 |
| 10:33 | 15 | Q.    Why?                                                   |
|       | 16 | A.    Excuse me?                                             |
|       | 17 | Q.    Why?                                                   |
|       | 18 | A.    Because it was less tracking that way.  Nobody ever knew |
|       | 19 | what you had.  Besides the phones were always tossed out every |
| 10:34 | 20 | two or three weeks.                                          |
|       | 21 | Q.    So you switched phones routinely?                      |
|       | 22 | A.    Correct.                                               |
|       | 23 | Q.    Do you remember your plea agreement in your case?      |
|       | 24 | A.    Somewhat.                                              |
| 10:34 | 25 | Q.    Do you remember having a plea agreement?               |

A.     Yes.

Q.     Do you remember in that plea agreement it says the that government will tell the Court at your sentencing any truthful cooperation that you provided to the government?

A.     Correct.

Q.     And that cooperation has to be truthful; right?

A.     Yes, sir.

Q.     Are you telling the truth today?

A.     Yes, sir.

Q.     When you were first arrested were you completely honest with the government?

A.     No, sir.

Q.     Why not?

A.     Because I didn't want to do any more damage than what I had already stepped in.  I mean I was already in it for a while.  I just didn't want to make the situation any worse, and I thought by lying I was going to try to get out of it.

Q.     So at that point you didn't tell the government everything?

A.     No, sir.  At the beginning, no.

Q.     But since then you changed your mind?

A.     Correct.

            MR. GYIRES:  May I have one moment, Your Honor?

            THE COURT:  You may.

            (MR. GYIRES AND MR. GALDO CONFER.)

```
 1    Q.   (BY MR. GYIRES)  Just a couple more questions.  Let me

 2    show you again Government's Exhibit 66.  We talked about this

 3    already.  Do you recognize it again?

 4    A.   Yes.

 5    Q.   Let me pull it out of the plastic.  Do you recognize that

 6    (indicating)?

 7    A.   Yes, sir.

 8    Q.   Now you said "maybe that is Pajaro."  What do you mean

 9    "maybe"?

10    A.   Because it only had certain looks that it might be him.

11    Q.   Like weight, hair, or what?

12    A.   Actually his facial the way his mustache looked and the

13    characteristics of his face kind of looked like him.  That's

14    why I had said it looked like him.

15    Q.   Okay.  Let me show you another government exhibit.  This

16    is Government's Exhibit 82, the marshal's booking photo of an

17    individual.  Let me zoom it in.  Does that person look familiar

18    to you (indicating)?

19    A.   No, sir.

20    Q.   Let me show you Government's Exhibit 81.  Do you think

21    that person (indicating) looks like that person (indicating)?

22    A.   Yes.

23    Q.   I'm sorry?

24    A.   Yes.

25    Q.   Let me do it again.  This person, Government's Exhibit 81
```

10:36  5
10:36 10
10:36 15
10:37 20
10:37 25

| | | |
|---|---|---|
| | 1 | compared to Government's Exhibit 82, do you think that is the |
| | 2 | same person (indicating)? |
| | 3 | A.   Yes, sir. |
| | 4 | Q.   And is Government's Exhibit 81 the photo that you |
| 10:37 | 5 | identified in the photo lineup? |
| | 6 | A.   That is. |
| | 7 | Q.   I can show you the photo lineup again.  Is that photo |
| | 8 | (indicating) the same as that photo (indicating)? |
| | 9 | A.   Yes. |
| 10:38 | 10 | Q.   So is this photo the photo that you identified in the |
| | 11 | photo lineup (indicating)? |
| | 12 | A.   Yes. |
| | 13 | Q.   Are you afraid today? |
| | 14 | A.   No, sir. |
| 10:38 | 15 | MR. GYIRES:  Pass the witness, Your Honor. |
| | 16 | THE COURT:  Mr. Martinez? |
| | 17 | MR. MARTINEZ:  No questions, Your Honor. |
| | 18 | THE COURT:  Okay.  You may step down.  Call your next |
| | 19 | witness. |
| 10:38 | 20 | MR. GYIRES:  The government calls Agent Bill |
| | 21 | Pritchard. |
| | 22 | (OATH ADMINISTERED.) |
| | 23 | THE WITNESS:  Yes, I do. |
| | 24 | MR. GALDO:  May I proceed, Your Honor? |
| 10:39 | 25 | THE COURT:  You may. |

DIRECT EXAMINATION

1

2   Q.   (BY MR. GALDO)   Good morning, sir.

3   A.   Good morning.

4   Q.   Can you please state and spell your name for the record.

10:39  5   A.   Yes.  William Pritchard, P-r-i-t-c-h-a-r-d.

6   Q.   Sir, what is your current occupation?

7   A.   I'm a special agent with the Drug Enforcement

8   Administration.

9   Q.   And what is your current assignment?

10:39 10   A.   I'm assigned to the Aviation Division as a pilot with DEA.

11   Q.   And how long have you been with the DEA?

12   A.   Thirteen years.

13   Q.   And what was your assignment back in February of 2008?

14   A.   I was a special agent assigned to the Eagle Pass office,

10:40 15   the resident office.

16   Q.   I want to direct your attention specifically to February

17   24th, 2008.  Were you involved in the investigation involving a

18   trailer driven by Aurelio Cortinas?

19   A.   Yes.

10:40 20   Q.   Specifically I just want to ask you some questions about

21   any cell phones that were involved in your investigation.  What

22   was your role with the cell phones with Mr. Cortinas?

23   A.   The cell phones, myself and another agent task force

24   officer retrieved the cell phone after he was arrested, after

10:40 25   Mr. Cortinas was arrested and reviewed the address book and the

1    contents.

2    Q.    And did you record that information anywhere?

3    A.    I did, yes.

4    Q.    And where did you record it?

10:40 5    A.    I recorded that into a report, DEA-6 report, Report of

6    Investigation.

7    Q.    Sir, specifically do you recall if you pulled, if you

8    wrote down the phone number of Mr. Cortinas's cell phone?

9    A.    Yes, I did.

10:41 10   Q.    And do you recall if you removed any contact information

11   of other individuals involved that turned out to be involved in

12   this drug trafficking organization?

13   A.    Yes, I did.

14   Q.    And do you recall the names that you pulled off?

10:41 15   A.    Yes, most of the names.  Some of the names.

16   Q.    And what are the names you remember?

17   A.    Chapo, Chaparro.  If you have a report so maybe I can

18   refresh my memory.

19         MR. GALDO:  Your Honor, permission to approach the

10:41 20   witness?

21         THE COURT:  You may.

22   Q.    (BY MR. GALDO) Agent, just I handed you a copy of

23   something.  What is that (indicating)?

24   A.    This is a DEA-6 report written by myself on March 7, 2008.

10:41 25   Q.    And what does it purport to deal with?

1    A.    This is the phone contents of Mr. Cortinas's cell phone.

2    Q.    And I believe you -- can you take a look at this for a

3    second and look at that and see if there's any other names of

4    individuals involved in this organization that you wrote down?

10:42  5    A.    Yes.  These are all, almost all of the names that we

6    determined were involved with this criminal organization.

7    Q.    Besides Chapo and Chaparro is there another name that

8    turned out to be involved with this organization?

9    A.    Yes.  There is the name of Pajaro on this report.

10:42  10    Q.    And if you could, could you please read into the record

11    the phone number of Mr. Cortinas's cell phone?

12    A.    Yes, sir.  Mr. Cortinas's phone is (830) 421-1062.

13    Q.    And if you could, please read first the number associated

14    with the name Chapo on the phone.

10:42  15    A.    Yes.  Chapo is (832) 837-8937.

16    Q.    And the name Chaparro, what number is that?

17    A.    Chaparro is (832) 837-1710.

18    Q.    And finally, the number associated with Pajaro?

19    A.    Pajaro is (859) 669-9842.

10:43  20         MR. GALDO:  May I approach, Your Honor?

21         THE COURT:  You may.

22         MR. GALDO:  The government passes this witness.

23         THE COURT:  Okay.  Mr. Martinez.

24                   CROSS EXAMINATION

10:43  25    Q.    (BY MR. MARTINEZ)  Good morning, sir.  My name is Ralph

1    Martinez.

2    A.    Good morning.

3    Q.    And I represent Mr. Castaneda.  You say you got several

4    numbers from the cell phone registration references from

10:43  5    Cortinas's phone; right?

6    A.    Correct.

7    Q.    And officer, agent, your conclusions that these were in

8    fact numbers attributed to these individuals comes from the

9    actual cell phone information; correct?

10:44 10   A.    Based on an interview with Mr. Cortinas he told us the

11   significance of each number and each name associated with that

12   number.

13   Q.    But your conclusion is not based on checking the records,

14   the subscriber records of the phone companies themselves?

10:44 15   A.    I didn't personally check the records.  That was another

16   person that did that.

17   Q.    Do you know if anybody did?

18   A.    I believe another analyst did that.  I was not involved in

19   that portion of the investigation.

10:44 20   Q.    In your years as an agent that's not too hard to do;

21   right?

22   A.    That's correct.

23   Q.    You get the number that belongs to Pajaro or Chapo or

24   Chaparro and you find out who the subscriber is; right?

10:45 25   A.    Yes.

```
 1              MR. MARTINEZ:  Nothing further.  Thank you.
 2              MR. GALDO:  No redirect, Your Honor.
 3              THE COURT:  All right.  You may step down.  Call your
 4    next witness.
 5              MR. GALDO:  The government calls Santiago Gamez.
 6              (OATH ADMINISTERED.)
 7              THE WITNESS:  I do.
 8                            DIRECT EXAMINATION
 9    Q.   (BY MR. GYIRES)  Can you please state your name for the
10    record.
11    A.   Santiago Gamez.
12    Q.   How are you employed?
13    A.   I'm employed with the Drug Enforcement Administration.
14    Q.   In what capacity?
15    A.   As an intelligence analyst.
16    Q.   What are your day-to-day duties in that capacity?
17    A.   My day-to-day duties with the Drug Enforcement
18    Administration is to assist case agents with their
19    investigations by conducting or generating subpoenas, telephone
20    analyses, analyzing any returns from the subpoena returns from
21    telephone companies, report writing, interviewing.
22    Q.   Do you prepare photo lineups?
23    A.   Photo lineups, drivers license queries.
24    Q.   Let me direct you to Government's Exhibit 65.  Let me take
25    it out of the plastic.  Do you recognize this (indicating)?
```

10:45 (line 5)
10:45 (line 10)
10:45 (line 15)
10:46 (line 20)
10:46 (line 25)

```
 1    A.    Yes.
 2    Q.    Let me zoom out.  Describe what this is (indicating).
 3    A.    This is a photo lineup that I generated of six individuals
 4    that are similar looking.
10:46 5    Q.    And what did you do with this photo lineup?
 6    A.    This photo lineup was presented to Aurelio Cortinas to try
 7    to identify a certain subject that I believed was Pajaro.
 8    Q.    Who did you think Pajaro was?
 9    A.    Luis Castaneda.
10:47 10   Q.    Why did you think that person in this lineup --
11              MR. MARTINEZ:  Objection, Your Honor, speculation.
12              THE COURT:  Let's clarify.
13              MR. GYIRES:  I'll rephrase.
14   Q.    (BY MR. GYIRES) Why did you make this photo lineup?
10:47 15   A.    This photo lineup was made up because we were trying to
16   identify a subject by the name of Pajaro, and I had obtained --
17              MR. MARTINEZ:  Objection, hearsay.
18              THE COURT:  Overruled.
19   Q.    (BY MR. GYIRES) Is the individual --
10:47 20             THE COURT:  Let him finish.
21              MR. GYIRES:  Okay.
22              THE COURT:  He was in the middle of the answer.  You
23   had obtained what?
24   A.    I had obtained names of subjects that I believed could
10:48 25   have been Pajaro, and this is one of the photographs
```

1    (indicating).

2    Q.    (BY MR. GYIRES)   Did you witness -- when Aurelio Cortinas

3    initialed this lineup did you witness that?

4    A.    Yes, I did.

10:48  5    Q.    What did he do?

6    A.    He was shown a photograph and asked if he could identify

7    anybody in that photograph that by any capacity, whether it was

8    a friend or anything.   And he identified this photo number five

9    as being Pajaro.   He initialed it and placed the phrase "recibe

10:48 10    la droga y la distribute."

11    Q.    What does that mean?

12    A.    "He receives the drug and distributes it."

13    Q.    Let me show you Government's Exhibit 81.   What is that?

14    A.    That is a driver's license photograph of Luis Castaneda.

10:48 15    Q.    Are you personally familiar with that driver's license

16    photograph?

17    A.    Yes.

18    Q.    How so?

19    A.    I have the ability to query the Texas DPS or Texas

10:49 20    driver's license database and I obtained that photograph.

21    Q.    Let me show you Government's 82.   Oh, here it is.   I

22    apologize.   This is Government's Exhibit 82.   Let me zoom in.

23    Can you describe what that is (indicating)?

24    A.    That is a JABS photograph of Luis Castaneda.   And what

10:50 25    that is is when some people when they get -- when people get

1    arrested they put them in JABS.  It is a database system.  They

2    photograph them and put their biographical information in

3    there.

4    Q.    What is the date of birth on that document?

10:50  5    A.    8/24/72.

6    Q.    Now I'm showing you Government's Exhibit 81 again, the

7    driver's license photograph.  What is the date of birth on

8    that?

9    A.    8/24/72.

10:50 10    Q.    What is the name on this document (indicating)?

11    A.    Luis Roel Castaneda.

12    Q.    Government Exhibit 82, what is the name on this document

13    (indicating)?

14    A.    Luis Roel Castaneda.

10:50 15    Q.    Do you see that person in the courtroom?

16    A.    Yes, I do.

17    Q.    Can you point to him?

18    A.    He's behind you sitting next to the gentleman in the black

19    suit.  He's wearing a blue possibly suit and he is bald.

10:50 20        MR. GYIRES:  Your Honor, may the record show that the

21    witness has identified the defendant.

22        THE COURT:  So noted.

23    Q.    (BY MR. GYIRES)  Let me show you Government's 81 again.

24    Is Luis Castaneda bald in that picture?

10:51 25    A.    No.

```
 1    Q.    Does this document say when this image was taken?

 2    A.    This image was taken on 7/20/1998.

 3    Q.    So how many years ago was that?  More than 10?

 4    A.    Twelve or 13.

 5    Q.    More than 10?

 6    A.    Yes.

 7    Q.    Okay.  About 13.  And just one more question about these

 8    images:  When was this photograph taken in Number 82?

 9    A.    This photograph was taken on 4/26 of 2010.

10    Q.    Now let me direct your attention to your work in this case

11    in relation to the phone subpoenas.  Describe what you did in

12    this case regarding that.

13    A.    In this case I was asked by the case agents.  They had

14    received a lot of telephones from the phone number or the

15    actual phone, the phone book from the suspect at the time,

16    Aurelio Cortinas; and they requested if I could assist them in

17    identifying who these phone numbers belonged to, so I generated

18    some subpoenas to several telephone companies and they sent

19    back subscriber information.

20    Q.    I'm showing you Government's Exhibit 74.  And let's go

21    step by step through this.  What is this (indicating)?

22    A.    That there is a chart that I generated referenced the

23    subpoenas that I had queried or had sent off to the telephone

24    companies.  I also requested telephone tolls.

25          MR. MARTINEZ:  I object, Your Honor.  I would ask
```

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
|    | 1  | that he take down the chart for now.  It has not been admitted |
|    | 2  | into evidence.                                               |
|    | 3  | THE COURT:  I thought it was; but --                         |
|    | 4  | MR. GYIRES:  Your Honor, it is demonstrative.                |
| 10:53 | 5 | THE COURT:  Well, i thought it was too.                     |
|    | 6  | MR. MARTINEZ:  Oh, I'm sorry.                                |
|    | 7  | MR. GYIRES:  If it is demonstrative, that's fine.            |
|    | 8  | THE COURT:  It was one of the ones that I fully              |
|    | 9  | admitted at the beginning of the case.                       |
| 10:53 | 10 | MR. MARTINEZ:  Then I don't have a problem.               |
|    | 11 | THE COURT:  Proceed.                                         |
|    | 12 | Q.   (BY MR. GYIRES)  Let me back up a little bit.  When you |
|    | 13 | say "subscriber information," what sort of data comes back to |
|    | 14 | you?                                                         |
| 10:53 | 15 | A.   Well, subscriber information gives you the name of the |
|    | 16 | person who is renting the phone or the service from these    |
|    | 17 | telephone companies.  They provide you a name, address, date of |
|    | 18 | birth sometimes, social security sometimes if they have it on |
|    | 19 | there.                                                       |
| 10:53 | 20 | A lot of them come back with, with all the new technology   |
|    | 21 | nowadays and all the telephone companies you sometimes don't |
|    | 22 | even have to give your name to these companies; but for those |
|    | 23 | that do have it they provide you a name, date of birth, social |
|    | 24 | security number and address.                                 |
| 10:53 | 25 | Q.   And that is called "subscriber information"?           |

A.    Subscriber information.

Q.    And it doesn't always come back with a name?

A.    Not always.

Q.    What other sort of information do you get back?

10:54  A.    I also subpoenaed records, telephone toll records, which are incoming and outgoing calls made between the subject from one phone number with whoever he called or whoever called him.

Q.    Okay.  So describe what this chart says and start with I guess at the beginning.

10:54  A.    Well, once I got all the records back from the telephone, the incoming and outgoing calls to four telephone numbers that were of heightened interest to me, one would be an Eladio Pena, telephone number (832) 837-8937.  The second number was Aurelio Cortinas, which was (830) 421-1062; a third number, again

10:54  another phone for a Chaparro, which was identified as Eladio Pena with (832) 837-1710; and a fourth, a Pajaro phone number, which was (859) 669-9842.  What I did when I received those records from the telephone companies I put them into a database.  All the incoming and outgoing provides dates, times,

10:55  durations; and what I did is I counted how many times certain numbers here talked to some of the other numbers.

And in this case you have Mr. Castaneda here between the dates of 1/23/08 and 2/24/08 made nine telephone contacts.  Well, his phone made nine telephone contacts with the phone

10:55  that Cortinas was carrying.

Q.    Let me pause you for a second.  So describe what those
arrows are saying.

A.    What those arrows are saying is the phone between Mr.
Castaneda going to the yellow, which is Mr. Cortinas's phone,
there was nine contacts.  The blue box underneath it indicates
all contacts, the nine that were made between 1/23 and 2/24 of
'08.

Q.    Describe the bottom Eladio Pena box.

A.    The bottom Eladio Pena box were the same thing, all
contacts made between 1/26/08 and 2/25/08.  There was 28
contacts between Eladio Pena's phone and Mr. Cortinas's phone
from Eladio to Cortinas.  Cortinas made five telephone calls to
Eladio.

Q.    Okay.  And then the top Pena box?

A.    The top, the same thing:  Between the dates of 12/19/07
and 1/25/08 14 calls were made from Cortinas's phone to Eladio
Pena's phone, and 43 calls were made from Eladio Pena to
Cortinas.

Q.    Now describe the boxes that say "Calls made on day of
cocaine seizure."  What is that?

A.    The cocaine seizure was made on February the 24th of '08.
And what I did is I particularly went in on that date just to
see how many calls were actually made during that arrest.  And
in this case there was 16 calls from Eladio Pena to Mr.
Cortinas's phone on that particular date of arrest and six from

```
 1    Luis Castaneda's phone to Mr. Cortinas's phone.
 2              MR. GYIRES:  May I approach the witness, Your Honor?
 3              THE COURT:  You may.
 4    Q.   (BY MR. GYIRES)  I'm showing you Government's Exhibit 75.
 5    Do you recognize that (indicating)?
 6    A.   Yes.  These are the Court Order requests and subpoenas and
 7    tolls that I subscribed or requested.
 8    Q.   Are these the phone tolls that are summarized in your
 9    chart?
10    A.   Yes.
11    Q.   Moving away from the phones, let me just show you another
12    government exhibit.
13              MR. GYIRES:  May I have one moment, Your Honor?
14              THE COURT:  You may.
15              (MR. GYIRES AND MR. GALDO CONFER.)
16    Q.   (BY MR. GYIRES)  Let me ask you one more question about
17    this chart, Government's Exhibit 74.  I don't think I asked you
18    who the phone numbers were subscribed to.
19    A.   The phone numbers, the orange box had -- this is where I
20    said they come back with different names or fictitious names or
21    no names.  This was a "Juan Perez" was the numbers with 8937,
22    ending with 8937 utilized by Eladio Pena.
23    Q.   What about the next box?
24    A.   The yellow box was a "Manuel Cortinas," which is related,
25    a relative of Aurelio Cortinas.  The bottom box, the white box
```

1    came back to a Juan Perez also, but utilized by Eladio Pena;

2    and the blue box returned to a Jorge Lopez utilized by Pajaro.

3    Q.   So the phone that Cortinas had was not subscribed to his

4    name.  Is that what that shows?

11:00 5    A.   Yes, it was not subscribed to him.

6    Q.   Okay.  I'm moving away from those phone records.  I'm

7    showing you Government's Exhibit 62.  I'm not sure if this will

8    fit on here.  Can you see this (indicating)?

9    A.   Yes, I can see it.

11:00 10    Q.   Can you see it okay?

11    A.   Yes.

12    Q.   Can you just describe what that is?  You can just read it.

13    That's enough.

14    A.   It is "United States District Court, Southern District of

11:00 15    Texas, Judgment in a Criminal Case."

16    Q.   What is the case caption?  Who are the parties?

17    A.   Luis Roel Castaneda.

18    Q.   vs.?

19    A.   vs. United States of America.

11:00 20    Q.   What is the date of the judgment?

21    A.   Date of offense?

22    Q.   No.  The date of the -- just a second.

23         THE COURT:  The date the judge signed it is the date

24    of the judgment.

11:01 25    A.   June 16, 2003.

1   Q.    (BY MR. GYIRES)   What does it say under "nature of the

2   offense"?

3   A.    "Nature of the offense, possession with intent to

4   distribute a quantity less than 50 kilograms of marijuana."

11:01  5   Q.    And the bottom left-hand box, --

6   A.    It has got --

7   Q.    -- what is the date of birth?

8   A.    The date of birth of the Defendant, 8/24/72.

9   Q.    On Government's Exhibit 82 what is the date of birth?

11:01  10   A.    8/24/72.

11              MR. GYIRES:  May I have one quick moment, Your Honor?

12              THE COURT:  You may.

13              (MR. GYIRES CONFERS WITH MR. GALDO.)

14              MR. GYIRES:  I pass the witness, Your Honor.

11:02  15              THE COURT:  Mr. Martinez.

16              (MR. GYIRES CONFERS WITH MR. MARTINEZ.)

17              THE COURT:  Gentlemen, you-all are on the record.

18   Speak loudly so the court reporter --

19              MR. GYIRES:  I apologize.

11:02  20              THE COURT:  -- can hear you.

21              MR. GYIRES:  I'm giving him the chart.

22              THE COURT:  That's fine.  But there can be no

23   whispering once we are on the record.

24              MR. GYIRES:  Yes, Your Honor.

11:02  25              MR. MARTINEZ:  May it please the Court, Your Honor.

|    |    |
|----|----|
| 1 | THE COURT:  Go ahead. |
| 2 | CROSS EXAMINATION |
| 3 | Q.   (BY MR. MARTINEZ)  Good afternoon, sir, or good morning. |
| 4 | My name is Ralph Martinez.  I represent Mr. Castaneda. |
| 11:02  5 | A.   Good morning. |
| 6 | Q.   You created a chart here based on the analysis of the |
| 7 | records you received; correct? |
| 8 | A.   Yes, sir. |
| 9 | Q.   That would involve the subscriber records from the phone |
| 11:03 10 | company; correct? |
| 11 | A.   Subscriber, yes, and tolls, telephone tolls. |
| 12 | Q.   And the telephone records that Cortinas had; correct? |
| 13 | A.   That Cortinas, in this case Jorge Lopez and Juan Perez's |
| 14 | records. |
| 11:03 15 | Q.   But you got all of those from the phone that was recovered |
| 16 | from Cortinas? |
| 17 | A.   All of this I got from all of the records, all four |
| 18 | telephones. |
| 19 | Q.   Okay.  Let me ask you did you ever get a phone that was |
| 11:03 20 | subscribed to Luis Castaneda? |
| 21 | A.   No, sir. |
| 22 | Q.   And the number here reflected as (859) 669-9842 was |
| 23 | subscribed to a Jorge Lopez; correct? |
| 24 | A.   Yes. |
| 11:03 25 | Q.   That number in no way was subscribed to Luis Castaneda; |

1    correct?

2    A.    Correct.

3    Q.    Now in the box you put in there "but used by Luis

4    Castaneda, A/K/A Pajaro"; correct?

11:04  5    A.    Correct.

6    Q.    There is nothing in the records from the phone companies

7    that would indicate the phone was ever used by Castaneda;

8    correct?

9    A.    Correct.

11:04 10    Q.    That is your deduction or your assumption or your

11    conclusion that comes from reviewing the records Cortinas had;

12    correct, and others?

13    A.    My assumption is based off of the identification of the

14    phone number by the cooperating defendants and the

11:04 15    identification of the subject.

16    Q.    Okay.  Now you're also saying A/K/A means "Known As,"

17    "Also Known As"?

18    A.    Correct.

19    Q.    So your assumption that Castaneda or your conclusion in

11:04 20    that box that Castaneda is Pajaro doesn't come from the phone

21    company, does it?

22    A.    No, sir, not from the phone company.

23    Q.    It comes -- it doesn't come from the records obtained from

24    Cortinas or anyone else that says "Pajaro, Also Known As Luis

11:05 25    Castaneda"; correct?

1    A.    Correct.

2    Q.    That comes from the information that maybe Cortinas gave

3    to the officers; correct?

4    A.    Yes.

11:05  5    Q.    All right.  So the little box here with the part that says

6    "used by Castaneda," you have no independent verification of

7    what Cortinas told you; correct?

8    A.    Repeat the question.

9    Q.    Where it says "used by Luis Castaneda" that is totally 100

11:05 10    percent dependent on what Cortinas told you; correct?

11    A.    Correct.

12    Q.    You can't verify that with any phone records, can you?

13    A.    No, sir.

14    Q.    You can't even verify that with any records you recovered

11:05 15    from anyone, can you?

16    A.    No, sir.

17    Q.    Thank you.  And that Luis Castaneda is known as Pajaro can

18    only be verified from what Cortinas said?

19    A.    Well, from two cooperating defendants.

11:06 20    Q.    And Barrientos?

21    A.    Correct.

22    Q.    But you have nothing else from the phone records recovered

23    from anyone or from the phone companies that would indicate

24    that Luis Castaneda is Pajaro; correct?

11:06 25    A.    Correct.

1   Q.   So that whole conclusion, the whole box basically what you

2   can really say 100 percent is and that you can verify is that

3   (859) 669-9842 was subscribed to Jorge Lopez?

4   A.   Correct.

11:06  5   Q.   For you to -- when -- in order for someone to accept use

6   by Luis Castaneda, A/K/A Pajaro that has to be based on

7   Cortinas and Barrientos; correct?

8   A.   Correct.

9   Q.   Okay.  Now this says 17 calls were made.  Well, let me go

11:07  10   to the next box on the left.   (830) 421-1062; correct?

11   A.   Yes.

12   Q.   That's the number I want to reference.  It is subscribed

13   to Emanuel Cortinas; correct?

14   A.   To Emanuel, yes.

11:07  15   Q.   And that's the only independent verification you have of

16   that; is that correct?  I mean the phone records, the

17   subscription records from the phone company has Emanuel

18   Cortinas; correct?

19   A.   Correct.

11:07  20   Q.   And it doesn't say anything about Cortinas in those

21   records; correct?  I'm sorry.  Aurelio Cortinas?

22   A.   No, it does not.

23   Q.   So the only thing you could verify 100 percent is that

24   (830) 421-1062 in some way is connected to Emanuel Cortinas

11:08  25   from the phone records of the company?

1    A.    Correct.

2    Q.    Okay.  The conclusion you wrote, "but used by Aurelio

3    Cortinas" is dependent on what Barrientos and Cortinas told

4    you; correct?

11:08  5    A.    Correct.

6    Q.    If somehow they are lying or are mistaken or trying to

7    work off some time or make a deal and it turns out not to be

8    true or they turn out to have made a mistake, then that part is

9    erroneous; correct?

11:08 10    A.    Repeat that question.

11    Q.    If Cortinas and Barrientos lied to you or are wrong in

12    their conclusions, then that part is wrong in your box?

13    A.    Not necessarily, because that's the phone that Mr.

14    Cortinas had in his possession when he was arrested; therefore,

11:09 15    that phone with (830) 421-1062 is correct as being used by --

16    Q.    At least on that day.

17    A.    -- Aurelio Cortinas.

18    Q.    At least on that day when you found it?

19    A.    On the arrest date, yes.

11:09 20    Q.    Okay.  But the other box, the phone, you never found

21    any -- you have -- if it turns out that Cortinas and Barrientos

22    were mistaken or not telling the truth, the box that says "Luis

23    Castaneda, A/K/A Pajaro," that would be wrong?

24    A.    Yes.

11:09 25    Q.    Okay.  Now you did find the phone on Aurelio Cortinas, so

1    you could make that box.  The point I want to the make though

2    is it says six calls from Cortinas to (859) 669-9842 subscribed

3    to Jorge Lopez.  How many did -- can you say for sure who made

4    those six calls, if it was Manuel Cortinas or Aurelio Cortinas?

11:10  5   Who made all those calls?

6    A.   The six?

7    Q.   Yes, sir.

8    A.   Castaneda's phone made that call to Cortinas's phone.

9    Q.   No.  It says six and it has a little arrow pointing.

11:10 10   A.   Yes.  That's what the arrow stands for:  This phone,

11   arrow, called that phone (indicating).

12   Q.   Okay.  Cortinas's phone, (830) 421-1062 calls

13   (859) 669-9842 six times?

14   A.   That is eight times from the yellow box, which is

11:10 15   Cortinas's phone to Castaneda's phone --

16   Q.   Well, there's two --

17            THE COURT:  Wait, wait, wait, wait.  Gentlemen, one

18   at a time.

19   Q.   (859) 669-9842 is subscribed to Lopez?

11:10 20   A.   Correct.

21   Q.   Okay.  So (830) 421-1062 subscribed to a Manuel Cortinas

22   makes six calls to (859) 669-9842 subscribed to Lopez, six

23   times?

24   A.   You're reading it different --

11:11 25            MR. MARTINEZ:  Can I approach the witness, Your

1    Honor.

2           THE COURT:  Okay.  Gentlemen, you can use the

3    highlighter.  Mr. Gamez, show what the six calls mean.

4           MR. MARTINEZ:  Okay.  I have got a chart that is

11:11  5    incorrect, Your Honor.  I just noticed the chart I was given

6    has the arrow pointing the other way.

7           THE COURT:  Okay.

8           MR. MARTINEZ:  I apologize.  I got an incorrect

9    chart.

11:11 10           THE COURT:  Okay.  So you've got the right one now?

11           MR. MARTINEZ:  Right.

12           THE COURT:  I was going to suggest that he might use

13    the pointer, that he just write real hard on the screen and it

14    will highlight it.

11:11 15           THE WITNESS:  (COMPLIED.)

16           THE COURT:  There you go.

17           MR. MARTINEZ:  The actual exhibit has what he was

18    talking about.  I had received a copy that has the arrow

19    pointing the other way.

20           COURT REPORTER:  The jurors, Your Honor?

21           THE COURT:  Yes.  You can see (referring to jurors).

22    Okay.

23           MR. GYIRES:  I think it needs to be zoomed out a

24    little.

11:12 25           THE COURT:  Got it (indicating).

1    Q.    (BY MR. MARTINEZ)   Thank you.   So I apologize.   I had the

2    wrong chart.   So six calls from (859) 669-9842 to

3    (830) 421-1062; right?

4    A.    On the date of the cocaine seizure, yes, sir.

11:12  5    Q.    You don't know who made those six calls unless you rely on

6    Barrientos and Cortinas; correct?

7    A.    Correct.

8    Q.    And you don't know who he was talking to unless you rely

9    upon Barrientos and Cortinas; correct?

11:12  10   A.    Are you saying Mr. Castaneda, his phone?

11   Q.    Who he was -- not "his" phone.   (859) 669-9842.   Because

12   I'm saying if you don't believe Cortinas and Barrientos, it

13   wouldn't be Castaneda's phone; correct?

14   A.    Correct.

11:13  15   Q.    Okay.   You don't know who that number was, that caller was

16   talking to, do you?

17   A.    No.

18   Q.    It could have been Emanuel Cortinas if you don't believe

19   Barrientos and Cortinas?

11:13  20   A.    We are talking about the date of the seizure, the six

21   telephone calls Mr. Cortinas had that phone in his possession

22   that day; therefore, those calls were made to Mr. Cortinas.

23   Not to Emanuel.

24   Q.    Well, it was made to that phone.

11:13  25   A.    Correct.

Q.   How do you know in the morning that phone wasn't given to him by Emanuel Cortinas?

A.   You could be right.

Q.   Okay.  Now you have eight calls from the (830) 421 number 1062, (830) 421-1062 to the number subscribed to Jorge Lopez, eight calls; correct?

A.   Yes.

Q.   And you don't know who was calling that phone number, do you?  I know you had the phone in Cortinas's hands.  But you don't know who made each and every one of those calls?

A.   Correct.

Q.   You don't even know when they were made, do you?

A.   Yes.  I have the documentation and the records that you have, the stack of them indicating what dates, times, how long the telephone call was made or how long it took, what time it was delivered.

Q.   But you don't know who made the calls; right?

A.   No.

Q.   And you don't know the content of the calls?

A.   No, I don't.

Q.   And you have nine calls coming from (859) 669-9842 to (830) 421-1062; correct?

A.   Yes.

Q.   That's a phone subscribed to Jorge Lopez; correct?

A.   Correct.

```
 1    Q.    But you don't know who made those calls, do you?

 2    A.    No.

 3    Q.    You don't even know if the same person made those calls?

 4    A.    No.

 5    Q.    And you've got up here at top an orange box (832) 837-8937

 6    subscribed to Juan Perez; correct?

 7    A.    Yes.

 8    Q.    That's a verifiable fact from the phone records; correct?

 9    A.    The name "Juan Perez"?

10    Q.    Yes.

11    A.    Yes.

12    Q.    But you put "Used by Eladio Pena, A/K/A Chapo; correct?

13    A.    Correct.

14    Q.    The only reason you can say that is based on your

15    conversations with Barrientos and Cortinas; correct?

16    A.    Correct.

17    Q.    And if they're mistaken or lying about that, that box is

18    wrong; right?

19    A.    Correct.

20    Q.    Now you are also saying A/K/A Chapo.  That means you are

21    saying Pena is known as Chapo; correct?

22    A.    Correct.

23    Q.    That is dependent on Cortinas and Barrientos; correct?

24    A.    Yes.

25    Q.    And if those two individuals are lying or mistaken that
```

1    Pena was Chapo, that box is incorrect; correct?

2    A.    True.

3    Q.    And the same thing with the phone, 14 calls made from the

4    phone subscribed to Manuel Cortinas that Aurelio Cortinas had

11:16  5    was made to the number subscribed to Perez, Juan Perez that you

6    say was used by and Aurelio Pena; correct?

7    A.    There was 14 calls made, yes.

8    Q.    But you don't know who made the 14 calls, do you?

9    A.    No, sir.

11:16  10    Q.    And you don't know their content?

11    A.    No, sir.

12    Q.    Then you have got 43 calls made from the number subscribed

13    to Juan Perez, but used by Eladio Pena, and you 43 calls;

14    correct?

11:16  15    A.    Correct.

16    Q.    You don't know who made those calls?

17    A.    No, sir.

18    Q.    You don't know the content; correct?

19    A.    No.

11:16  20    Q.    And I guess the same thing is true with the box

21    (832) 837-1710 subscribed to Juan Perez; correct?

22    A.    Yes.

23    Q.    That is objectively verifiable from the phone records of

24    the phone company; correct?

11:17  25    A.    Again the name Juan Perez, yes.

```
 1   Q.    And the phone was used by Eladio Pena, A/K/A Chaparro.

 2   The fact that the phone was used by Eladio Pena depends on

 3   whether or not you believe or that if you believe what

 4   Barrientos or Cortinas told you or in fact they were telling

 5   you the truth; correct?

 6   A.    Correct.

 7   Q.    And the fact that Eladio Pena was known at Chaparro, once

 8   again that depends on those two individuals telling the truth

 9   or being -- not being mistaken; correct?

10   A.    Correct.

11   Q.    And if they are mistaken or lying, that box is wrong;

12   correct?

13            MR. GYIRES:  Your Honor, I object to asked and

14   answered.  He has made his point.

15            MR. MARTINEZ:  All right, Your Honor.

16            THE COURT:  I was going to say I thought he was

17   asking it about every box.

18            MR. MARTINEZ:  Yes.  This is a different box.

19            MR. GYIRES:  Okay.

20   Q.    (BY MR. MARTINEZ)  So that box would be incorrect?

21   A.    Repeat your question.

22   Q.    If Barrientos and/or if Barrientos and Cortinas are

23   mistaken about Eladio Pena being Chaparro or they're lying

24   about that, that box would not be correct?

25   A.    True.
```

1    Q.    You have got 28 calls made from that (832) 837-1710 to the

2    number subscribed to Cortinas.  And you got another one that

3    says five calls from them to Pena's number and 16 calls from

4    the 837-1710 to Aurelio Cortinas.  All those numbers you don't

11:18  5    who really made the calls, do you?

6    A.    No.

7    Q.    You don't know the content?

8    A.    No, sir.

9    Q.    So that whole box really a big part of it, your whole

11:18 10    chart depends on whether or not Cortinas and Barrientos are

11    correct, at least a big part of it, that Castaneda, Luis

12    Castaneda is Pajaro; correct?

13    A.    The telephone calls, yes, depends on -- the telephone

14    calls are actually made between the phones.  That's a fact.

11:19 15    Q.    Yes, sir.

16    A.    But the name "Pajaro" and "used by Mr. Castaneda," yes,

17    that depends on Mr. Cortinas and Mr. Barrientos' statements.

18    Q.    Okay.  I appreciate you're saying that.  Okay.  So you

19    interviewed Cortinas, Mr. Cortinas and Mr. Barrientos; correct?

11:19 20    A.    Yes, sir.

21    Q.    Were they interviewed at the same time?

22    A.    No, sir.

23    Q.    Where did you interview them?

24    A.    Mr. Cortinas was interviewed here at the GEO on different

11:19 25    occasions, different dates.

```
 1    Q.    Okay.  He had an attorney at the time; right?

 2    A.    Yes.

 3    Q.    And the attorney gave you permission to interview him;

 4    right?

11:19  5   A.    Correct.

 6    Q.    In fact the attorney was present in those interviews,

 7    wasn't he?

 8    A.    The majority of them, yes.

 9    Q.    Why would an attorney in your opinion allow --

11:20 10          THE COURT:  Counsel.

11          MR. MARTINEZ:  Okay.

12    Q.    (BY MR. MARTINEZ)  Let me ask you this:  At the time you

13    were interviewing these gentlemen you could safely say the

14    attorneys were trying --

11:20 15          MR. GYIRES:  Objection, Your Honor, speculation.

16          THE COURT:  And it is irrelevant what the attorneys

17    were trying.

18    Q.    (BY MR. MARTINEZ)  When the individuals Cortinas and

19    Barrientos were talking to you --

11:20 20          MR. GYIRES:  Objection, Your Honor.

21          THE COURT:  Wait.  Let him ask the question.  I don't

22    even know what the question is.

23    Q.    (BY MR. MARTINEZ)  Were they trying to cooperate with you?

24    A.    Were they trying to cooperate?

11:20 25   Q.    Yes, sir.
```

A.    Yes, they are.

Q.    And were they trying to get a reduction in sentence?

          MR. GYIRES:  Objection, Your Honor.  I object to "why."  He's speculating as to why the witnesses are cooperating.

          THE COURT:  Don't speculate as to what the witnesses or why they did it.  If you know, if they told you, you may answer; but do not speculate.

A.    I don't know why.  It is not in my capacity as an intel analyst to negotiate with these people as to what is going to happen after they cooperate with us.

Q.    (BY MR. MARTINEZ)  All right.  Fair enough.  Did you discuss -- don't tell me what was discussed.  But did you discuss with the attorneys of these people the aspects of the case?

          THE COURT:  No.  It is irrelevant.  The attorneys are not parties in this case.

Q.    (BY MR. MARTINEZ)  Did you know how many times Mr. Cortinas or Mr. Barrientos were -- were they interviewed by any other people in the government besides you before you talked to them?

A.    Yes, the case agent.

Q.    And who would that be?

A.    Bill Pritchard.

Q.    And they were also -- Cortinas was interviewed by Mr.

1    Dixon; correct?

2    A.    Yes.   They were usually present together when they did the

3    interviews.

4    Q.    Okay.   You did put together the photo array; correct, the

11:22  5    photo spread?

6    A.    Yes.

7    Q.    The photo lineup?

8    A.    Yes, sir.   Yes, I did.

9    Q.    It would be Exhibit 66; correct?

11:22 10    A.    I don't know what the exhibit number would be, sir.

11    Q.    Let me see if this is it here, sir (indicating).

12                (MR. MARTINEZ AND MR. GYIRES CONFER.)

13                THE COURT:   Gentlemen, you cannot have a conversation

14    on the record.   No whispering.

11:22 15                MR. GYIRES:   Yes, Your Honor.

16    Q.    (BY MR. MARTINEZ)   Is Exhibit 66, --

17                MR. MARTINEZ:   I'm sorry, Your Honor.   Excuse me.

18    Q.    -- is that the photo spread you put together (indicating)?

19    A.    Yes.

11:23 20    Q.    Is that Barrientos' photo spread, the one he was asked to

21    identify?   Correct?

22    A.    Yes.   Mr. Barrientos was shown this photo lineup.

23    Q.    Okay.   And this one, 65 is Cortinas; correct (indicating)?

24    A.    Correct.

11:23 25    Q.    Okay.   This photograph in Exhibit 66, Mr. Barrientos.   The

1    fourth -- the fifth one is Mr. Castaneda; correct?

2    A.   It is.  But it is -- you got a -- it is hard to see; but

3    it is Mr. Castaneda.

4    Q.   Where did you get that photograph?

11:24  5    A.   That photograph was from the drivers license query that I

6    conducted to obtain the driver's license, if he had one.  And

7    he did, so that's the photo that it came from.

8    Q.   That was your choice to use that photograph on this photo

9    spread; correct?

11:24 10    A.   That's how I conduct all my photo spreads, from driver's

11    license queries.

12    Q.   Okay.

13    A.   It has the same background.  It gives me a variety of

14    individuals to choose from that are similar.  In order not to

11:24 15    be prejudice towards an individual you have to have similar

16    background.  You don't want to have five photos and the suspect

17    in a black background.

18    Q.   The same thing with this photograph here; right, it is a

19    license photo?

11:24 20    A.   It is a drivers license photo is what it is.

21    Q.   Okay, sir.  Thank you.  I'm going to finish up with you,

22    sir.  I don't want to keep you.

23         Every interview you conducted with Cortinas, Mr. Cortinas

24    and Mr. Barrientos, every single one of them were conducted,

11:25 25    but not preceded with an oath; correct?

```
 1              MR. GYIRES:  Objection, Your Honor, relevance.

 2              THE COURT:  Where are you going, counselor?

 3              MR. MARTINEZ:  I can tell you the relevance.

 4              THE COURT:  Why don't you-all approach.

 5              (ON-THE-RECORD BENCH CONFERENCE, TO WIT:)

 6              MR. MARTINEZ:  In the courtroom he didn't identify

 7    him.

 8              THE COURT:  Uh-huh (yes).

 9              MR. MARTINEZ:  There presumably he did.

10              THE COURT:  Uh-huh (yes).

11              MR. MARTINEZ:  The reason I want to make the

12    difference is that he could very well be lying to the officers

13    because there was no oath.  There is no consequences.

14              MR. GYIRES:  That's for the witness.

15              THE COURT:  Mr. Martinez, it doesn't matter whether

16    there was an oath or not.  It is a crime to lie to federal

17    officers in an investigation.  That's what 1001 is, so it makes

18    no difference whether there is an oath or not.

19              MR. MARTINEZ:  Yes, true, ma'am.

20              THE COURT:  And the consequences are the same.

21              MR. GYIRES:  And the questions are more appropriate

22    for the cooperators.  Not for this witness.

23              MR. MARTINEZ:  Your Honor, there would be a

24    difference.

25              THE COURT:  The problem is you are asking this
```

1    witness to speculate why the people would have lied and if they

2    were lying at the time of the interview.

3            MR. MARTINEZ:  No.  I'm not going to ask that

4    question.

11:26  5            THE COURT:  You are.  You're making it based on his

6    speculation.

7            MR. MARTINEZ:  Okay.  I understand that would be

8    improper if I --

9            THE COURT:  Uh-huh (yes).

11:26 10            MR. MARTINEZ:  But I'm not going to ask that next

11    question.  I'm just going to ask was an oath given to him, yes

12    or no?  And, yes, I agree with you the consequences might be --

13            THE COURT:  I think that whether there is an oath or

14    not is irrelevant.  The objection is sustained.

11:26 15            MR. MARTINEZ:  Okay.  Okay.

16            THE COURT:  Okay.

17            (BENCH CONFERENCE CONCLUDED.)

18            THE COURT:  Proceed.

19            MR. MARTINEZ:  I have nothing further.  Thank you.

11:26 20            THE COURT:  Okay.  Mr. Gyires.

21                    REDIRECT EXAMINATION

22    Q.   (BY MR. GYIRES)  Do phone records tell you the nicknames

23    of the people that they are subscribed to?

24    A.   No, sir.

11:27 25    Q.   I'm showing you part of Government's Exhibit 75.  Do you

1    recognize this (indicating)?

2    A.    Yes.   That's the subscriber information that I obtained

3    from Sprint.

4    Q.    For which phone number?

11:27 5    A.    For (859) 669-9842.

6          COURT REPORTER:   Say the number again.   (859)?

7          THE WITNESS:   (859) 669-9842.

8    Q.    (BY MR. GYIRES)   Do you remember which subject that was on

9    the chart?  I can show it to you.

11:28 10    A.    That was Jorge Lopez, A/K/A Pajaro, --

11    Q.    The chart with Luis Castaneda?

12    A.    -- Luis Castaneda.

13          THE COURT:   One at a time.

14    A.    Mr. Castaneda.

11:28 15    Q.    (BY MR. GYIRES)   Can you read what it says on the bottom

16    of that page two?

17    A.    The very bottom?

18    Q.    Yes, the first sentence of the bottom paragraph.

19    A.    "Search results indicate one or more of the numbers listed

11:28 20    on the above reference may belong to Boost, a Sprint Prepaid

21    Phone Service."

22    Q.    What does that mean?

23    A.    That means that this phone company has a subsidiary phone

24    company that uses their service.  Boost is another telephone

11:29 25    company that uses their service.  And with Boost it is prepaid.

1    You don't have to provide your name, date of birth, social

2    security number, address like you do when you do a post paid

3    like telephone service.

4    Q.    Are those accounts prepaid?

11:29  5    A.    I can't recall, sir.  I would have to look at the

6    documents.

7    Q.    Let me show you the document again (indicating).

8    A.    Can you zoom out, please?

9    Q.    (Complied.)

11:29 10    A.    It is prepaid.

11    Q.    Do these records indicate the length of the activation of

12    any phone?

13    A.    Yes, they do.

14    Q.    Do you remember any of that information from this case?

11:30 15    A.    No, sir.  It would be on the records there.

16    Q.    Do you remember on this chart, Government's Exhibit 74,

17    what in the box that says Luis Castaneda with the six calls

18    made from the Castaneda box to Cortinas on the day of the

19    cocaine seizure, do you remember the times of the day that

11:30 20    those six calls were made?

21    A.    No, sir.  Again, it would be in the --

22    Q.    If you looked at the document, would you be able to find

23    it?

24    A.    Yes.

11:30 25             MR. GYIRES:  May I approach the witness, Your Honor?

| | |
|---|---|
| 1 | THE COURT:  You may.  Agent Gamez, is this going to |
| 2 | take a little bit of time? |
| 3 | THE WITNESS:  Yes, ma'am. |
| 4 | THE COURT:  We'll take a short break while he looks |
| 11:32  5 | at the numbers, and that way you can get something to drink. |
| 6 | (JURY OUT.) |
| 7 | THE COURT:  All right.  You cannot speak to any of |
| 8 | the attorneys while we're on break, not even to the government |
| 9 | attorneys.  Look for what you need.  Everybody else take a |
| 11:33  10 | break.  We'll be in recess. |
| 11 | (RECESS.) |
| 12 | THE COURT:  We are back on the record DR-10-CR-361; |
| 13 | United States of America vs. Luis Roel Castaneda.  All right. |
| 14 | All parties are present including the defendant and the witness |
| 11:57  15 | is still on the witness stand.  Did you find the information |
| 16 | that you needed? |
| 17 | THE WITNESS:  Yes, ma'am. |
| 18 | THE COURT:  We're ready for the jury? |
| 19 | MR. GYIRES:  Yes, Your Honor. |
| 11:57  20 | THE COURT:  Bring them in. |
| 21 | (JURY IN.) |
| 22 | THE COURT:  You may be seated.  You may proceed. |
| 23 | Q.   (BY MR. GYIRES)  Let me ask the question again.  Do you |
| 24 | know what time of day the phone calls between Castaneda's phone |
| 11:58  25 | and Cortinas' phone were made? |

1        MR. MARTINEZ:  I'm going to object, Your Honor.  I

2   understand the point; but by labeling it Castaneda's phone that

3   is an open question.

4        MR. GYIRES:  I'll rephrase it.

11:58   5        THE COURT:  All right.

6   Q.   (BY MR. GYIRES)  The Cataneda box and the Cortinas box on

7   your chart and the arrow that says how many times those two

8   phones were in contact, what time of day was that on February

9   24, 2008?

11:59  10   A.   I can't recall the exact time; but I did locate the times

11   on the records.

12   Q.   And what did it say?

13   A.   On the first call that came in on February 24th from the

14   last four numbers ending 9842 to Cortinas's phone was at

11:59  15   5:26:04 p.m.  The second call that came in was at 6:46:03 p.m.

16   The third -- excuse me I'm sorry.  Let me rephrase that.  The

17   first one was 5:26:04.  The second 6:36:03.  The third 6:36:40.

18   The fourth was 6:37:23 tenths of a second.  The fifth, 7:34:45.

19   And the last at 8:16:30.

12:00  20   Q.   Those were phone calls made from the box labeled

21   Castaneda, that phone to Cortinas' phone?

22   A.   Correct.

23   Q.   Let me also in relation to the phones records --

24        MR. GYIRES:  May I approach the witness to get the

12:00  25   records, Your Honor?

                     THE COURT:  You may.

1

2    Q.   (BY MR. GYIRES)  I'm showing you a portion of Government's

3    Exhibit 75.  I'm showing you the bottom paragraph which you

4    indicated earlier.  Can you read what it says about subscriber

5    information beginning with the second sentence?

6    A.   "Our office maintains subscriber information for Boost

7    accounts; but this information is often inaccurate or

8    incomplete as no identification is required when purchasing a

9    Boost phone."

10   Q.   Was the phone labeled "Castaneda," was that a Boost

11   prepaid phone?

12   A.   I would have to look at --

13   Q.   Can I show you a report to refresh your memory?

14        MR. GYIRES:  May I approach, Your Honor?

15        THE COURT:  You may.

16   Q.   (BY MR. GYIRES)  Let me know when you are finished looking

17   at it.

18             (WITNESS REVIEWS DOCUMENT.)

19   A.   Yes, sir.

20   Q.   Was it a Boost prepaid phone?

21   A.   According to Sprint, which I subscribed the very first

22   time, they returned it saying that it is a Boost prepaid phone.

23   Q.   So it is possible the subscriber information was not

24   correct when it says "Jorge Lopez"?

25   A.   Correct.

```
 1              MR. GYIRES:  May I approach the witness to retrieve
 2      the document, Your Honor?
 3              THE COURT:  You may.
 4      Q.   (BY MR. GYIRES)  Let me direct your attention one more one
 5      last time to the photo lineups that you arranged.  About, if
 6      you can estimate, how many photo lineups did you show Aurelio
 7      Cortinas in total?
 8      A.   In total?
 9      Q.   More than five?
10      A.   More than five.
11      Q.   More than 10?
12      A.   All together to try to identify Mr. Castaneda, or in total
13      of all the photo lineups?
14      Q.   Let's just say in trying to identify Castaneda.
15      A.   About three photo lineups.
16      Q.   Who did you base the other lineups on?
17      A.   When I subscribed phone records from the 9842 number,
18      A/K/A Pajaro number it returned with other telephone numbers;
19      and I subpoenaed those and I came up with a name of "Jose
20      Castaneda."  At this point we don't know who Pajaro is.  It
21      could be anybody.  So I looked up Jose Castaneda in a driver's
22      license query, took that photo, placed it in a photo lineup,
23      brought it to Mr. Cortinas who identified --
24              MR. MARTINEZ:  I'm going to object, Your Honor, to
25      any identification stated by Cortinas is hearsay,
```

```
 1              MR. GYIRES:  It is not hearsay, Your Honor.  It is an
 2    exception.
 3              THE COURT:  How?
 4              MR. GYIRES:  It's --
 5              THE COURT:  Approach.
 6              (ON-THE-RECORD BENCH CONFERENCE, TO WIT:)
 7              THE COURT:  How is it not hearsay?
 8              MR. GYIRES:  Because it is a statement offered by a
 9    witness who testified, offered to rebut.
10              THE COURT:  SO why didn't you ask the witness who
11    testified?
12              MR. GYIRES:  I did.  But it is offered to rebut a
13    charge of fabrication or mistake.  I'll give you the Rule
14    number.
15              THE COURT:  Are you talking about the rule that I
16    told you yesterday in the 600 series?
17              MR. GYIRES:  No.  It's --
18              THE COURT:  Shoot.  Hearsay is under the 800s.
19              MR. GYIRES:  Yes.  I'll find the number.  It is
20    801(d)(1)(C).
21              THE COURT:  801?
22              MR. GYIRES:  Yes, Your Honor.
23              THE COURT:  A non-hearsay rule?
24              MR. GYIRES:  Correct.
25              THE COURT:  801(d)(C)?
```

| | |
|---|---|
| 1 | MR. GYIRES:  801(d)(1)(C). |
| 2 | THE COURT:  You're off, counsel. |
| 3 | MR. GYIRES:  Why? |
| 4 | THE COURT:  This is a declarant statement.  You don't |
| 12:07 5 | have the declarant on the stand.  It says "A prior statement of |
| 6 | a witness." |
| 7 | MR. GYIRES:  So it would only apply to -- |
| 8 | THE COURT:  Mr. Cortinas. |
| 9 | MR. GYIRES:  -- Mr. Cortinas?  Okay. |
| 12:07 10 | THE COURT:  So you can re-call -- |
| 11 | MR. GYIRES:  Then I'll only ask about how he arranged |
| 12 | the lineup.  I won't ask for what he said. |
| 13 | THE COURT:  Here is my question.  I have got to tell |
| 14 | you-all I don't know about this jury; but I'm grossly confused |
| 12:07 15 | at this point.  How many times did Mr. Cortinas look at a photo |
| 16 | lineup with this man's picture? |
| 17 | MR. GYIRES:  Just once. |
| 18 | MR. MARTINEZ:  No.  Three times. |
| 19 | THE COURT:  I don't think it is clear from the |
| 12:07 20 | testimony is what I'm saying.  So you-all better clarify, |
| 21 | because it is not very clear. |
| 22 | MR. GYIRES:  And that's what I was doing.  I wanted |
| 23 | to go through and say how many times.  I'll refrain from saying |
| 24 | what Cortinas said. |
| 12:08 25 | THE COURT:  He can't say what Cortinas said. |

```
 1              MR. GYIRES:  All I'm going to ask him -- right.  All
 2    I'm going to ask him is how, what he presented to him.
 3              THE COURT:  Mr. Gyires, you better be clearer in your
 4    questions and be a little bit clearer what you are asking from
12:08 5   the witness, because you are asking these open-ended questions
 6    and this witness is just kind of going off on his own and it is
 7    not real clear what is going on.
 8              MR. GYIRES:  I'll tell him to keep his answers short.
 9              THE COURT:  No.  Just ask him.
12:08 10             MR. GYIRES:  Okay.
11             THE COURT:  Just better phrase your questions.
12             MR. GYIRES:  Better questions.  Yes, Your Honor.
13             THE COURT:  Okay.
14             (BENCH CONFERENCE CONCLUDED.)
12:08 15  Q.   (BY MR. GYIRES)  Without telling me what Aurelio Cortinas
16    told you, how many photo lineup spreads did you show him in an
17    attempt to identify Castaneda?
18             THE COURT:  Let's back up for just a second.  Agent,
19    how many photo spreads did you show anybody with this
12:09 20  defendant's picture?
21             THE WITNESS:  With this defendant's picture --
22             THE COURT:  Uh-huh (yes).
23             THE WITNESS:  -- when he was cooperating?
24             THE COURT:  But to Mr. Cortinas.  How many photo
12:09 25  spreads did you show Mr. Cortinas with this defendant's
```

```
 1    picture?
 2              THE WITNESS:  Once.
 3              THE COURT:  Okay.  Proceed.
 4    Q.   (BY MR. GYIRES)  Did you show him other photo lineups that
 5    did not include Castaneda?
 6    A.   Yes.
 7    Q.   In an attempt to identify Castaneda?
 8    A.   Correct.
 9    Q.   And is that the same with Barrientos?
10    A.   Correct.
11    Q.   Whose photos were in the other photos?
12    A.   In the other photo lineups?
13    Q.   Yes.
14    A.   While we were attempting to identify Mr. Castaneda,
15    Pajaro?
16    Q.   Yes.
17    A.   Both of Mr. Castaneda's brothers, Eddie and Jose
18    Castaneda.
19              MR. GYIRES:  May I have one moment, Your Honor?
20              THE COURT:  You may.
21               (MR. GYIRES AND MR. GALDO CONFER.)
22              MR. GYIRES:  Pass the witness, Your Honor.
23              THE COURT:  Okay.  Mr. Martinez.
24              MR. MARTINEZ:  Thank you, Your Honor.
25                          RECROSS EXAMINATION
```

12:09   5
12:09  10
12:10  15
12:10  20
12:10  25

1    Q.    (BY MR. MARTINEZ)  Sir, I must have misunderstood, and it

2    could be my fault.  I thought you had said that Mr. Cortinas

3    was presented with three photo lineups to identify Mr.

4    Castaneda, not one.

12:11 5    A.    No, there's three; but there was three subjects that we

6    didn't know if it was A/K/A Pajaro, one being Jose, one being

7    Eddie, one being Mr. Castaneda here.  So there were three photo

8    lineups throughout the investigation, which the others were

9    identified as Jose Castaneda, a brother to Mr. Castaneda and

12:11 10    Eddie Castaneda, which is a brother to Mr. Castaneda and Mr.

11    Castaneda.

12    Q.    So you're saying you did only one photo ID that contained

13    my client?

14    A.    One photo ID that was shown to Mr. Cortinas, yes.

12:12 15    Q.    Okay.  You had a separate photo spread that had the photo

16    of Eddie Castaneda; correct?

17    A.    Yes.

18    Q.    And then you had a third photo lineup session or exercise

19    where you had Jose Castaneda; correct?

12:12 20    A.    Correct.

21    Q.    Three brothers?

22    A.    Three brothers.

23    Q.    And you were trying to clear up which one of the brothers

24    in your opinion was Pajaro; correct?

12:12 25    A.    At this point -- well, at the beginning we only had one

brother, which was Jose.  With that information I presented it

to Cortinas.  When he identified Mr. Castaneda's brother as

being Jose Castaneda, his brother, we now had a potential

relative to Pajaro.  So with that information I investigated

12:13  further and obtained a Luis Roel Castaneda, unknown at this

point if they were related or not, but brought up a DL photo

and presented it.

Q.    Let me ask you.  I'm not supposed to be asking narratives.

Let me ask you this:  When he was presented the lineup that

12:13  contained the photo of my client did it contain the photos in

that lineup spread of Eddie or Jose?

A.    No, sir.

Q.    Were they done at the same time on the same day?

A.    Jose Castaneda's photo lineup was done three months prior

12:13  to this Mr. Castaneda's, that photo lineup being presented to

Cortinas.

Q.    Okay.  Now you also mentioned that the subscriber

information on the phones may contain incorrect or inaccurate

information according to that disclosure in the records;

12:14  correct?

A.    I didn't say that; but the records do, yes.

Q.    Okay.  So when you did your chart we've already

established that a lot of the chart depends on the accuracy or

honesty of Cortinas and Barrientos; correct?

12:14  A.    Yes.

1   Q.   But even the objectively reliable information, the phone

2   numbers on that chart that comes from the phone company,

3   according to the statement, they may not even be accurate;

4   correct?

12:15 5   A.   The phone number is accurate.  What may not be accurate is

6   your subscriber information.  Presumably the name could be

7   somebody else's name, because you don't have to add

8   biographical information when you use a prepaid phone.  I've

9   seen documents with weird names; but they accept them.

12:15 10  Q.   Okay.  So when you put the chart, the boxes or the number

11  attributed to the subscriber, to Jorge Lopez, that may be

12  wrong?  Not from you.  But from the records?

13  A.   The subscriber name could be wrong, because again, it

14  could be a false name --

12:15 15  Q.   Okay.

16  A.   -- that the buyer is giving.

17  Q.   And if that's a possibility or the case, the charge

18  phone, not because you did it wrong, but because the records

19  could be incorrect; correct?

12:15 20  A.   The chart could be wrong, just the subscriber name.

21  Q.   So the whole chart depends on the accuracy of the

22  subscriber records which they're telling you may not be the

23  case; correct?

24  A.   Again, the subscriber name may not be accurate.

12:16 25  Q.   All right.  So your chart may use those records.  Your

1    chart is predicated on those records; correct?

2    A.    That and the fact of the two cooperating --

3    Q.    All right.

4    A.    -- defendants' statements.

12:16  5    Q.    I'm going to get to that.

6           THE COURT:  Let him finish his answer before

7    interrupting, Mr. Martinez.  You-all can't speak at the same

8    time.

9           MR. MARTINEZ:  Okay.  Excuse me.

12:16  10   Q.    (BY MR. MARTINEZ)  So for that chart to be accurate the

11   records have to be; correct?

12   A.    Yes.

13   Q.    The subscriber records.  And Barrientos and Cortinas have

14   to be accurate; correct?

12:16  15   A.    Correct.

16   Q.    All right.  Did you ever go and get the records from the

17   Boost, the Sprint prepaid service company?

18   A.    I can't recall if I did.  If I could see that report, I

19   could see.

12:17  20   Q.    Well, I'm just going to ask you if you recall it.  You

21   don't have to go through it again.

22   A.    Actually the way it works, now that you ask, Sprint

23   composed the subscriber information with the prepaid phone.

24   They got it from the other company.  Boost has the telephone

12:17  25   tolls.  So that Sprint doesn't get bombarded with thousands of

1    more calls from their database system, Boost holds those

2    telephone toll records, the incoming and outgoing information.

3    The subscriber, they both had subscribers; but at this type

4    query Sprint, they provided it to me.

12:17 5    Q.    So the records you have come from Sprint?

6    A.    Yes.

7    Q.    But you don't have the records that come from Boost?

8    A.    I don't believe I do.

9    Q.    Okay.  You heard in this case that there were some boats

12:18 10    that were used to transport drugs; is that correct?

11    A.    Correct.

12    Q.    Did you locate those boats?

13         MR. GYIRES:  Objection, Your Honor, outside the scope

14    of --

12:18 15         THE COURT:  Overruled.

16         MR. GYIRES:  -- what we've been talking about.

17         THE COURT:  Proceed.

18    Q.    (BY MR. MARTINEZ)  Did you locate those boats?

19    A.    Personally, or from the investigations were they located

12:18 20    by the case agents and the investigators?

21    Q.    That's correct.  Were they located maybe by not you, but

22    by somebody else?

23    A.    Yes.

24    Q.    Do you know if anybody checked the registration of who

12:18 25    owned the boats?

A.    Yes, they did.

Q.    Did any of the names come up to Castaneda, my client?

A.    No.

Q.    What about the warehouse that supposedly the drugs were found?  Did you check the registrant of the warehouse?

A.    Yes.

Q.    And did my name come out -- my client's name come out?

A.    No, it didn't.

Q.    All right.  A Freudian slip.  Did you talk, did any of your agents talk to any of the list of subscribers that you were able to locate on Sprint?

MR. GYIRES:  Objection, Your Honor, hearsay, relevance.

MR. MARTINEZ:  I'm not saying what they said.  I just said "Have you talked to them?"

THE COURT:  Have you talked to them, yes or no?

THE WITNESS:  No.

Q.    (BY MR. MARTINEZ)  Did you talk to the registrants that were listed as the owners of the boats?

A.    I can't answer for the other investigators because I wasn't with each and every one on every occasion; but as far as me, no.

Q.    Do you know if anybody else did?

A.    I don't know, sir.

Q.    How about the warehouse?  Did you know if anybody talked

1    to the listed owner of the warehouse?

2    A.    Yes, sir.  I did.

3              MR. MARTINEZ:  Thank you, sir.  I appreciate it.

4              THE COURT:  Okay.  Mr. Gyires.

12:20  5      MR. GYIRES:  Very briefly, Your Honor.

6                        FURTHER DIRECT EXAMINATION

7    Q.    (BY MR. GYIRES) The boats in the warehouse that you were

8    questioning those were in Del Rio; right?

9    A.    They were in Del Rio here.

12:20 10   Q.    And back to the chart, the way the chart describes the

11    phone numbers interacting, does it depend at all on the

12    nicknames associated with the phone number?

13    A.    Does it depend on them?

14    Q.    I mean the subscriber information.

12:20 15   A.    No, it does not.

16              MR. GYIRES:  Pass the witness.

17              THE COURT:  Mr. Martinez?

18              MR. MARTINEZ:  No questions, Your Honor.

19              THE COURT:  You may step down.  This is a good place

12:21 20   to break for lunch.  Remember all of my instructions.  You are

21    excused until 1:30.  You may be released.

22              (LUNCH RECESS.)

23              THE COURT:  We are on the record DR-10-CR-361; United

24    States of America vs. Luis Roel Castaneda.  All parties are

01:41 25   present including the defendant.

1        MR. MARTINEZ:  Yes, Your Honor.

2        THE COURT:  Okay.  And we are getting ready for the

3    last witness.  Let's bring the jury in.

4        (JURY IN.)

01:42 5        THE COURT:  You may be seated.  You may call your

6    next witness.

7        MR. GYIRES:  The government calls Agent William

8    Meholif.

9        (OATH ADMINISTERED.)

01:42 10        THE WITNESS:  I do.

11                    DIRECT EXAMINATION

12   Q.   (BY MR. GYIRES)  Can you please introduce yourself to the

13   jury.

14   A.   My name is William Meholif.  I'm a special agent with the

01:42 15   DEA.

16   Q.   How long have you been an agent?

17   A.   I've been with the Drug Enforcement Administration since

18   September 2007.

19   Q.   Can you tell us a little bit about your training?

01:42 20   A.   I completed 20 weeks of training at the DEA Academy in

21   Quantico, Virginia.

22   Q.   Where were you first stationed?

23   A.   The Cleveland resident office in Cleveland, Ohio.

24   Q.   When did you come to Eagle Pass?

01:42 25   A.   I arrived here in Eagle Pass in April of 2009.

1   Q.    What are your typical duties day to day?

2   A.    To enforce the narcotic laws of the United States, but

3   more specifically to enforce the Controlled Substances Act,

4   carry a firearm, execute warrants, make arrest for crimes

01:43   5   committed against the United States of America and to perform

6   other law enforcement duties as authorized by law.

7   Q.    Do you investigate drug trafficking organizations?

8   A.    Yes, sir.

9   Q.    In your capacity as an agent have you been able to debrief

01:43   10   and talk to individuals directly involved in drug trafficking?

11   A.    Yes, sir.

12   Q.    Have you become familiar with the practices that drug

13   trafficking organizations use to move drugs into and throughout

14   the United States?

01:43   15   A.    Yes, sir.

16   Q.    Based on your training and experience, tell us a little

17   bit about how narcotics come into the U.S.

18   A.    The best way I can describe, this is a typical situation.

19   Not all organizations are the same; but it is kind of like an

01:43   20   assembly line where everybody has a specific part or a specific

21   job to do down that assembly line.

22   Q.    Give us some specific examples of those parts.

23   A.    An example that would relate to this area would be

24   somebody's job would be to bring the drugs from the interior of

01:44   25   Mexico up to the Mexican/United States border.  Somebody's job

1    would be to transport the drugs across the border into the

2    United States.  Somebody's job then would be to transport the

3    drugs once it comes into America into somewhere into the

4    interior of the United States where it can be broken down more

01:44  5    like in San Antonio, Dallas, Houston, Chicago where the bulk

6    drugs can be broken down and it just keeps going down the

7    assembly line.

8    Q.   Why is there an assembly line consisting of different

9    people doing different little jobs?

01:44  10   A.   It is oftentimes done to thwart law enforcement because

11   when somebody gets arrested they don't know who had done, you

12   know two movements before in the assembly line or two movements

13   ahead in the assembly line.  It is a way so law enforcement

14   cannot identify other subjects.

01:44  15   Q.   What are some other ways that drug traffickers conceal

16   their identities?

17   A.   They often use prepaid phones, they use nicknames, fake

18   names or no names and just some other typical methods.

19   Q.   What about registrations of vehicles?

01:45  20   A.   Oftentimes when they register they'll register vehicles,

21   property, other utilities in a family member's name, in a

22   friend's name, in a wife's name to try to remove themselves

23   from being identified through documents.

24   Q.   How would you describe the structure and hierarchy of drug

01:45  25   trafficking organizations?

1    A.    It is kind of like a business where you have your leaders

2    at the top, and then the leaders have people who report to them

3    much like a business, like a chain of hierarchy.

4    Q.    Tell us how drugs come specifically across the border.

01:45  5    A.    There are multiple methods.  An example would be here in

6    this area it could be waded across by somebody walking across

7    the Rio Grande.  If it out in Arizona, it will get walked

8    across.  It can come across the port by the port of entry in a

9    concealment inside a vehicle.  They can be body carried where

01:46 10    somebody will strap it to them.  Narcotics can be swallowed and

11    they are internally carried across, and once they return to the

12    United States it can be passed that way.

13    Q.    Once the drugs get past the border what other obstacles

14    are there?

01:46 15    A.    Locally here they encounter Border Patrol.  They can get

16    stopped by Border Patrol or local police, and also they have to

17    get past the checkpoint to get into the interior of the United

18    States.

19    Q.    How do they get past the checkpoint?

01:46 20    A.    Oftentimes they will use concealment in vehicles.  They

21    will sometimes they will get around before the checkpoint and

22    actually walk around the checkpoint and have somebody pick them

23    up a few miles past the checkpoint.

24    Q.    How are narcotics generally packaged?

01:46 25    A.    They are packaged usually in kilogram quantities of

1    approximately 2.2 pounds, and they're oftentimes wrapped in,

2    tape and oftentimes they have masking agents inside the tape to

3    thwart narcotics dogs and law enforcement.

4    Q.    How are these people paid?

01:47 5    A.    They are paid by multiple methods.  Sometimes they are

6    paid on a salary basis by, you know, a few thousand dollars a

7    month and they are almost on call or on standby whenever the

8    organizations need them.  Sometimes they are paid per load

9    almost like an independent person, or oftentimes they are just

01:47 10    paid by their work.  If they work that day, they'll get paid

11    for their efforts.

12    Q.    Now let's talk about generally about the value of cocaine

13    specifically.  Describe where it might originate from.

14    A.    Cocaine is often produced in South America and the prices

01:48 15    range anywhere from $800 a kilogram to $8,000 a kilogram.  Once

16    the cocaine is moved into Mexico the price can range from

17    anywhere from $13,000 to $22,000, and once it gets into the

18    interior of the United States, for example, like Houston, it

19    can range anywhere from $17,000 to upwards of $27,000.  Those

01:48 20    are ranges.  It can be higher or it can be lower; but those are

21    just approximate ranges.

22    Q.    But the idea being the price goes up, if I understood

23    correctly, as it goes from South America into the United

24    States?

01:48 25    A.    Yes, sir.

```
 1   Q.   Explain the price of cocaine as it goes from being bulk to
 2   sold on the street.
 3   A.   Cocaine when the kilogram is usually purchased and it goes
 4   down the line individuals will often take the kilogram of
 5   cocaine and they'll break it down and they will put additives
 6   in there so they can make more of a profit.  And oftentimes
 7   approximately a gram, there's thousand grams to one kilogram.
 8   A gram can go, can range anywhere from $60 to over $100 for a
 9   gram.
10   Q.   What does that depend on?
11   A.   It depends on the location of where the drugs are being
12   sold.  It is cheaper here closer to the border; but as you go
13   further north oftentimes the price will increase.
14   Q.   What about the purity of the cocaine?
15   A.   The same thing.  Oftentimes here down on the border where
16   the purity is a lot higher; whereas, as you go further into the
17   United States the amount of additives in the cocaine are
18   greater and the purity goes down.
19   Q.   What is, say, a street level value for a kilogram of
20   cocaine?
21   A.   Ultimately the end user, a street value of a kilogram of
22   cocaine will go anywhere from approximately $60,000 to over
23   $100,000.  I've seen figures where in Washington D.C. is over
24   $145,000 at the end user.
25   Q.   So did you say about $800 per kilogram in South America
```

01:48  5
01:49  10
01:49  15
01:49  20
01:50  25

1    and then that can turn into $60,000 to $100,000 street level in

2    the United States?

3    A.    Yes, sir.

4         MR. GYIRES:  Pass the witness.

01:50  5         THE COURT:  Mr. Martinez.

6         MR. MARTINEZ:  I have no questions, Your Honor.

7         THE COURT:  You may step down.

8         MR. GYIRES:  The government rests, Your Honor.

9         THE COURT:  Okay.

01:50  10         MR. MARTINEZ:  I'm sorry, Your Honor.  I just wanted

11    to see if I could make a motion outside the presence of the

12    jury.

13         THE COURT:  I was just going to take care of that,

14    Mr. Martinez.

01:50  15         MR. MARTINEZ:  Okay.  Thank you, Your Honor.

16         THE COURT:  I was going to excuse the jury to go to

17    the jury deliberation room.  We just need to take care of some

18    matters here for just a moment, and I'm going to let you go to

19    the jury deliberation room.

01:50  20         (JURY OUT.)

21         THE COURT:  Go ahead.

22         MR. MARTINEZ:  Your Honor, at this time in the

23    presence the government and my client, I would respectfully

24    move for a judgment of acquittal, Your Honor, that the elements

01:51  25    of my client's participation in this case has not been proven

1    beyond a reasonable doubt.

2         The government offered several witnesses, the two fact

3    witnesses, Mr. Barrientos and Cortinas, neither one of which

4    couldn't make an in-court identification of my client.

01:51  5         In addition to that, Mr. Barrientos stated that even the

6    pretrial identification that it might have been my client,

7    could have been my client, and he wasn't clear about that.

8         And so that would be the basis of my objection, Your

9    Honor.  There's no evidence presented.  There's no fact

01:52  10   witnesses who identified my client.

11              THE COURT:  Okay.  Mr. Gyires.

12              MR. GYIRES:  First off there is obviously

13   overwhelming evidence of the conspiracy itself, and I don't

14   think that defense counsel is disputing that, and that an

01:52  15   individual by the name of Pajaro was involved in that

16   conspiracy, and his involvement was detailed by the two

17   cooperating defendants.

18         In terms of the identity of the defendant, there

19   are -- both witnesses were shown multiple photo lineups

01:52  20   involving dozens or many people and they both picked out the

21   same person.  That photo lineup matches the drivers license

22   which is in evidence that describes an individual by the name

23   of Luis Roel Castaneda with a birth date that matches Luis Roel

24   Castaneda with the same birth date in the U.S. Marshals booking

01:53  25   photo which is also in evidence.  So the jury I think can

1    definitely make the determination that those photo lineups are

2    reliable and that the photos are the defendant.

3              THE COURT:  Okay.  Rebuttal.

4              MR. MARTINEZ:  Your Honor, whatever happened in the

01:53  5    pretrial photo spread, the testimony in this court that the

6    jury heard was what was presented here.  And, yes, there was

7    witnesses who said that there was a pretrial identification;

8    but those were photographs depicting my client in 1997.  And

9    the witnesses, one in particular, Barrientos was not even sure

01:53 10   in that pretrial identification that it was my client in the

11   photograph.  He said it might have been him.

12        And as far as the other one, Mr. Cortinas, Mr. Cortinas

13   was making an identification, but when he made it in pre-trial;

14   but in court he didn't reaffirm that.  And he and both of them

01:54 15   said that the photograph was not misleading in any way.  It

16   looked like the booking photograph.

17        So to me the courtroom identification is what really

18   should count.  That's the evidence that the jury heard.  That's

19   the -- you know, if you rely on a pretrial identification in

01:54 20   this regard, the argument is that they haven't been ratified

21   here in court.  If they mean anything, the Court should count

22   that the jury never heard what he happened in those.  They are

23   not able to evaluate that.  I wasn't able to cross examine on

24   that.  Although I didn't ask these witnesses any questions, I

01:55 25   might have asked the witnesses who -- the witness who conducted

```
 1    the pretrial.  You know, what --

 2              THE COURT:  Mr. Martinez, are you talking about

 3    earlier not being able to cross examine the witness?

 4              MR. MARTINEZ:  No.  I'm talking about if the

 5    witnesses.  I'm talking about Barrientos and Cortinas.

 6              THE COURT:  You were allowed to cross examine them

 7    and you chose not to.

 8              MR. MARTINEZ:  Yes.  But if they had said that they

 9    identified my client, I would have had -- I would have cross

10    examined them.

11              THE COURT:  They did say they identified your client

12    off the lineup.

13              MR. MARTINEZ:  Right.  Right.  But what I'm saying is

14    at that point when they identified them no one really -- the

15    circumstances of that lineup was not before the Court.

16              THE COURT:  That doesn't mean you didn't have a

17    chance to cross examine them about it.

18              MR. MARTINEZ:  That's right.  That's right.  I'm not

19    saying that I didn't.

20              THE COURT:  But you argued that you weren't allowed

21    to cross examine.  That's not a true statement.

22              MR. MARTINEZ:  No, no, no, no.  I said I --

23              THE COURT:  You said you were not allowed.

24              MR. MARTINEZ:  Okay.  Okay.  No.  I was.

25              THE COURT:  Okay.
```

1          MR. MARTINEZ:  I chose not to, if I misstated that.

2          THE COURT:  Okay.

3          MR. MARTINEZ:  But the reason was because regardless

4     of what I did or didn't do, the jury didn't see the

01:56  5     circumstances of that.  It is the state's or the government's

6     burden to establish the case.  And I would ask the Court to

7     consider more the in-court identification that wasn't made and

8     that balances against whatever happened in the pretrial.  And

9     the reason is --

01:56  10          THE COURT:  How do you come to that conclusion, Mr.

11     Martinez?

12          MR. MARTINEZ:  Because a witness.

13          THE COURT:  But you are talking about credibility at

14     this point; right, how much weight the jury is going to give to

01:56  15     a particular identification?  Aren't you talking about the

16     weight?

17          MR. MARTINEZ:  That's part of it.

18          THE COURT:  Isn't that the job of the jury and not

19     the Court?

01:56  20          MR. MARTINEZ:  Well, absolutely.

21          THE COURT:  So you are asking me to make a

22     credibility finding on behalf of the jury, and I'm not going to

23     do that.

24          MR. MARTINEZ:  Well, it is not necessarily a credibility

01:56  25     finding.

363

1          THE COURT:  It is a weight, how much weight you are

2    going to give --

3          MR. MARTINEZ:  Okay.

4          THE COURT: -- to a particular piece of evidence.

01:56  5          MR. MARTINEZ:  But I guess it is not necessarily

6    credibility.  They may not have been lying pretrial.  They may

7    have been mistaken.  Having time to recollect what happened,

8    being in the courtroom, taking an oath when a judge is present

9    it could have been a more opportune or a better way to make an

01:57 10    identification than when you don't take the oath and you're

11    making it in a -- to me the courtroom has a say of sort of

12    bringing out --

13          THE COURT:  You're right, Mr. Martinez.  But that

14    doesn't take away from the -- I mean the fact that somebody

01:57 15    takes an oath or doesn't take an oath doesn't change the weight

16    to be given the evidence by the jury.  That is still the jury's

17    province.  Not the Court.

18        And there is nothing.  While the witnesses have to -- or

19    the government has to prove that the defendant is the

01:57 20    perpetrator of the crime or is the alleged perpetrator of the

21    crime, I should say, there is nothing that says it absolutely

22    requires an in-court identification for that to be the only

23    proof.  There is no requirement of that in law.  If that were

24    the case, why would there ever be any pretrial lineups?

01:58 25          MR. MARTINEZ:  No.  I see your point.

1           THE COURT:  I mean, isn't that the law?

2           MR. MARTINEZ:  Well, first of all, let me just say

3      one thing:  Barrientos' pretrial identification was not really

4      a pretrial identification, because he said it might have looked

01:58  5      like a Pajaro.

6           THE COURT:  That's what he said today.

7           MR. MARTINEZ:  Or could have.

8           THE COURT:  But --

9           MR. GYIRES:  That is up to the jury, Your Honor.

01:58  10           THE COURT:  Stop, Mr. Gyires.  It is not your turn.

11      He said that in court when he testified, that he wasn't sure.

12      That didn't come out that it happened at the time of the

13      pretrial identification.

14           MR. MARTINEZ:  Yes, it did, judge.  Well, --

01:58  15           THE COURT:  He testified today that he picked out the

16      person in the lineup that he thought was your client; but there

17      is no other evidence other than what he said in court today

18      that that was a hesitation at the time he made that pretrial

19      identification.

01:58  20           MR. MARTINEZ:  Well, maybe I heard it wrong; but

21      that's exactly what he said.  But when he said "I didn't pick

22      up, I didn't identify him in the identification" I thought he

23      was talking about at the time he made the identification.  Not

24      here in court.

01:59  25           THE COURT:  No.  I thought the pretrial evidence or

1    pretrial identification was he picked him out and even noted

2    "that is the person with the drugs."

3            MR. MARTINEZ:  I thought he had --

4            THE COURT:  There was one that says that on the

01:59 5    identification, the pretrial identification.

6            MR. MARTINEZ:  Well, the second one, Barrientos to me

7    I thought said "I picked him up, I picked him out as the one

8    that might have been a Pajaro."

9            THE COURT:  Right.  But there is nothing in the

01:59 10   pretrial identification that showed that hesitation until

11   today.  I think --

12           MR. MARTINEZ:  Right.

13           THE COURT:  -- he testified today.  But that doesn't

14   necessarily mean that he had that same hesitation at the time

01:59 15   that the pretrial identification was made.

16           MR. MARTINEZ:  It might have been that when I heard

17   it today he was referring back to the time of the

18   identification and maybe I heard it wrong.

19           THE COURT:  That's up to the jury to decide what he

01:59 20   meant.

21           MR. MARTINEZ:  Okay.  Well, that would be my basis,

22   Your Honor, is they have a pretrial identification that was

23   rebutted by, yes, it may go to the weight of the evidence.

24           THE COURT:  That goes to the jury then, doesn't it?

02:00 25           MR. MARTINEZ:  You know, I under a legal sufficiency

1      standard --

2              THE COURT:  There has to be sufficient evidence when

3      viewing the evidence in the light most favorable to the

4      government.  That's the standard on a Rule 29.

02:00  5          MR. MARTINEZ:  You know, I --

6              THE COURT:  Is that not the standard?

7              MR. MARTINEZ:  It is the standard; but I don't know

8      if that standard if the Court on appeal and yourself what that

9      standard --

02:00  10          THE COURT:  It is a sufficiency issue on appeal.

11             MR. MARTINEZ:  You know --

12             THE COURT:  It is a sufficiency issue.  It is

13     not -- it is whether I erred by not granting the Rule 29

14     because the evidence was insufficient.  But the standard that I

02:00  15     have to apply now is whether the evidence when viewed in the

16     light most favorable to the government there is sufficient

17     evidence to send the case to the jury.

18         Do I agree with you that the identification is problematic

19     in this case in terms of in court?  Yes.  Does that mean that

02:01  20     there is absolutely no evidence of identification such that the

21     case should not go to the jury?  No, I don't agree with you on

22     that.

23             MR. MARTINEZ:  And maybe I'm caught up with what used

24     to be in Texas the factual sufficiency; but I know you don't

02:01  25     have that here, not in Texas anymore; but --

1          THE COURT:  You're right.  Let's use federal law.

2          MR. MARTINEZ:  All right.  I just thought I had read

3    opinions about issues and this standard that there was some

4    weighing or balancing of the evidence by the Court.

02:01  5          THE COURT:  But there is in the sense that I'm

6    looking at the evidence; but I have got to look at it in the

7    light most favorable to the government.

8          MR. MARTINEZ:  Okay.  And if that standard you would

9    have a witness --

02:01  10         THE COURT:  When you look at the evidence in the

11   light most favorable to the government there is sufficient

12   evidence to let the jury make that decision, because what you

13   are arguing and what you are keying on is the credibility

14   issues.

02:01  15         MR. MARTINEZ:  Okay.

16         THE COURT:  And those credibility issues need to be

17   made by the jury.

18         MR. MARTINEZ:  And let's say the witness is credible,

19   has told the truth.  It is a witness who identified my client

02:02  20   in a pretrial setting.  That's the standard.  That's what you

21   have got to assume.  But in the court he can't make that

22   identification.

23         THE COURT:  That's not sufficient to eviscerate the

24   original identification, counselor.

02:02  25         MR. MARTINEZ:  Okay.  But I'm not claiming he's

1    necessarily lying.  You know, I'm just saying that he may have

2    just --

3                THE COURT:  No.  I'm saying I know what you are

4    saying.  You are saying it weighs against.  It totally undoes

02:02  5    the original identification.  It doesn't.  That's the weight to

6    the evidence that the jury has go to make that particular

7    finding.

8        What you're basically saying is if there is an equally

9    possible hypothesis, then you have to go with the defendant is

02:02 10    what I'm hearing you argue:  "Yes, they might have done a

11    pretrial identification that identified my client; but because

12    they couldn't do it in court, you weigh it.  Either one is

13    equally possible.  You go with my client."  That isn't the

14    standard on a Rule 29.  It is when you view the evidence in the

02:03 15    light most favorable to the government.

16                MR. MARTINEZ:  Okay.  I guess I interpreted "most

17    favorable to the government" as credibility; but it could just

18    be to the weight of the evidence.  No, he doesn't have to be

19    lying.  He could just say --

02:03 20                THE COURT:  Sure.

21                MR. MARTINEZ:  -- "I've changed mind."

22                THE COURT:  Exactly.  I mean it could very well be

23    that he is not lying.  But that's for the jury to decide,

24    whether he is lying or not.

02:03 25                MR. MARTINEZ:  All right.

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | THE COURT:  I'm just looking at the evidence under                     |
|       | 2  | that particular standard.  And the Court finds that under that         |
|       | 3  | standard is it on the edge?  Yes, you're probably right it is          |
|       | 4  | on the edge, Mr. Martinez; but I think there is still                  |
| 02:03 | 5  | sufficient when I apply that particular standard to at least           |
|       | 6  | let the case go to the jury and let the jury make that                 |
|       | 7  | decision.                                                              |
|       | 8  | MR. MARTINEZ:  All right, judge.                                       |
|       | 9  | THE COURT:  All right.  Mr. Martinez, talk to your                     |
| 02:03 | 10 | client again --                                                        |
|       | 11 | MR. MARTINEZ:  Yes, Your Honor.                                        |
|       | 12 | THE COURT: -- in terms of just making sure that he                     |
|       | 13 | doesn't want to and you have got a good, firm answer.  I know          |
|       | 14 | you have already been pretty firm about it the last few times         |
| 02:03 | 15 | that we've talked; but I always give them one last chance.             |
|       | 16 | MR. MARTINEZ:  And I'll let him affirm it on the                       |
|       | 17 | record.                                                                |
|       | 18 | THE COURT:  Okay.                                                      |
|       | 19 | (COUNSEL CONFERS WITH DEFENDANT.)                                      |
| 02:04 | 20 | MR. MARTINEZ:  Your Honor, he would like to just make                  |
|       | 21 | for the record, if the Court would allow it.                          |
|       | 22 | THE COURT:  Okay.  Go right ahead.                                     |
|       | 23 | MR. MARTINEZ:  Do you want me to ask him a question?                   |
|       | 24 | THE COURT:  Whatever you want.  Whatever you feel you                  |
| 02:04 | 25 | want to put on the record.  Your representation is fine if you         |

1    are --

2           MR. MARTINEZ:  Okay.  I have discussed it with my

3    client just now, judge, as you asked.  I have discussed it with

4    him on several occasions; and he has indicated, my client ha

02:04  5    indicated he'd prefer not to testify and he will relinquish his

6    right to testify.

7           THE COURT:  That's fine.  Okay.  Let me do this:

8    I've got the charge for you or the first draft, I should say.

9    Let me -- there are some changes that I can already make right

02:04 10   now because your client is not testifying.  That way we don't

11   have to worry about them in a minute.

12      We didn't have any objections to exhibits and I didn't

13   strike any testimony.  So I'm making some changes to a

14   highlighted portion, just so that you-all will know ahead of

02:05 15   time (indicating).  And we didn't have any character evidence.

16           MR. MARTINEZ:  That's right, Your Honor.

17           MR. GYIRES:  Correct.

18           THE COURT:  All right.  In terms of the "impeachment"

19   instructions, which ones do you-all want or need?  I know we

02:07 20   need the "accomplice testimony."  You don't have a confession,

21   so I don't need the "confession" instruction.  I don't have

22   "use of addictive drugs" evidence.

23           MR. MARTINEZ:  How about "prior inconsistent

24   statements"?

25           THE COURT:  Okay.  Yes, that is one of the

1    "impeachment" ones.

2             MR. MARTINEZ:  Okay.  And the "accomplice," you said

3    the "accomplice testimony"?

4             THE COURT:  The "accomplice" one is going to come in.

02:07  5    And then I think we had "experts."

6             MR. GYIRES:  We had one expert, yes, one expert at

7    the end.

8             THE COURT:  Okay.  Let me get these instructions in

9    where they go so that you can see (indicating).  Let me make

02:08  10    sure.  On the "accomplice" let me just make sure that -- I'm

11    making it plural, just so you know, since there were two.

12             MR. MARTINEZ:  Right.  I don't know if you want to

13    spell out the names.

14             THE COURT:  I don't normally do that.

02:09  15             MR. MARTINEZ:  Okay.

16             THE COURT:  Were both co-defendants in this case,

17    Mr. Gyires?

18             MR. GYIRES:  No, Your Honor.  Barrientos was not a

19    co-defendant.

02:10  20             THE COURT:  They were in separate indictments?

21             MR. GYIRES:  Wait.  Neither of them were

22    co-defendants.

23             THE COURT:  They were just alleged accomplices.

24             MR. GYIRES:  Separate.  Cortinas was indicted

02:10  25    separately all together.  Barrientos --

1          THE COURT:  The instruction says "named as

2     co-defendants."  Neither one of these were co-defendants in

3     this case?

4          MR. GYIRES:  Correct.

02:10   5          THE COURT:  Okay.  We have the "accomplice" one in

6     there.  Who is the expert, Mr. Gyires?

7          MR. GYIRES:  Bill Meholif, the last witness, the case

8     agent.

9          THE COURT:  On what?

02:11  10          MR. GYIRES:  I guess it can be interpreted as expert

11     testimony on the method and means of drug organizations.

12          THE COURT:  Okay.  Those three are now in there.

13     We've got the indictment in here.  And we have got Title 963.

14     Both counts are conspiracy counts; right?

02:12  15          MR. GYIRES:  Correct.

16          THE COURT:  Okay.  On the overall amount, is there

17     any -- I'm trying to think of the word -- any dispute as to the

18     amount?

19          MR. GYIRES:  Of the drugs, Your Honor?

02:15  20          THE COURT:  Uh-huh (yes).

21          MR. GYIRES:  No.  There is a written stipulation.

22          THE COURT:  So I'm going to leave it as an element as

23     opposed to doing a special interrogatory then, if it is not

24     really an issue in terms of the amount.

02:15  25          MR. GYIRES:  It is in the stipulation.

1          THE COURT:  That's fine.  We don't need an "aiding

2     and abetting"; right?

3          MR. GYIRES:  Correct, Your Honor.

4          THE COURT:  We don't have "willful indifference"?

02:17  5          MR. GYIRES:  Correct, Your Honor.

6          THE COURT:  Okay.  Mr. Martinez, I'm assuming you

7     want an "identification" instruction.

8          MR. MARTINEZ:  Yes, ma'am.  Thank you.

9          THE COURT:  Okay.  Do you need a "lesser included"?

02:18 10          MR. MARTINEZ:  What would be "lesser included"?

11          THE COURT:  I can't think of anything that would be a

12     "lesser included."

13          MR. GYIRES:  I can't either.

14          THE COURT:  There really isn't a lesser included.

02:18 15          MR. MARTINEZ:  A phone count; but --

16          THE COURT:  That's not a lesser included.

17          MR. MARTINEZ:  Okay.  I would remind you, judge, you

18     may want to put a 404(b) instruction.

19          THE COURT:  Yes, I've got that too.  That was going

02:18 20     to be my next one.

21          MR. MARTINEZ:  Okay.

22          THE COURT:  Okay.  The "identification" instruction

23     is now in.  I'm about to put in the "similar act" instruction.

24     Almost done here and you will have them (indicating).

02:22 25          Okay.  Everybody be sure and read the charge well.  Look

1    for grammatical issues.  Look for singular versus plural,

2    things of that nature.  And then we'll do the official, after

3    you have had a chance to read it, the official charge

4    conference of anything else that needs to be in there or needs

02:23  5    to be excluded or anything of that nature.

6            MR. GYIRES:  Your Honor, are the witnesses allowed to

7    be in the courtroom at this point?

8            THE COURT:  If we are not taking any more testimony,

9    yes.

02:25 10           MR. MARTINEZ:  May I be excused just to look at this

11   (indicating)?

12           THE COURT:  You may.  Mr. Gyires, you may also be

13   excused if you need to be.

14           MR. GYIRES:  Thank you, Your Honor.

02:25 15           (RECESS.)

16           THE COURT:  Okay.  You have had a chance to look at

17   the charge?

18           MR. GALDO:  Yes, Your Honor.

19           THE COURT:  Okay.  But did you-all look at the

02:41 20   highlighted portion?  Is everybody fine with the language of

21   the highlighted portion?

22           MR. MARTINEZ:  Yes, ma'am.

23           MR. GALDO:  Yes, Your Honor.

24           THE COURT:  Okay.  Then I'll delete the highlight.

02:41 25           MR. GALDO:  Your Honor.

1          THE COURT:  Yes, sir.

2          MR. GALDO:  If I may, on the bottom of page four

3   there is the language about "earlier statements of witnesses

4   not admitted into evidence to prove that the contents of those

02:41  5   statements are true."

6          THE COURT:  Uh-huh (yes).

7          MR. GALDO:  There were no prior statements used to

8   impeach witnesses and nothing was admitted.  The concern there

9   would be --

02:41  10          THE COURT:  This doesn't mean formal admission like

11   an exhibit.  It means the previous statements were not -- the

12   ones that the jury heard were not part of the evidence,

13   admitted into evidence is what that means.

14          MR. GALDO:  Your Honor, I don't even believe that

02:42  15   occurred at all.  I can't think of a single time when counsel

16   asked a witness --

17          THE COURT:  Then why do I need that whole prior

18   impeachment by prior inconsistencies if there was none?  Then

19   that instruction is totally irrelevant.

02:42  20          MR. GALDO:  Yes.  That's the government's position.

21          THE COURT:  Mr. Martinez?

22          MR. MARTINEZ:  The statement of a prior?  Like a

23   prior statement?

24          THE COURT:  You asked for prior the "prior

02:42  25   inconsistency --

1          MR. MARTINEZ:  Yes, Your Honor.

2          THE COURT:  -- impeachment" instruction.

3          MR. MARTINEZ:  Yes, ma'am.

4          THE COURT:  Apparently there wasn't any impeachment

02:42  5  by prior inconsistencies of any witness?

6          MR. MARTINEZ:  I was quite honestly, and I think that

7  the government is bringing that concern up, I was thinking of

8  the prior identification as being a statement.

9          THE COURT:  But it is not inconsistent, is it?

02:42 10          MR. MARTINEZ:  It might be.  It is a statement that

11  this guy --

12          THE COURT:  But actually this "prior inconsistency"

13  instruction doesn't apply to that because that is evidence that

14  was admitted as substantive evidence.  This is any prior

02:43 15  statement that was made that is not admitted as substantive

16  evidence, it was just brought in to show that --

17          MR. MARTINEZ:  I see.

18          THE COURT:  But the prior identification is

19  substantive evidence, so I can't instruct the jury to not

02:43 20  consider it as substantive evidence.

21          MR. MARTINEZ:  Okay.  Well, that's why I asked for

22  it.  He is exactly right, you know.

23          THE COURT:  Okay.

24          MR. MARTINEZ:  I actually thought it would apply; but

02:43 25  I see your point.

|   | 1 | THE COURT:  If it wasn't substantive evidence, yes, I |

         1          THE COURT:  If it wasn't substantive evidence, yes, I
         2     can see where that might be something that would need to be
         3     considered; but if it is substantive evidence, I can't tell the
         4     jury not to consider it as such.
02:43    5          MR. MARTINEZ:  Okay.  That's what I was trying to do.
         6          THE COURT:  Okay.  So do I take out that instruction
         7     all together then?
         8          MR. GALDO:  That would be the government's position,
         9     Your Honor.
02:43   10          THE COURT:  Mr. Martinez?
        11          MR. MARTINEZ:  Yes, Your Honor.
        12          THE COURT:  Okay.  Then let me get to that point and
        13     I will do so.  What else, Mr. Galdo?  You were -- is that the
        14     only?
02:44   15          MR. GALDO:  Yes, Your Honor.  That's all the
        16     government, the only issue the government would wish to raise.
        17          THE COURT:  Okay.  Mr. Martinez, did you have any
        18     objections or corrections to the instructions?
        19          MR. MARTINEZ:  No, ma'am, I don't.
02:44   20          THE COURT:  Okay.  I'm just making some spacing
        21     changes, nothing substantive other than I will take out the
        22     "prior inconsistency" instruction.  Just give me a moment here
        23     (indicating).  Mr. Gyires, who is doing your closing?
        24          MR. GYIRES:  I am, Your Honor.
02:45   25          THE COURT:  Okay.  You are doing both parts?

```
 1              MR. GYIRES:  Yes, Your Honor.
 2              THE COURT:  Right now I'm just asking counsel, both
 3    of you, give me a wish list in terms of time.  This doesn't
 4    mean I am going to give you-all all this time.  I'm just asking
 5    for a wish list.
 6              MR. MARTINEZ:  I'm not sure I understand.  I'm sorry,
 7    Your Honor.
 8              THE COURT:  I said I'm taking requests in terms of a
 9    wish list for how much time the parties want to argue.
10              MR. GYIRES:  Thirty total for the government would be
11    fine.
12              MR. MARTINEZ:  That's fine with me, Your Honor.
13              THE COURT:  An hour for both of you-all?
14              MR. GYIRES:  I don't think I'll take that long.  I
15    can cut it down.
16              THE COURT:  You are talking one defendant, two
17    counts, gentlemen.
18              MR. MARTINEZ:  We always think we are greater orators
19    than you might think.
20              THE COURT:  I beg your pardon?
21              MR. MARTINEZ:  We always tend to think we're greater
22    orators than you might think.
23              MR. GYIRES:  Twenty-five minutes?
24              MR. MARTINEZ:  I'll do 20 minutes.  I'll talk less
25    than they talk.  Because I think that's fine with me.  I'll
```

```
 1    take 20 minutes if they take 20 minutes.  That's fine.
 2              MR. GYIRES:  Deal.
 3              MR. MARTINEZ:  Well, she has --
 4              THE COURT:  I was going to say that's fine; but I
 5    usually give the government five minutes more than the defense
 6    because you have the burden of proof.  But if you are willing
 7    to do 20, Mr. Gyires, you are on for 20.
 8              MR. GYIRES:  Twenty-five would be nice.
 9              THE COURT:  You already said 20.
10              MR. GYIRES:  Then 20.
11              THE COURT:  Okay.
12              MR. GYIRES:  We'll make it work.
13              THE COURT:  All right.  How do you-all want your
14    time?  What kind of warnings do you-all want?
15              MR. MARTINEZ:  Five minutes, Your Honor, for me.
16              THE COURT:  You just want a five-minute warning?
17              MR. MARTINEZ:  Yes, ma'am.
18              THE COURT:  Okay.  For your first?
19              MR. GYIRES:  10 and 10.
20              THE COURT:  Okay.  But do you want a particular
21    warning at the end of?  Like do you want a two-minute warning
22    at eight minutes so that you know you only have two more at the
23    first part?
24              MR. GYIRES:  Yes, Your Honor.  And if I could change
25    it to 12 minutes and then eight minutes.  That's my final
```

1    answer.

2              THE COURT:  I'm sorry.  Say that again.

3              MR. GYIRES:  Twelve minutes and then eight minutes.

4              THE COURT:  Okay.

02:48  5        MR. GYIRES:  As in --

6              THE COURT:  Twelve the first part, eight the second

7    part.  And what kind of warnings do you want each time?

8              MR. GYIRES:  A three-minute warning both times would

9    be fine.

02:48 10             THE COURT:  A three-minute?

11             MR. GYIRES:  Yes, Your Honor.

12             THE COURT:  Okay.  I want both of you-all to hear,

13   listen for Mr. Maciel's voice.  He's the one that's going to be

14   giving you the warnings.

02:49 15        Okay.  We just had to add an "s" to the word "crime" and

16   things of that nature.  Does anybody want to quickly review the

17   charge before I print up the final copy?

18             MR. GYIRES:  Yes, Your Honor, I will very briefly.

19             THE COURT:  Okay.  And I can tell you what -- I will

02:49 20   give you a copy; but I'll also tell you what changes were made.

21        I took out the highlight obviously on page three.  That

22   paragraph that was highlighted, I took the highlight off.  On

23   page seven I just realigned seven and eight I realigned the

24   one, two, three and four or the first, second, third and fourth

02:49 25   in terms of the elements.  That is all I did.  I didn't change

1      the wording.

2          On page nine for the date instruction there were some

3      grammatical errors, because the instruction reads on a specific

4      date; and I changed it to a time period, because it is a time

02:50  5    period in the indictment.

6          On page 10 I needed to add the letter "s" to of the word

7      "crime," "the crimes charged" as opposed to "the crime

8      charged."

9          Ms. Green, this copy that I'm going to print up is for my

02:50 10   signature and that's the one we'll give copies to the attorneys

11     from.  Mr. Martinez, do you want a clean copy of the charge?

12     You can argue from it if you need to.

13              MR. MARTINEZ:  Whatever is best for you, judge.

14              THE COURT:  It is up to you.  If you are going to

02:50 15   show it or you are going to argue it or whatever, just let me

16     know and I'll give you a clean copy.

17              MR. MARTINEZ:  Okay, judge.  I would like a clean

18     copy.

19              MR. GYIRES:  Your Honor, the "prior inconsistent

02:50 20   statement" language is still in there.

21              THE COURT:  Oh, that's right.  Never mind, Ms. Green.

22     Get rid of that (indicating).  You're right.  The "prior

23     inconsistency"?

24              MR. GYIRES:  It starts on page four.

02:51 25            THE COURT:  Right.  "The testimony of a witness may

1    be discredited"?

2         MR. GYIRES:  Yes, Your Honor.  And the next

3    paragraph, "Earlier statements" --

4         THE COURT:  The next two paragraphs actually.

02:51 5    MR. GYIRES:  Yes.

6         THE COURT:  "Earlier statements," and then "If you

7    believe a witness has been discredited."

8         MR. GYIRES:  Yes, Your Honor.

9         THE COURT:  So it should go from "Your job is to

02:51 10   think about" to the next paragraph, "In this case the

11   government called as witnesses."

12        MR. GYIRES:  Yes, Your Honor.

13        THE COURT:  Then, Mr. Gyires, get rid of that copy

14   you just had.

02:51 15   MR. GYIRES:  (Nods affirmatively.)

16        THE COURT:  I'm going to print two clean copies

17   unsigned, one for Mr. Martinez and one for Mr. Gyires, and then

18   I'll print up my copy.

19             (FINAL JURY CHARGE DISTRIBUTED TO COUNSEL.)

02:53 20   THE COURT:  Okay.  Let's bring in the jury.

21             (JURY IN.)

22        THE COURT:  You may be seated.  Mr. Gyires, you may

23   proceed.

24        MR. GYIRES:  May it please the Court, counsel, ladies

02:54 25   and gentlemen of the jury.  My name is Marton Gyires and I

1    represent the United States along with Michael Galdo, and we

2    appreciate your patience throughout all of this.

3        The indictment in this case -- and, Your Honor, is the

4    ELMO working?  It should be.

02:54  5            THE COURT:  It should be.

6            MR. GYIRES:  Okay.  Thank you.  The indictment in

7    this case charges two counts.  One count is conspiracy to

8    import cocaine into the United States, and Count Two charges

9    conspiracy to possess with intent to distribute cocaine.

02:55  10        The judge will instruct you that conspiracy is an

11   agreement between two or more persons to join together to

12   accomplish some unlawful purpose.

13           MR. GYIRES:  Your Honor, I don't think it is

14   (indicating).

02:55  15           THE COURT:  You have to send to me.  Try that.

16           MR. GYIRES:  Yes, Your Honor.  I clicked "Send to

17   Court."

18           THE COURT:  Okay.  There it is (indicating).

19           MR. GYIRES:  Okay.  Thank you.  A conspiracy is a

02:55  20   sort of partnership in crime where each member becomes an agent

21   of every other member.  Really what that means for us is that

22   the defendant did not have -- as long as he took part in the

23   overall conspiracy to import cocaine and to possess it with

24   intent to distribute, then he's a member of that conspiracy.

02:56  25   He need not know about every part of the cocaine's trip as it

1    comes across the border into the United States.  He need not be

2    involved in every step of that conspiracy.  If he knowingly

3    possessed it and took part in some unlawful purpose regarding

4    that cocaine in Houston, then he's guilty of both counts.

02:56  5         Ladies and gentlemen, there's overwhelming evidence that

6    there was a cocaine conspiracy in this case.  We had witnesses

7    testify who explained the DPS trooper's stop of the

8    tractor/trailer on February 24, 2008, and the 140 kilograms of

9    cocaine found inside that flatbed trailer.

02:56 10         You heard testimony of the search of the warehouse up on

11   Highway 90 here in Del Rio, Texas and how that warehouse had

12   140 kilograms of cocaine inside, secretly inside a fishing

13   boat.

14         You heard testimony from two individuals who have pled

02:57 15   guilty on drug distribution charges and you heard their

16   testimony on how they are involved with this conspiracy.

17   There's clearly a conspiracy to possess cocaine and to import

18   cocaine.

19         There's also evidence in this case about the defendant's

02:57 20   involvement in this conspiracy.  You heard two men get up on

21   the witness stand and explain how Pajaro, Luis Roel Castaneda

22   was involved in the conspiracy, that he unloaded the cocaine in

23   Houston, helped set up a safe place to unload that cocaine and

24   was involved with making the tractor/trailers arrive at the

02:57 25   different locations so they could safely unload it.

1      Aurelio Cortinas, the first defendant saw Pajaro, the

2      defendant about 11 or 12 times, he said.  Barrientos, the

3      second man who took the witness stand, he said he saw Pajaro,

4      the defendant about 20 times.  And we'll get to the identity

02:58  5      issue in a little bit; but they saw him on numerous occasions

6      is what their testimony was.

7          There were phone records in this case linking a phone used

8      by the defendant to the two cooperating witnesses, the two

9      defendants -- I'm sorry -- the two witnesses who took the stand

02:58 10      and explained their part.  Those two drivers had phones; and

11      there were phone records that showed that Pajaro, the defendant

12      was using a phone subscribed to somebody else or a fake

13      name -- we don't know -- but subscribed to somebody other than

14      him.  He was using that phone, and on nine times on the date of

02:59 15      the arrest of Aurelio Cortinas he called Aurelio Cortinas.  The

16      times of those phone calls -- or it might have been six times.

17          The times were 5:26, 5:36, 6:36, 6:37, 7:34, 8:16 all in

18      the p.m.  That's a lot of phone calls, and that's a lot of

19      phone calls after Aurelio Cortinas was arrested.

02:59 20          Who is making those phone calls?  A reasonable inference

21      is that it is the defendant, Pajaro because his phone number,

22      Pajaro there was a name Pajaro in Aurelio Cortinas's phone

23      labeled "Pajaro," and that number called him those six times

24      after he was arrested.  That is Pajaro calling, asking where

02:59 25      the drugs are.  That's a reasonable inference, ladies and

1    gentlemen, that that's what happened.

2        Both drivers, tractor/trailer drivers said that the

3    organization routinely switched cell phones, routinely had

4    prepaid phones and routinely switched numbers and phones and

03:00  5    phone companies in order to conceal their identities.  Yes,

6    that phone number chart depends a lot on the word of the two

7    truck drivers.  And, yes, the identity of the defendant depends

8    on the two truck drivers.

9        Ladies and gentlemen, both men were shown multiple photo

03:00 10    lineups and both men picked out that photo as a person who

11    unloaded and received cocaine in Houston, Texas.  This person,

12    this photograph I'm showing you, Government's Exhibit 81 is a

13    driver's license belonging to Luis Roel Castaneda, and that's

14    on that license, with a date of birth of 08/24/1972.  Both

03:01 15    drivers picked that photo out of numerous lineups.  That photo

16    matched the photo on the lineup.  That is the driver's license

17    belonging to Luis Roel Castaneda.  That photo matches the

18    intake photo of the Defendant Luis Roel Castaneda, Pajaro.

19    These photos are the same person with the same birth date

03:02 20    (indicating).  The drivers were shown multiple lineups, ladies

21    and gentlemen, and that's who they picked out.

22        They didn't point to them in court.  You were able to

23    observe their demeanor.  You were able to observe if they

24    looked afraid.  You were able to observe if the defendant looks

03:02 25    like the pictures in these photographs.  This photograph shows

1   Luis Castaneda with a full head of hair in the pictures from

2   1998.

3        It is your job to discern and figure out the credibility

4   of the witnesses and whether or not you believe them.  If they

03:02  5   are telling the truth in these photo lineups that that man is

6   Pajaro, then that man is the Defendant Luis Castaneda, because

7   this matched the driver's license of Luis Castaneda with that

8   same birth date and the marshal's booking photo of Luis

9   Castaneda with the same birth date.

03:03  10       The question is do you believe that the cooperators, that

11  the defendants, that the drivers on the witness stand do you

12  believe they accurately picked out that photo from the photo

13  lineup?  Ladies and gentlemen, what are the chances that two

14  people who did not talk to each other about it picked out the

03:03  15  same person out of dozens of photographs, photographs which

16  included the defendant's brothers, photographs which included

17  many other people, two people picking out the same person

18  describing --

19             MR. MACIEL:  Three minutes.

03:03  20             MR. GYIRES:  Thank you -- describing his involvement

21  in the conspiracy the same way?  Both described his

22  participation in receiving the cocaine in Houston and finding

23  the place for it to be unloaded and unloading it himself.  They

24  were both paid by Luis Castaneda.  They both testified to that.

03:04  25  They received cash from him.

388

1          Cortinas, the first driver saw him 11 or 12 times.

2     Barrientos saw him 20 times.  Based on those numerous, numerous

3     interactions with the defendant they both picked him out of a

4     photo lineup.

03:04  5          It is your job to decide whether or not you believe them

6     and why they didn't point to him in court; but the photo

7     lineups speak for themselves.  This driver's license belongs to

8     the defendant (indicating), a defendant whose intent in this

9     case you can infer that he knows how to transport drugs, that

03:04 10     there is no mistake of identity, because he's been convicted in

11     2003 of possession with intent to distribute marijuana.

12          And we're asking you, ladies and gentlemen, to find a

13     verdict of guilty on both counts.  Because what are the chances

14     that two men pick the same person out of many, many people and

03:05 15     describe what he did the exact same way?  We're asking for a

16     guilty verdict on both counts because the identification is

17     proven beyond a reasonable doubt as is his involvement in the

18     conspiracy.  Thank you.

19               THE COURT:  Mr. Martinez.

03:05 20               MR. MARTINEZ:  If it please the Honorable Court, my

21     client Mr. Castaneda and the government.  What are the chances

22     that two individuals who purportedly made an accurate pretrial

23     identification will come into this courtroom and independently

24     say "I can't identify him"?  What are those chances?

03:06 25          Mr. Cortinas came up here and sat up there, got a good

1       look at him and said "I can't identify him, Pajaro."  He
2       supposedly met with him 11 or 12 times.  He supposedly got
3       money, drugs, whatever.  He would have identified him.  No
4       question about it.  "Oh, he cut his hair.  He looks different."
03:06  5  Well, he didn't say that.  He wasn't misled by the photos.
6           And incidentally, you have the booking photo.  He said,
7       Barrientos said "it looks like."  That is not confusing.  But
8       you prepared, government, the photo array and you chose to use
9       the '97 photo.  That's your problem.
03:07 10          The point is is he got up here and it if he had seen him
11      11 or 12 times, there's no question he would identify him.  So
12      the mistake of the witness or maybe even the lie comes not here
13      in this great courtroom with this great judge in front of a
14      great jury under oath.  It came at the pretrial.
03:07 15          Maybe he lied then.  Maybe he made a mistake then.  Maybe
16      he knew my client from a previous occasion.  Maybe someone
17      suggested it to him.  After all, there was three officers that
18      spoke to him, many others.  We don't know.
19          But all I can deal with and all you can deal with is what
03:07 20  happens in this courtroom, because you weren't there at the
21      pretrial.  No one got to question or view those circumstances.
22          But you were here.  This is all you have; and it is not
23      right and fair in my opinion to convict someone on the word of
24      someone, what he said months ago, no one got to see it.  And
03:08 25  the officers said he made an identification.  They said it.

1   But now they're saying "No, I didn't." No.  They're saying it

2   is not him.  Implicitly they are saying they made a mistake at

3   the earlier identification or that they lied, whatever it is.

4   They would have done it if they had seen him 11 or 12 times in

03:08  5   this courtroom.

6        Barrientos was even more emphatic.  He said "The photos

7   don't confuse me.  The booking photo looks like this photo.

8   I'm not confused."  And he gave him several occasions, the

9   prosecutor:  "Are you sure you can see?  Look over here."  He

03:08 10   asked him several times, several times.  And he confidently,

11   consistently without reservation said it is not -- "I can't

12   identify him."

13            THE COURT:  Mr. Martinez, --

14            MR. MARTINEZ:  Yes, ma'am.

03:09 15            THE COURT:  -- the podium.  You're in federal court.

16            MR. MARTINEZ:  I'm sorry.  "It is not him.  It is not

17   him."  So their only two witnesses in court could not identify

18   this man as being at the warehouse, giving money, receiving

19   drugs or anything.

03:09 20        And second, they can't say he was Pajaro either.  Okay.

21   That's the real witnesses, the only witnesses.

22        So the government is saying "Go ahead and convict him.

23   Forget about the presumption of innocence."  They're not saying

24   "Forget about the presumption of innocence"; but they are

03:09 25   saying "We've overcome the presumption of innocence."  They are

1    telling you "We have met our burden of proof."  They are

2    telling you "There is no reasonable doubt" when our two only

3    witnesses of any significance can't even identify him.

4                THE COURT:  Stay at the podium, Mr. Martinez.

03:10  5                MR. MARTINEZ:  Excuse me, Your Honor.

6                THE COURT:  That's fine.

7                MR. MARTINEZ:  We are relying instead on what was

8    said months ago, and you didn't see it.

9         Now at the time they made the pretrial identification they

03:10 10    are nervous.  They are scared.  They are confused.  They very

11    well may have known my client and his brothers.  Maybe they

12    chose "Maybe I'll get the credit.  Maybe I'll say something,

13    whether it is the truth or not.  And who knows?  Maybe I can

14    get credit for it."  In the case of Mr. Cortinas he already got

03:10 15    credit.

16         And remember this:  I don't think you could ever know what

17    they're going to say or when they said it is the truth.  They

18    were caught with dope.  On one case, 12 kilograms.  In the

19    other case, 164 kilograms essentially.  Remember though they

03:11 20    took other trips.  They were never punished for that either.

21         In the case of Mr. Barrientos his wife was caught.  She

22    wasn't punished, so they got more than just a reduced sentence.

23    They got a free pass on a lot of other loads and the wife got a

24    free pass; but nonetheless they stood up here and said it

03:11 25    wasn't him.

1              So you don't know why they made the pretrial

2        identification.  It could have been a lie.  It could have been

3        a mistake.  It could have been a rush to judgment.  Maybe they

4        confused him with his brothers.  Maybe they knew him from an

03:11   5        earlier point.  Maybe they were so scared they decided to go

6        ahead and try to get the credit.

7              All you can deal with is what is in this courtroom.  All I

8        can deal with is what is in this courtroom.  And you saw it.

9        It is unfair for me to try to project an image or cross examine

03:12  10        or review an issue or you evaluate something when you weren't

11        even there.

12              Now they tried to create a chart.  It depends on the two

13        witnesses.  Yet they drew conclusions, "Castaneda's phone."  It

14        wasn't Castaneda's phone.  Castaneda, A/K/A Pajaro.  You don't

03:12  15        know who the calls were made to.  All you know is the phones

16        were registered in someone's name.  And those records aren't

17        particularly accurate.  They never got the other records from

18        the Boost company and they are drawing conclusions and trying

19        to create some kind of chart as if that is evidence.  You know

03:12  20        better than that.

21              Then they try "Well, we'll go ahead and put in this prior

22        judgment."  Well, the instructions will tell you that doesn't

23        mean just because he sold marijuana in 2003, less than 50

24        kilos, means he did this crime.  That says that in the

03:12  25        instruction.

1        Why would they do it?  What issue could it possibly be

2   resolving?  But I'm hoping you are smart enough, and I know you

3   are, to read that instruction and say "I'm not going to convict

4   someone for something he has nothing to do with in this case."

03:13  5   And by the way, why are you trying to do that?  Aren't you the

6   government?  Why are you trying to do that?

7        Now they didn't bring the owner of the warehouse, the

8   owner of the trucks, the owner of the boats, the owners of the

9   phones.  What would they have said?  Who made the call?  Did I

03:13 10   make the calls?  I didn't make the call.  I gave the phone to

11   so and so.  You could have resolved that.  Just call those

12   guys, all the subscribers, all those owners.  They didn't talk

13   to the warehouse owner, according to one of the officers.  They

14   didn't call them.  What would they have said?

03:14 15        So the question is how could two men identify him?  I

16   don't know.  Somebody might have suggested it to them.  They

17   may have known my client.  They may be identifying him at the

18   time to protect somebody.  They may have been liars.  Maybe

19   they were both mistaken.  Maybe the only photo in the spread

03:14 20   was somebody that they knew from a previous occasion and that's

21   the only one they knew.  Maybe they were scared that they had

22   to identify someone.  I don't know.  Maybe they talked to each

23   other.  I have no idea.  But neither do you, and you can't

24   speculate on that.

03:14 25        All you know is what they said on that stand, what they

1    didn't say on the stand; and they didn't say my client was the

2    man at that warehouse.

3         Now the instructions are going to be given to you.  And it

4    says defined in the law "Don't substitute your own opinion for

03:14 5    what the law is."  You may not like drugs.  You may not like my

6    client.  You may not like that prior statement, that prior

7    record.  You may like those two witnesses.  You may like these

8    young men.  You may not like me.

9         The point is is what is the law?  Not what your opinion is

03:15 10    on drugs.  Not what your opinion is of anything else.  What is

11    the law and what is the evidence?  "Without prejudice or

12    sympathy.  Remember the promise that was made and the oath you

13    took."

14         Another thing, "An indictment is just an accusation."  He

03:15 15    is presumed to be innocence.  Can you ever rebut the

16    presumption with those two witnesses who might and you have to

17    rely on something that was said out of court?

18         "The law does not require the defendant to prove his

19    innocence or produce any evidence, and no inference can be

03:15 20    drawn from the fact that he didn't testify" can be used.

21         Who has the burden of proof?  The government has the

22    burden of proof.  Not the defendant.  The government.  And how

23    far?  Beyond a reasonable doubt.  Don't you think if your two

24    witnesses can't identify him and they're your only witnesses,

03:16 25    that is walking, talking, smelling, living, breathing

1    reasonable doubt?

2        And how heavy is that burden?  "It is a strict or heavy

3    burden."  Well, what exactly is it?  "Proof beyond a reasonable

4    doubt; therefore, is such proof of such a convincing character

03:16 5    that you would be willing to rely and act upon it without

6    hesitation in the most important of your affairs."

7        Those two witnesses and what they didn't say, what they

8    should have said is not elimination of reasonable doubt.  What

9    they said in pretrial and you not having a chance to hear it

03:16 10    does not, would not convince you to do things in the most

11    important of your affairs?  You would hesitate.  Of course you

12    would.  You don't know what really happened; but you know what

13    happened in this courtroom.

14        "Remember that the statements, objection, arguments made

03:16 15    by lawyers is not evidence."  That includes me.  That includes

16    them too.  "Well, the license has his name.  The name has his

17    name; therefore, he must have."  What do you say Mr.

18    Government?  What do you say about your two witnesses in this

19    courtroom not identifying him?  Explain that.  Don't ask why

03:17 20    would two people identify him in pretrial?  I don't know.  The

21    same police officers, the same techniques and tactics used

22    against them, the same fear that permeates these guys, the same

23    reliance on testimony where you catch people red handed and

24    offer them deals and hope that they convict someone who is

03:17 25    presumed innocent.

1          MR. GYIRES:  Object, Your Honor.

2          THE COURT:  What is the objection?

3          MR. GYIRES:  I wasn't in evidence.

4          THE COURT:  It is argument.  The jury will remember

03:17  5   the evidence as they heard it from the witness stand.

6          MR. MARTINEZ:  That's what happens when you rely on

7   people who get caught.  You don't believe the guy who got

8   caught with the dope and try to convict the guy who may never

9   have even been there.  You don't make deals with them.  What

03:18  10  they did is they got the deal.  You can't believe.  That is

11  what is going to happen when you assist somebody like that.

12  You are making a deal with the devil basically.

13         Now why didn't they just go on and say themselves?

14  Because time has passed.  And these people, I really believe

03:18  15  this and it is my opinion, so and it is not evidence, that this

16  courtroom and that oath, this you-all make a difference.  We're

17  not in the police station.  We're not crowded around by

18  officers asking questions.  We're not making deals.  It is the

19  courtroom, and I believe you affect what the witnesses say.

03:18  20  And it is here that is important.  And for your purposes I

21  don't see what else could be.

22         So the lawyers they are smart guys and I'm a smart guy.  I

23  think that they are smarter than I am; but it's not evidence.

24         Credibility, believability, ask the questions.  The judge

03:19  25  will give you what those questions are.

1      Look at this one:  If they were accomplices, and that's

2   what they are, the dismissal of some charges, receiving a

3   lesser sentence might affect their credibility.

4      "You should keep in mind that such testimony it always to

03:19  5   be received with caution and weighed with great care."  They

6   could be lying if they're working off deals, if they're

7   involved in the case that they're pointing the finger at on

8   someone else.  You may disregard everything they said pretrial,

9   during trial, in a restaurant, in a bar, anywhere, because they

03:19  10  are accomplices, if you choose to do that.

11     "You should never convict a defendant upon the unsupported

12  testimony of an alleged accomplice unless you believe that

13  testimony beyond a reasonable doubt.  The fact that the

14  accomplice has entered a plea of guilty to the offenses charged

03:20  15  is not evidence of guilt of any other person."  It is the kind

16  of witness the Court is telling you about.  Be careful.  All

17  the witnesses, you have to ask the credibility questions, and

18  you'll hear them; but with these witnesses be even more

19  careful, that's what they're telling you.

03:20  20     So when you look at this these are not the only

21  instruction; but these are the ones that I think you should

22  consider.

23     Identification testimony, like any other witness ask the

24  credibility questions, consider that they are accomplices and

03:20  25  ask yourself in addition is there adequate opportunity to

1    observe, the length of time they observed, what were the

2    prevailing conditions?

3              MR. MACIEL:  Five minutes.

4              MR. MARTINEZ:  What were the circumstances

03:20  5    surrounding the identification, the manner in which the witness

6    was presented and how he made the identification, the

7    opportunity he had to observe?  And you can consider that,

8    those circumstances and in saying the pretrial identification,

9    not only in itself suggested, not only in itself is

03:21  10    insufficient; but it bears very little weight when you compare

11    it to what happened in this courtroom under oath with these two

12    witnesses, with the same witnesses who purportedly made a valid

13    ID pretrial.  They didn't make it here.  And what they did

14    months ago with us not watching pales in comparison with what

03:21  15    they did here.  Thank you.

16              THE COURT:  Okay.  Mr. Gyires.

17              MR. GYIRES:  Ladies and gentlemen, the government did

18    not choose these witnesses.  We didn't choose who to put on the

19    witness stand.  The defendant chose the witnesses.  The

03:21  20    defendant chose Cortinas and Barrientos, the driver to testify

21    here.  Not the government.

22        Let there be no confusion.  You heard testimony that the

23    government promised those witnesses nothing in exchange for

24    their testimony.  They weren't promised anything.  I'm sure

03:22  25    maybe they hoped for something; but they weren't promised

1    anything.

2        You didn't see the tractor/trailer getting pulled over.

3    That happened outside of the courtroom.  You didn't see the

4    cocaine being transported.  That happened outside of the

03:22  5    courtroom.  A lot of the evidence you heard happened outside of

6    this courtroom.

7        Included in that evidence is what you are perfectly

8    allowed to look at is identification of the defendant that

9    happened outside of the courtroom.

03:22  10    There is no evidence whatsoever that the government

11    coerced them into who to point to.  In fact, several witnesses

12    testified that that did not happen.  They were not told who to

13    point to.  The only one saying that there is any coercion is

14    the defendant and his counsel through his counsel.

03:23  15    What are the chances that they came into this courtroom

16    and couldn't for whatever reason identify the defendant?

17    Maybe they're high.  You heard testimony that this was in

18    relation to the Gulf Cartel.  You have to decide if you think

19    they were afraid.  When they made those photo lineup

03:23  20    identifications they weren't in front of the defendant.  Those

21    are things you have to decide as you decide if you believe

22    their testimony beyond a reasonable doubt.

23        You don't have to believe their testimony beyond all

24    doubt.  That will be in the instructions as well.  Reasonable

03:23  25    doubt is not beyond all doubt.

1          Look at those photo lineups, look at the driver's license,
2     look at the booking photo and ask yourself if you believe the
3     testimony of the defendants?  It is up to you.  Is it
4     reasonable to believe that those photo lineups aren't accurate?
03:24 5     How is it possible that two people would identify the same man
6     out of dozens of individuals and describe what he did almost
7     identically without any evidence of coercion or someone telling
8     them who to point to?  It is not reasonable, ladies and
9     gentlemen.
03:24 10         Think of the details of the testimony of the witnesses in
11    assessing whether or not you believe them.  They explained why
12    they got involved, how they got involved, how they drove, where
13    the cocaine was stashed, where they went.  They identified
14    other things.  They recognized the warehouse where we ended up
03:24 15    finding 140 pounds of cocaine.  They turned out to be right
16    then.  They recognized tractor/trailers.  They turned out to be
17    right then.
18         Think about their testimony, the details and what they
19    recognized and what they saw, and then think about if it is
03:25 20    possible for two men to be mistaken when they're shown dozens
21    of photographs, for two men to describe in detail the
22    participation of the defendant in this conspiracy and that it
23    is in fact him.
24         There's no doubt that the defendant is the man in this
03:25 25    license and that he's the man in the booking photo and that

he's the man in that photo lineup.  That's who the witnesses
pointed to.

I can't tell you why they didn't point to the defendant in
the courtroom today; but that is up to you to decide.  You are
going to have to decide that.  What we have proven beyond a
reasonable doubt is that he's in this photograph and that he
was involved in this conspiracy and that he was identified by
the drivers.  And we're asking for a guilty verdict on both
counts, ladies and gentlemen, the only verdict that is
consistent with the evidence in this case.  Thank you.

THE COURT:  All right.  Members of the jury, these
are your final instructions:  In any jury trial there are in
effect two judges.  I am one of the judges.  The other is the
jury.  It is my duty to preside over the trial and to decide
what evidence is proper for your consideration.  It is also my
duty at the end of the trial to explain to you the rules of law
that you must follow and apply in arriving at your verdicts.

First I will give you some general instructions which
apply in every case, for example, instructions about the burden
of proof and how to judge the believability of witnesses.  Then
I will give you some specific rules of law about this
particular case, and finally I will explain to you the
procedures you should follow in your deliberations.

You as jurors are the judges of the facts; but in
determining what actually happened, that is, in reaching your

1    decisions as to the facts it is your sworn duty to follow all

2    of the rules of law as I explain them to you.  You have no

3    right to disregard or give special attention to any one

4    instruction or to question the wisdom or correctness of any

03:27  5    rule I may state to you.  You must not substitute or follow

6    your own notion or opinion as to what the law is or ought to

7    be.  It is your duty to apply the law as I explain it to you

8    regardless of the consequences.

9         It is also your duty to base your verdict solely upon the

03:28 10    evidence without prejudice or sympathy.  That was the promise

11    you made and the oath you took before being accepted by the

12    parties as jurors and they have the right to expect nothing

13    less.

14         The indictment or formal charge against the defendant is

03:28 15    not evidence of guilt.  Indeed the defendant is presumed by the

16    law to be innocent.  The law does not require the defendant to

17    prove his innocence or produce any evidence at all, and no

18    inference whatever may be drawn from a defendant's election not

19    to testify.

03:28 20         The government has the burden of proving the defendant's

21    guilt beyond a reasonable doubt; and if it fails to do so, you

22    must acquit the defendant.  While the government's burden of

23    proof is a strict or heavy burden, it is not necessary that the

24    defendant's guilt must be proved beyond all possible doubt.  It

03:28 25    is only required that the government's proof exclude any

1    reasonable doubt concerning a defendant's guilt.

2        A reasonable doubt is a doubt based upon reason and common

3    sense after careful and impartial consideration of all the

4    evidence in the case.  Proof beyond a reasonable doubt

03:29  5    therefore is proof of such a convincing character that you

6    would be willing to rely and act upon it without hesitation in

7    the most important of your own affairs.

8        As I told you earlier, it is your duty to determine the

9    facts.  In doing so you must consider only the evidence

03:29 10    presented during the trial including the sworn testimony of the

11    witnesses and the exhibits.

12        Remember that any statements, objections or arguments made

13    by the lawyers are not evidence.  The function of the lawyers

14    is to point out those things that are most significant or most

03:29 15    helpful to their side of the case and in so doing call your

16    attention to certain facts or inferences that might otherwise

17    escape your notice.  In the final analysis however, it is your

18    own recollection and interpretation of the evidence that

19    controls in the case.  What the lawyers say is not binding upon

03:29 20    you.

21        During the trial I sustained objections to certain

22    questions.  You must disregard those questions entirely.  Do

23    not speculate as to what the witness would have said if

24    permitted to answer the question.  Do not consider any

03:29 25    testimony or other evidence which may have been stricken in

reaching your decisions.  Your verdicts must be based solely on the legally admissible evidence and testimony.

Also do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case.  Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

While you should consider only the evidence, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.  In considering the evidence you may make deductions and reach conclusions which reason and common sense lead you to make, and you should not be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of one who asserts actual knowledge of a fact such as an eye witness.  "Circumstantial evidence" is proof of a chain of events and circumstances indicating that something is or is not a fact.  The law makes no distinction between the weight you may give to either direct other circumstantial evidence.

I remind you that it is your job to decide whether the government has proved the guilt of the defendant beyond a

1    reasonable doubt.  In doing so you must consider all of the

2    evidence.  This does not mean however that you must accept all

3    of the evidence as true or accurate.

4         You are the sole judges of the credibility or

03:31  5    believability of each witness and the weight to be given the

6    witness's testimony.  An important part of your job will be

7    making judgments about the testimony of the witnesses who

8    testified in this case.  You should decide whether you believe

9    all or any part of what each person had to say and how

03:31 10    important that testimony was.

11         In making that decision I suggest that you ask yourself a

12    few questions:  Did the person impress you as honest, did the

13    witness have any particular reason not to tell the truth, did

14    the witness have a personal interest in the outcome of the

03:31 15    case, did the witness have any relationship with either the

16    government or the defense, did the witness seem to have a good

17    memory, did the witness clearly see or hear the things about

18    which he testified, did the witness have the opportunity and

19    ability to understand the questions clearly and answer them

03:32 20    directly, did the witness's testimony differ from the testimony

21    of other witnesses?

22         These are a few of the considerations that will help you

23    determine the accuracy of what each witness said.  Your job is

24    to think about the testimony of each witness you heard and

03:32 25    decide how much you believe of what each witness had to say.

1          In this case the government called as witnesses alleged

2    accomplices with whom the government has entered into a plea

3    agreement providing for the dismissal of some charges and/or

4    lesser sentences than the accomplices otherwise would be

03:32 5    exposed to for the offense to which they pled guilty.  Such

6    plea bargaining, as it is called, has been approved as lawful

7    and proper and is expressly provided for in the rules of this

8    court.

9          An alleged accomplice, including one who has entered into

03:32 10    a plea agreement with the government, is not prohibited from

11    testifying.  On the contrary, the testimony of such a witness

12    may alone be of sufficient weight to sustain a verdict of

13    guilty.  You should keep in mind that such testimony is always

14    to be received with caution and weighed with great care.  You

03:33 15    should never convict a defendant upon the unsupported testimony

16    of an alleged accomplice unless you believe that testimony

17    beyond a reasonable doubt.  The fact that an accomplice has

18    entered a plea of guilty to the offense charged is not evidence

19    of the guilty of any other person.

03:33 20          During the trial you heard the testimony of William

21    Meholif -- did I say that right -- who has expressed opinions

22    concerning the method and means of narcotics trafficking.  If

23    scientific, technical or other specialized knowledge might

24    assist the jury in understanding the evidence or in determining

03:33 25    a fact in issue, a witness qualified by knowledge, skill,

1    experience, training or education may testify and state an

2    opinion concerning such matters.  Merely because such a witness

3    has expressed an opinion does not mean however that you must

4    accept this opinion.  You should judge such testimony like any

03:34  5    other testimony.  You may accept it or reject it and give it as

6    much weight as you think it deserves considering the witness's

7    education and experience, the soundness of the reasons given

8    for the opinion and all other evidence in the case.

9        You are here to decide whether the government has proved

03:34 10    beyond a reasonable doubt that the defendant is guilty of the

11    crimes charged.  The defendant is not on trial for any act,

12    conduct or offense not alleged in the indictment.  Neither are

13    you concerned with the guilt of any other person or persons not

14    on trial as a defendant in this case except as you are

03:34 15    otherwise instructed.

16        The indictment reads as follows, Count One:  Beginning on

17    or about August 1st, 2006, and lasting through on or about

18    February 29, 2008, in the Western District of Texas Defendant

19    Luis Roel Castaneda, also known as Pajaro (2), knowingly, and

03:34 20    intentionally combined, conspired, confederated and agreed with

21    each other and with others both known and unknown to the

22    Grand Jury to commit the following offense against the United

23    States:  To import into the United States from Mexico, a place

24    outside the United States, a controlled substance, which

03:35 25    offense involved five kilograms or more of a mixture or

1    substance containing a detectible amount of cocaine, a

2    Schedule II controlled substance, in violation of Title 21,

3    United States Code, Section 952(a) and 960(a)(1) and (b)(1)(B)

4    and in violation of Title 21, United States Code, Section 963.

03:35  5        Count Two:  Beginning on or about August 1st, 2006, and

6    lasting through on or about February 29, 2008, in the Western

7    District of Texas the Defendant Luis Roel Castaneda, also known

8    as Pajaro (2), knowingly and intentionally combined, conspired,

9    confederated and agreed with each other and with others both

03:35 10   known and unknown to the Grand Jury to commit the following

11   offense against the United States:  To possess with intent to

12   distribute a controlled substance, which offense involved five

13   kilograms or more of a mixture or substance containing a

14   detectible amount of cocaine, a Schedule II controlled

03:35 15   substance, in violation of Title 21, United States Code,

16   Sections 841(a)(1) and 841(b)(1)(A) and in violation of Title

17   21, United States Code, Section 846.

18        Title 21, United States Code, Sections 846 and 963 make it

19   separate crimes for anyone to conspire with someone else to

03:36 20   commit violations of certain controlled substances laws of the

21   United States.  In this case the defendant is charged in

22   Count One with conspiring to import a controlled substance from

23   Mexico to the United States.  The defendant is charged in Count

24   Two with conspiracy to possess with intent to distribute a

03:36 25   controlled substance.

1       A conspiracy is an agreement between two or more persons

2  to join together to accomplish some unlawful purpose.  It is a

3  kind of partnership in crime in which each member becomes the

4  agent of every other member.

03:36  5       For you to find the defendant guilty of the crime charged

6  in Count One you must be convinced that the government has

7  proved each of the following beyond a reasonable doubt:  First,

8  that two or more persons directly or indirectly reached an

9  agreement with at least one other person to import cocaine into

03:37 10  the United States; second, that the defendant knew of the

11  unlawful purpose of the agreement; third, that the defendant

12  joined in the agreement willfully, that is, with the intent to

13  further its unlawful purpose; and fourth, that the overall

14  scope of the conspiracy involved five kilograms or more of

03:37 15  cocaine.

16       For you to find the defendant guilty of the crime charged

17  in Count Two you must be convinced that the government has

18  proved each of the following beyond a reasonable doubt:  First,

19  that two or more persons directly or indirectly reached an

03:37 20  agreement with at least one other person to possess with intent

21  to distribute cocaine; second, that the defendant knew of the

22  unlawful purpose of the agreement; third, that the defendant

23  joined in the agreement willfully, that is, with the intent to

24  further its unlawful purpose; and fourth, that the overall

03:37 25  scope of the conspiracy involved five kilograms or more of

1    cocaine.

2        One may become a member of a conspiracy without knowing

3    all the details of the unlawful scheme or the identities of all

4    the other alleged conspirators.  If a defendant understands the

03:38  5    unlawful nature of a plan or scheme and knowingly and

6    intentionally joins in that plan or scheme on one occasion,

7    that is sufficient to convict him for conspiracy even though

8    the defendant had not participated before and even though the

9    defendant played only a minor part.

03:38 10        The government need not prove that the alleged

11    conspirators entered into any formal agreement nor that they

12    directly stated between themselves all the details of the

13    scheme.  Similarly, the government need not prove that all the

14    details of the scheme alleged in the indictment were actually

03:38 15    agreed upon or carried out nor must it prove that all of the

16    persons alleged to have been members of the conspiracy were

17    such or that the alleged conspirators actually succeeded in

18    accomplishing their unlawful objectives.

19        Mere presence at the scene of an event even with knowledge

03:38 20    that a crime is being committed or the mere fact that certain

21    persons may have associated with each other and may have

22    assembled together and discussed common aims and interests does

23    not necessarily establish proof of the existence of a

24    conspiracy.  Also a person who has no knowledge of a

03:38 25    conspiracy, but who happens to act in a way which advances some

purpose of a conspiracy does not thereby become a conspirator.
While mere presence at the scene of a crime or close
association with another who is involved in a crime is not
sufficient in itself to support a conviction, such presence or
association is a factor which the jury may consider along with
other evidence in reaching its verdict.

"Importation" means to bring into the United States from a
place outside of the United States.  "To possess with intent to
distribute" simply means to possess with intent to deliver or
transfer possession of a controlled substance to another person
with or without any financial interest in the transaction.

The word "knowingly," as that term has been used from time
to time in these instructions, means that the act was done
voluntarily and intentionally, not because of mistake or
accident.

You will note that the indictment charges that the
offenses were committed during a specified time period.  The
government does not have to prove that the crimes were
committed during that exact time period so long as the
government proves beyond a reasonable doubt that the defendant
committed the crimes on dates reasonably near the date range in
the indictment.

In any criminal case the government must prove not only
the essential elements of the offense or offenses charged as
defined in these instructions, but must also prove of course

the identity of the defendant as the perpetrator of the alleged
offense or offenses.

In evaluating the identification testimony of a witness
you should consider all the factors already mentioned
concerning your assessment of the credibility of any witness in
general and should also consider in particular whether the
witness had an adequate opportunity to observe the person in
question at the time or times about which the witness
testified.  You may consider in that regard such matters as the
length of time the witness had to observe the person in
question, the prevailing conditions at that time in terms of
visibility or distance and the like and whether the witness had
known or observed the person at earlier time.

You may also consider the circumstances surrounding the
identification itself including, for example, the manner in
which the defendant was presented to the witness for
identification and the length of time that elapsed between the
incident in question and the next opportunity the witness had
to observe the defendant.

If after examining all of the testimony and evidence in
the case you have a reasonable doubt as to the identity of the
defendant as the perpetrator of the offenses charges, you must
find the defendant not guilty.

You have heard evidence of an act of the defendant which
may be similar to those charged in the indictment, but which

was committed on another occasion.  You must not consider any
of this evidence in deciding that the defendant committed the
acts charged in the indictment because the defendant was acting
in conformity with a character trait or because he had a
propensity to commit crimes.  However, you may consider this
evidence for other very limited purposes.  You may consider
evidence of the similar acts allegedly committed on other
occasions to determine whether the defendant had the state of
mind or intent necessary to commit the crime charged in the
indictment, whether the defendant had a motive or the
opportunity to commit the acts charged in the indictment or
whether the defendant acted according to a plan or in
preparation for the commission of a crime or whether the
defendant committed the acts for which he is on trial by
accident or mistake or to prove the identity of the defendant
as the alleged perpetrator of the charged offenses.

These are the limited purposes for which any evidence of
other similar acts may be considered.

A separate crime is charged in each indictment.  Each
count and the evidence pertaining to it should be considered
separately.  The fact that you may find the defendant guilty or
not guilty as to one of the crimes charged should not control
your verdict as to any other.

If the defendant is found guilty, it will be my duty to
decide what the punishment will be.  You should not be

concerned with punishment in any way.  It should not enter your consideration or discussion.

To reach a verdict on each count of the indictment, whether it is guilty or not guilty, all of you must agree. Your verdicts must be unanimous on each count of the indictment.  Your deliberations will be secret.  You will never have to explain your verdicts to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.

During your deliberations do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong; but do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning verdicts.

Remember at all times you are judges, judges of the facts. Your duty is to decide whether the government has proved the defendant guilty beyond a reasonable doubt.

When you go to the jury room the first thing that you should do is select one of your number as your foreperson who will help to guide your deliberations and will speak for you here in the courtroom.

          1          A form of verdict has been prepared for your convenience

          2      and is attached as the last page in your packet in this

          3      particular packet.  The foreperson will write the unanimous

          4      answer of the jury in the space provided for each count of the

03:43     5      indictment, either "guilty" or "not guilty."  At the conclusion

          6      of your deliberations the foreperson should date and sign the

          7      verdict form.

          8          If you need to communicate with me during your

          9      deliberations, the foreperson should write the message and give

03:44    10      it to the Court Security Officer on forms that will be provided

         11      to you.  I will either reply in writing or bring you back into

         12      the court to answer your message.  The forms will have a title

         13      of "Jury note number _____."  Please sequentially number

         14      the notes so that we can keep track of the questions and the

03:44    15      corresponding answers.  So, for example, if you send out

         16      question number one, I'm going to send back answer number one.

         17      If you send out question number two, I'm going to send answer

         18      number two, so that way we can pair up the answer and the

         19      questions.

03:44    20          Bear in mind that you are never to reveal to any person,

         21      not even to the Court, how the jury stands numerically or

         22      otherwise on each count of the indictment until after you have

         23      reached unanimous verdicts.

         24          You may now retire to deliberate.  Do not begin your

03:44    25      deliberations until you have received all of the exhibits.  I

1    caution that you should always follow the instructions I have

2    given you throughout your deliberations.  And then that last

3    page is the verdict form.

4        All right.  You may retire to deliberate.  We will get the

03:45  5    exhibits in to you in just a moment.

6                    (JURY OUT.)

7                    THE COURT:  Counsel, be sure to get with Ms. Green to

8    make sure you have all the appropriate exhibits to send in.

9                    MR. GYIRES:  Yes, Your Honor.

03:45 10                    (RECESS.)

11                    COURTROOM DEPUTY:  Judge, a question:  Everything

12    that was preadmitted goes back in?

13                    THE COURT:  If it was preadmitted means it was

14    admitted without you-all having to prove the --

03:51 15                    COURTROOM DEPUTY:  But even if they didn't show it,

16    it goes in?

17                    THE COURT:  It doesn't matter.  If it has been

18    admitted, it is admitted.  It is evidence.

19                    MR. GYIRES:  Okay.  So we can't withdraw any of them?

03:52 20    If we both agree that we don't want one to go back, can we take

21    it out?  It's not a big deal.

22                    MR. MARTINEZ:  It is my client's plea agreement.

23                    THE COURT:  Your client's plea agreement?

24                    MR. GYIRES:  And a photograph with the fingerprints

25    snuck in.

1              THE COURT:  Your client's plea agreement wasn't

2      preadmitted as an exhibit.

3              MR. GYIRES:  It was -- it was on the judgment of

4      conviction.

03:52  5       THE COURT:  Oh, you mean of the underlying?

6              MR. GYIRES:  Yes, of the --

7              THE COURT:  Yes, of the Laredo one.

8              MR. GYIRES:  -- prior conviction.

9              THE COURT:  Yes, the Laredo one.

03:52  10      MR. MARTINEZ:  I'm sorry.

11             MR. GYIRES:  That one was for --

12             THE COURT:  This is the one about the Laredo one.  It

13     is not --

14             MR. GYIRES:  And a fingerprint photo snuck in there

03:52  15   too that we didn't, forgot to --

16             MR. MARTINEZ:  Oh, I'm sorry.  I thought it was the

17     plea agreement in this case.

18             MR. GYIRES:  No, no, no, no.

19             THE COURT:  No.  No, it's not this case.  It's the

03:52  20   one from the Southern District.

21             MR. MARTINEZ:  Okay.  I see.

22             THE COURT:  So no.  I mean, if I preadmitted it, it

23     is evidence.

24             MR. GYIRES:  Okay.  That's fine.

03:52  25      MR. MARTINEZ:  Okay.

1          THE COURT:  All right.  Mr. Martinez and Mr. Gyires

2     in 69, there was no exhibit associated with 69; right?

3          MR. GYIRES:  That's the one that says "skipped"?

4          THE COURT:  That's the one that was skipped; right?

03:53 5          MR. GYIRES:  Yes.  Yes.

6          THE COURT:  Okay.  Let me just make clear for the

7     record these are the exhibits that were preadmitted:

8          MR. GYIRES:  Yes.

9          THE COURT:  1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13,

03:53 10    14, 15 through 19, 20 through 28, 29, 30, 31, 32, 33, 34, 35,

11    36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46 through 50, 51

12    through 52, 61, 62, 63, 64, 65, 66, 67, 68, 70.  71 was not

13    preadmitted and it was never admitted.  74.  75, 80 and 81.

14    And I think there was an 82 as well.

03:54 15         MR. GYIRES:  Correct.

16         COURTROOM DEPUTY:  Good to go.

17         (RECESS.)

18         (JURY OUT.)

19         THE COURT:  This is DR-10-CR-361; United States of

05:11 20    America vs. Luis Roel Castaneda.  All parties are present

21    including the defendant.  We have jury note number one.  And

22    frankly, I'm not real sure what the answer will be.

23      "Under what terms was Mr. Castaneda brought into custody?

24    Was it because of the key number two witnesses?"  Which frankly

05:12 25    is irrelevant and was not even brought up.

419

1           MR. GYIRES:  Because of what?

2           THE COURT:  "Was it because of the key number two

3     witnesses" plural?

4           MR. GYIRES:  I don't even know what that means.

05:12  5     THE COURT:  I'm assuming it is the accomplices.

6           MR. GYIRES:  Are they asking why we arrested him, I

7     guess?

8           THE COURT:  I guess.  But I can't answer that

9     because --

05:12 10     MR. GYIRES:  Right.

11          THE COURT:  -- that wasn't in evidence.

12          MR. GYIRES:  Yes.  I guess that's the answer.

13          THE COURT:  And it is not really relevant.

14          MR. MARTINEZ:  Well, I think what they might -- maybe

05:12 15    they're trying to say if that's the only evidence they have.

16          THE COURT:  I still can't answer it.  If they are

17    saying "Under what terms was Mr. Castaneda brought into

18    custody," there wasn't any evidence as to that, because that

19    would have been irrelevant.

05:12 20          MR. GYIRES:  That's fine, Your Honor.  That's seem --

21          THE COURT:  I mean, I don't know.

22          MR. GYIRES:  -- like a good answer to me.

23          THE COURT:  I have got to answer it somehow; but I'm

24    not sure how.

05:13 25          MR. GYIRES:  Maybe just it wasn't part of the

1    evidence.

2        THE COURT:  No.  I can't do that either.  What I can say

3    is "You have received all the evidence that you have that may

4    be relevant to a decision in this case" and then just leave it

05:13  5    at that and "Keep deliberating."

6            MR. GYIRES:  That's fine, Your Honor.

7            MR. MARTINEZ:  Yes, Your Honor.

8            THE COURT:  Do you-all want me to add something like

9    "Rely on your memories --

05:13  10            MR. MARTINEZ:  That's fine.

11            THE COURT:  -- "of the evidence" or "Rely on your" --

12            MR. MARTINEZ:  "You heard the evidence."

13            MR. GYIRES:  I don't even think that is necessary;

14    but that sounds fine.  I think maybe they probably just

05:14  15    aren't -- they heard testimony on how other people --

16            THE COURT:  I'm not going to speculate as to what --

17            MR. GYIRES:  Okay.

18            THE COURT:  -- the jury is thinking.

19            MR. GYIRES:  I just --

05:14  20            THE COURT:  I'm just not going to speculate.  I'm

21    just letting them know they've received all the evidence, that

22    they are to rely on their own memories of that evidence, keep

23    deliberating" is all I'm going to basically tell them.  Any

24    objections to that?

05:14  25            MR. MARTINEZ:  No, ma'am.

1          MR. GYIRES:  No, Your Honor.

2          THE COURT:  Okay.  So answered.  All right.  Here is

3     the answer and here is the question to file (indicating).

4     Okay.  You-all may be excused.

05:15 5          MR. GYIRES:  Thank you, Your Honor.

6          (RECESS.)

7          (JURY OUT.)

8          THE COURT:  For the record, we are on the record in

9     DR-10-CR-361; United States of America vs. Luis Roel Castaneda.

05:25 10   All parties are present including the defendant.  The jury

11    informs me they have a verdict.  Are you ready to receive the

12    verdict?

13         MR. GYIRES:  Yes, Your Honor.

14         MR. MARTINEZ:  Yes, Your Honor.

05:25 15        THE COURT:  Let's bring them in.  The foreperson

16    first.

17         (JURY IN.)

18         THE COURT:  You may be seated.  Mr. Foreman, I

19    understand that the jury has reached verdicts.  Is that

05:25 20   correct?

21         JURY FOREMAN:  Excuse me?

22         THE COURT:  You have reached verdicts?

23         JURY FOREMAN:  Yes, ma'am.

24         THE COURT:  Would you give the form to the Court

05:25 25   Security Officer.

1           FOREMAN:  (Complied.)

2           THE COURT:  All right.  Mr. Castaneda, would you

3    please rise.  Verdict of the jury, Count One:  As to Count of

4    the indictment, conspiracy to unlawfully import five kilograms

05:26  5    or more of cocaine into the United States from Mexico, we the

6    jurors find the Defendant Luis Roel Castaneda guilty.

7           Count Two:  As to Count Two of the indictment, conspiracy

8    to possess with intent to distribute five kilograms or more of

9    cocaine, we the jurors find the Defendant Luis Roel Castaneda

05:26 10    guilty.  Signed by the foreperson and dated March 16, 2011.

11           Anything further, Mr. Gyires?

12           MR. GYIRES:  No, Your Honor.

13           THE COURT:  Mr. Martinez?

14           MR> MARTINEZ:  No, ma'am.

05:27 15           THE COURT:  You may be seated for the moment.  Ms.

16    Green, would you post the verdict of the jury.

17           Ladies and gentlemen of the jury, that completes your

18    service on this case.  Other than with the attorneys, you are

19    free to talk to anyone that you would like to about your

05:27 20    experience; but you are not required to.  As I told you

21    earlier, you never have to explain your verdicts to anyone.

22    The only reason I say "except the attorneys," is because the

23    attorneys cannot contact you without Court permission, and

24    don't have my permission to contact you at this point.

05:27 25           If I should give them permission to contact, you again

1    have the option to talk to them or not.  That is always your

2    power and that's always your decision to make.

3        I want to thank you for your service.  You actually

4    fulfilled a Constitutional duty under the Sixth Amendment.

05:27 5    That's a jury of the defendant's peers.  So I thank you very

6    much for your service in this case.  We couldn't have proceeded

7    without you.

8        Ms. Ducharme needs to see you in the jury room.  So if you

9    will go to the jury room and she will give you some

05:27 10   documentation, and then from there you will be released.  You

11   may be excused.  Thank you.

12              (JURY OUT.)

13              THE COURT:  Mr. Castaneda, you have now been found

14   guilty of the charges in the indictment.  I am

05:28 15   tentatively -- this is a very tentative setting for your

16   sentencing.  I'm going to sentence you much sooner than this

17   date; but right now I'm setting it for November the 29th at

18   9:00 a.m.  Realistically however I'm Ordering that the

19   Probation Department complete your Report in no more than 120

05:28 20   days from today.  Once I get that Report then I will move your

21   sentencing date and time to an earlier date and time.  So

22   realistically I'll see you around the summer sometime as

23   opposed to November.  This is just so that I don't lose the

24   case from our system.

05:28 25        Anything further, Mr. Gyires?

424

        1               MR. GYIRES:  No, Your Honor.

        2               THE COURT:  Anything further, Mr. Martinez?

        3               MR. MARTINEZ:  You said 11/29?  I know it is a

        4       tentative date.

05:29   5               THE COURT:  Yes, 11/29 at 9:00 a.m.  and you should

        6       get an Order on this and you'll also get an Order re-setting it

        7       when we re-set it.

        8               MR. MARTINEZ:  Okay.  I guess you still do a

        9       Presentence Report.  I mean, there's enhancements here and

05:29  10       everything.

       11           THE COURT:  Everything will be done.  It will be a

       12       complete Presentence Report, and you'll get a chance to object

       13       to everything and you'll get your disclosure notices and all.

       14               MR. MARTINEZ:  Okay.  Thank you.

05:29  15               THE COURT:  Yes.  In fact, you'll probably get a call

       16       from the Probation Department so they can schedule an interview

       17       with you and your client.

       18               MR. MARTINEZ:  Okay.

       19               THE COURT:  Okay.  All right.  Anything else?

05:29  20               MR. GYIRES:  No, Your Honor.

       21               MR. MARTINEZ:  No, Your Honor.

       22               THE COURT:  We are adjourned until 9:30 in the

       23       morning.

       24               (ADJOURNED.)

       25                              oOo

1     UNITED STATES DISTRICT COURT        )

2     WESTERN DISTRICT OF TEXAS           )

3

4            I, ANNA RENKEN LAFRENZ, Official Court Reporter

5     for the United States District Court, Western District of

6     Texas, do hereby certify that the foregoing is a correct

7     transcript from the record of proceedings in the above matter.

8

9            Certified to by me this 30th day of December,

10    2011.

11

12

13

14                    /s/ Anna Renken Lafrenz, CSR, RPR

15                    ANNA RENKEN LAFRENZ, CSR, RPR
                      United States District Court
16                    Western District of Texas
                      111 E. Broadway
17                    Suite 214
                      Del Rio, Texas  78840
18
                      CSR #2343
19                    Expires 12/31/12

20

21

22

23

24
          #6640AR
25